# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS,<br>*Plaintiff*,<br>v.<br>HISPANIC SCHOLARSHIP FUND,<br>*Defendant*. | Case No. 1:25-cv-4207 |

# TIME-SENSITIVE MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
### (Relief Requested by January 30, 2026)

## INTRODUCTION

Racial and ethnic discrimination is "invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). The Reconstruction Congress understood this fact when it passed the Civil Rights Act of 1866, which bars racial and ethnic discrimination "in the making and enforcement of contracts against whites as well as nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 (1976); *Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613 (1987). Better known as §1981, this law guarantees all Americans the "same right" to contract, 42 U.S.C. §1981(a), protecting the "equal right of all persons" to "make and enforce contracts without respect to" race and ethnicity. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up); *Al-Khazraji,* 481 U.S. at 613.

The Hispanic Scholarship Fund is flouting §1981 by inking contracts with some ethnicities but not others. Under its "Hispanic Scholars Program," the Fund awards millions in scholarships and other benefits to thousands of applicants every year. In exchange for a shot at those benefits, contestants must license away their name, image, and likeness; hand over their personal data; agree to a class-action waiver; and more. But only applicants who "identify as being of Hispanic Heritage" are eligible to compete. App. (Appendix) 2. So the program bans Blacks, Asians, and Native Americans that aren't Hispanic. But it welcomes whites that are.

That rank discrimination was never lawful, even before *Harvard* held that colleges cannot use race in admissions. But if the Fund needed a reminder, *Harvard* reaffirms that eliminating racial and ethnic discrimination "means eliminating all of it." 600 U.S. at 206 (emphasis added). Ethnic discrimination is never benign: It always "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220 (cleaned up). Because the Fund's program discriminates on its face, it violates §1981. And because the American Alliance for Equal Rights has members who are being excluded from the program because of their ethnicity, it is entitled to relief.

1

Time is of the essence. The program's application opens January 5 and closes February 15, 2026—a short five-week window that's weeks away. App.2, 5. Because that deadline is fast approaching, the Alliance respectfully asks this Court to preliminarily enjoin the Fund from closing the application window or selecting scholars. If the Court needs more time to consider the preliminary injunction, the Alliance asks for the same relief via TRO. Because the party that loses this motion will likely appeal and seek interim relief, the Alliance respectfully asks this Court to rule **by January 30, 2026**.

## BACKGROUND

### A. The Hispanic Scholarship Fund runs the HSF Scholars Program, which is open only to Hispanics.

The Fund runs a program called the "HSF Scholars Program." Once a year, HSF selects 10,000 students from a pool of more than 69,000 applicants. *See* App.2, 69. Winners receive a range of prizes, from lucrative scholarships, to exclusive mentorship opportunities, to private seminars, and more. The application window opens around "January 1st and closes on February 15th." App.5; *accord* App.2.

Eligibility for the program turns on ethnicity. According to the Fund, the program "is open to students of all races that identify as being of Hispanic Heritage." App.2. That ethnic bar is a strict "eligibility requiremen[t]." App.2 (cleaned up). It's surrounded by three other plainly binding requirements: GPA, citizenship, and submitting a FAFSA or student-aid form. App.2

The Fund has repeatedly reiterated its ethnic bar. In an FAQs page on its website, the Fund asks: "Do I have to be Hispanic/Latino to apply?" App.8. The Fund's answer: "The HSF Scholar Program is open to students of all races that identify as being of Hispanic Heritage." App.8. Specifically, students "must be at least one-quarter Hispanic/Latino," App.8—a requirement that the Fund has widely advertised. *E.g.*, App.11 ("Requirements: … must be of Hispanic/Latino heritage."); Verif.-Compl. ¶19 (similar).

### B. The HSF Scholars Program involves contracts.

The program involves contracts: It offers applicants a chance at a scholarship if they agree to the Fund's terms, assent to its privacy policy, draft several essays, and sign a binding pledge. When

2

applicants first encounter the program's webpage, the Fund tells them to make an account and agree to its "Terms of Use and Privacy Policy." App.13. To move past the "Sign up" page, students must check a box, stating, "I agree to the Terms of Use and Privacy Policy." App.13. If an applicant fills in every piece of information on the sign-up page but does not check that box, the applicant cannot proceed: A prompt will appear, stating, "Must accept Terms of Service." App.15. And if an applicant doesn't agree to the Fund's terms and privacy policy, he cannot "Create [an] Account." App.15.

The terms of use are a contract. As the terms warn, "[t]his is a contract between you and HSF." App.18. The Fund's terms further stress that applicants "may use this Service"—*i.e.*, the Fund's application platform—"only if [they] form a binding contract with HSF." App.18. So if an applicant "do[es] not agree" to the Fund's terms, they "may not use the Service." App.18. Applicants who agree to the Fund's terms—and continue through the HSF Scholars application—must bargain away important rights. Most notably, applicants must grant the Fund a "worldwide license" to use their "name, voice, and/or likeness" whenever they post anything on the Fund's application and platform. App.24-25. Applicants must also "consent to the collection, use, and disclosure" of their personal data. App.27. And they must agree to a liability waiver, class-action waiver, jury-trial waiver, arbitration agreement, indemnification agreement, and choice-of-law clause. App.29-34.

The Fund's privacy policy is also a contract. Applicants must agree to let the Fund "collect" all the "information" they post on the Fund's website. App.39-40. Applicants also must let the Fund "retain any messages [that they] send through the Service." App.39. And they must let the Fund use their personal information for "marketing," "promot[ions]," "statistical analysis," or "shar[ing]" with "third-party business partners." App.39, 41.

After applicants finish the first part of the Fund's application process, they face still more obligations. At the second step, students "must submit" several essays. App.51. Those essays are "one

3

of the most important parts of [the] HSF application." App.63. And they play a "critical role" in deciding whom among the many applicants wins. *See* App.54; App.63.

Once a student submits his application, he then competes with thousands of other applicants for a shot at the Fund's limited pool of prizes. The Fund's evaluation process is "rigorous," and selection is highly "competitive." App.51, 69; *accord* Anderson-Decl. ¶11 (embedded link under "I have a really high GPA" tab). Every year the Fund's applications "greatly outnumber the awards [it has] available," App.51; Anderson-Decl. ¶11, as the Fund selects only 10,000 winners from "a highly competitive pool of over 69,000 applicants," App.69.

Getting selected as an HSF Scholar imposes even more obligations. After an applicant is dubbed an "HSF Scholar," he must agree to "the HSF Scholar pledge and survey." Anderson-Decl. ¶11 (embedded link under "What is the HSF Scholar pledge and survey" tab). When students sign that pledge, they must "commi[t]" to "giv[e] back to the Latino community." *Id.* And they must promise to complete several "online Scholar surveys" for the Fund. *Id.*

In exchange for all those obligations, HSF scholars are "eligible to receive a scholarship." App.2. The Fund awards "more than $30 million in Scholarships annually." App.2. And HSF Scholars can receive anywhere "from $500-$5,000." App.2.

HSF Scholars also gain access to the Fund's exclusive job bank. Once they become HSF Scholars, students receive "exclusive access to the HSF Insider," a proprietary platform that "shares invaluable information." App.2. That platform also offers students exclusive "internship and job opportunities with HSF corporate partners," App.2—a group that includes some of the Nation's largest companies, like JP Morgan Chase, Morgan Stanley, and Wells Fargo, App.75-76.

HSF Scholars can also access the Fund's "invaluable Scholar Support Services." App.2. Those services include "career coaching," "mentoring," "leadership development," and "wellness resources." App.71; Anderson-Decl. ¶15 (embedded link under "How much are HSF Scholarship awards" tab).

HSF Scholars are also eligible to attend exclusive scholar conferences, like the Fund's "STEM Summit," "Finance Conference," and "the Media, Sports & Entertainment Summit." App.2. And finally, HSF Scholars are "entitled to list [themselves] as a recipient" of the HSF scholarship on their resume. App.71; Anderson-Decl. ¶16 (embedded link under the "What are the non-financial benefits of being designated HSF Scholar" tab).

### C. The program's ethnic bar injures the Alliance's members.

The Alliance has members who are being harmed by the Fund's program, including Students A and B. App.79 ¶¶9-10. Students A and B are members of the Alliance. App.79 ¶¶9-11; 94 ¶14; 89 ¶13. Both are ready and able to apply for the program but cannot because of their ethnicity. App.79-80 ¶¶12-15; 93 ¶¶7-10; 88 ¶¶7-10.

Students A and B are "able" to apply to the HSF Scholars program because they satisfy all the eligibility criteria aside from the ethnic one. *Nuziard v. MBDA*, 721 F. Supp. 3d 431, 455-59 (N.D. Tex. 2024); *see* App.93 ¶7; 88 ¶7; 79 ¶13. Both students have GPAs that are well over the Fund's minimum requirements. App.2; *accord* App.93 ¶7; 88 ¶7; 79 ¶13. Both will be enrolled full time during the 2026-2027 academic year. App.2; *accord* App.93 ¶7; 88 ¶7; 79 ¶13. Both are U.S. citizens. App.2; *accord* App.93 ¶7; 88 ¶7; 79 ¶13. And both will submit a FAFSA or state-based financial aid form because they want to compete for the Fund's scholarships. App.2; *accord* App.93 ¶7; 88 ¶7; 79 ¶14.

But Students A and B can't apply to the HSF Scholars Program because they are not Hispanic. App.93 ¶8; 88 ¶8; 80 ¶15. Students A and B don't "identify as being of Hispanic Heritage." App.2. Student A identifies as Asian-American, and Student B identifies as non-Hispanic white. App.93 ¶8; 88 ¶8; 80 ¶15. So they cannot apply, compete, or be selected for the program—and all because they're the wrong ethnicity. App.93 ¶¶7-8; 88 ¶¶7-8; 80 ¶15.

Students A and B are "ready" to apply to the HSF Scholars program, once a court orders the Fund to stop discriminating. *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 20-21 (D.D.C. 2007); *see* App.93

5

¶¶9-10; 88 ¶9; 79 ¶14. Students A and B have reviewed the website and the application page. App.93 ¶9; 88 ¶9; 79 ¶14. They have also reviewed the HSF Scholar benefits, the award, and the eligibility requirements. App.93 ¶9; 88 ¶9; 79 ¶14. If a court ordered adequate relief, Students A and B would complete the application once it opens in January and submit it before the window closes on February 15, 2026. App.93 ¶9; 88 ¶9; 79 ¶14. As part of that process, Students A and B would also create an HSF account. App.93 ¶9; 88 ¶9; 79 ¶14. But because they are not currently eligible for the HSF Scholars program, they have not yet done so. App.93 ¶9; 88 ¶9.

## ARGUMENT

If this case proceeded on a normal course, the Fund would quickly open its application window on January 5 and close it on February 15—irreparably harming the Alliance by racially discriminating against its members and extinguishing their chance to compete in the program's 2026 cycle. The Alliance thus needs a preliminary injunction that bars the Fund from closing the window or picking winners until this case reaches final judgment. *E.g.*, *AAER v. Fearless Fund*, 103 F.4th 765, 780 (11th Cir. 2024) (holding that the Alliance was entitled to that relief); *AAER v. Fearless Fund*, Doc. 142, No. 1:23-cv-3424 (N.D. Ga. Aug. 26, 2024) (giving the Alliance that relief). If needed, this Court should enter a TRO awarding the same relief until it can resolve the Alliance's preliminary-injunction motion. *E.g.*, *AAER v. Fearless Fund*, 2023 WL 6520763, at *1 (11th Cir. Sept. 30) (temporarily granting the Alliance that relief).

### I. The Court should enter a preliminary injunction.

The Alliance is entitled to a preliminary injunction if it can satisfy four factors: likely success on the merits, likely irreparable harm, the balance of equities, and the public interest. *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 367 (D.D.C. 2018). The Alliance satisfies each factor, as the Eleventh Circuit held it did in *Fearless Fund*.

### A. The Alliance is likely to succeed on the merits.

The Fund's program violates §1981 because it's contractual and closed to all ethnicities but one. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts," 42 U.S.C. §1981(a), thus banning discrimination in contracting based on ethnicity, *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003); *accord Al-Khazraji,* 481 U.S. at 613. That ban extends to contracts between private parties. And the Fund's program is a contract that treats different races differently. So the program violates §1981—as courts have found in similar cases. *See, e.g.*, *Fearless Fund*, 103 F.4th at 775-79; *AAER v. Founders First*, 2024 WL 3625684, at *3-4 (N.D. Tex. July 31).

To start, §1981 covers the Fund. Section 1981 explicitly covers "nongovernmental" actors. 42 U.S.C. §1981(c); *accord Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975); *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986). It thus covers "private parties" like the Fund. *Fearless Fund*, 103 F.4th at 769; *accord Founders First*, 2024 WL 3625684, at *1 (applying §1981 to "a nonprofit organization").

Section 1981 also protects Students A and B. The statute prohibits discrimination "against, or in favor of, any" ethnicity. *Gratz*, 539 U.S. at 276 n.23; *accord Al-Khazraji,* 481 U.S. at 613. Titled "Equal rights under the law," Section 1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 768 (2019), thus protecting "the equal right of all persons … to make and enforce contracts without respect to" ethnicity. *Domino's Pizza, Inc.*, 546 U.S. at 474 (cleaned up); *accord Al-Khazraji,* 481 U.S. at 613. That protection covers Asian Americans like Student A and non-Hispanic whites like Student B. *Al-Khazraji,* 481 U.S. at 613; *McDonald*, 427 U.S. at 288.

The Fund's program involves "contract[s]." 42 U.S.C. §1981(a). Under §1981, a contract is "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Fearless*

7

*Fund*, 103 F.4th at 775. The Fund's program fits that definition: It offers applicants a chance at thousands in scholarships, in exchange for their name, image, and likeness; an arbitration agreement; a class-action waiver; an indemnification agreement; and more. *Supra* B; *Fearless Fund*, 103 F.4th at 775; *accord Founders First*, 2024 WL 3625684, at *3 n.7 (holding that a similar program was a contract because it "offer[ed] contestants a grant in exchange for their time [and] intellectual property" among other things). The program is also a contest, which makes the whole thing a contract. *E.g.*, *AAER v. Fearless Fund*, 2023 WL 6295121, at *4 (N.D. Ga. Sept. 27) (agreeing that "courts construe contests as offers for a unilateral contract"). "[N]early all jurisdictions have adopted the rule that contract law governs the sponsor-contestant relationship." *Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1104 (10th Cir. 2001) (cleaned up); *see also, e.g.*, *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910); *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994) ("answering an essay question" is "a contest"). "[P]erformance by the entrant of the act requested by the sponsor … constitutes an acceptance of an offer and forms a binding contract." *Hampton*, 247 F.3d at 1104 (cleaned up). So when an applicant fills out an application, completes the Fund's essays, and agrees to the Fund's terms, they perform "the act[s]" that the Fund "requested," which "constitutes an acceptance" of the Fund's "offer." *Id.* That agreement creates a "binding contract." *Id.*; *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8).

The Fund's program implicates a right that §1981 protects: the right to "*make … contracts.*" 42 U.S.C. §1981(a) (emphasis added). Under §1981, "a contractual relationship need not already exist." *Domino's*, 546 U.S. at 476. Section 1981 "protects the would-be contractor along with those who already have made contracts." *Id.* The law thus provides relief when discrimination "blocks the creation of a contractual relationship." *Id.* So defendants are liable "under §1981 when, for racially motivated reasons, they prevented individuals who 'sought to enter into contractual relationships' from doing so." *Id.* (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)).

8

The Fund is intentionally discriminating based on ethnicity. "[P]roof of a facially discriminatory … policy"—or even "a corporate decision maker's express[ed] desire to avoid" contracting with members of a certain ethnicity—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here, there's both. The program "facially discriminat[es]" against anyone who isn't Hispanic. *Id.*; *see supra* A. And the Fund's "corporate decision maker[s]" have expressed a "desire to avoid" contracting with non-Hispanics by broadcasting their anti-Hispanic bar online. *Amini*, 440 F.3d at 359; *see supra* A. The Alliance, therefore, "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

Because the Fund's program is a contract that discriminates, it violates §1981 because it cannot satisfy strict scrutiny. *See Gratz*, 539 U.S. at 276 n.23; *Harvard*, 600 U.S. at 198 n.2. The Supreme Court has identified "only two compelling interests that permit" racial discrimination: "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the other is "avoiding imminent and serious risks to human safety in prisons." *Harvard*, 600 U.S. at 207. Neither exists here. The Fund does not even ask applicants if they've suffered prior discrimination. And a generalized interest in "diversity" cannot be "elevated to the 'compelling' level." *Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998).

Nor is the program narrowly tailored to achieve any compelling interest. By barring all non-Hispanics from funding, the Fund's program imposes an illegal "quota," which is not narrowly tailored to any permissible goal. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507-08 (1989); *accord Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987). The program also uses ethnicity as a negative for non-Hispanics by treating ethnicity as a positive for Hispanics in a competitive, zero-sum process. *Harvard*, 600 U.S. at 218-19. And the Fund never "considered" or reasonably rejected strategies "other than" the program's scheme of "explicit racial classifications." *Parents Involved v. Seattle Sch. Dist. No. 1*, 551

9

U.S. 701, 735 (2007). The Fund thus cannot show "the most exact connection between justification and classification." *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986); *Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994).

### B. The Alliance's members will be irreparably harmed without interim relief.

Without interim relief, the Alliance and its members will suffer irreparable harms in the form of racial discrimination and the lost opportunity to compete. Courts have recognized these harms before, thus granting the Alliance preliminary relief in similar cases. *E.g.*, *Fearless Fund*, 103 F.4th at 780; *Founders First*, 2024 WL 3625684, at *5 & n.24.

To start, the harm inflicted by racial discrimination is itself irreparable. The Fund's program subjects Students A and B "to 'a discriminatory classification' that prevents [them] 'from competing on an equal footing.'" *Founders First*, 2024 WL 3625684, at *5 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 211 (1995)). That discrimination is "irreparable." *Fearless Fund*, 103 F.4th at 780; *Founders First*, 2024 WL 3625684, at *5. The hurt, stigma, and exclusion from being "judged by ancestry" cannot be reliably rectified by damages. *Harvard*, 600 U.S. at 220; *see, e.g.*, *Nuziard*, 2024 WL 965299, at *45.

Separately, Students A and B will forever lose their opportunity to apply for this round of the program. Such "lost opportunities" are irreparable because they are "difficult, if not impossible, to quantify" with damages. *MacGinnitie v. Hobbs Grp.*, 420 F.3d 1234, 1242 (11th Cir. 2005); *see Fearless Fund*, 103 F.4th at 780 ("each lost opportunity to enter [a] contest works an irreparable injury"); *Founders First*, 2024 WL 3625684, at *5 n.24 ("Lost opportunit[ies] … justify" a finding of "irreparable harm."). In fact, those injuries—"deprivations of temporally isolated opportunities"—are "exactly" the type of injuries "[t]hat preliminary injunctions are intended to relieve." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). And those injuries are especially stark for Student B, since the 2026 cycle is the last time he will be eligible to apply for the program. App.88 ¶7; *accord* App.2.

10

### C. The equitable factors favor the Alliance.

"[T]he balance of the equities weighs in the Alliance's favor." *Fearless Fund*, 103 F.4th at 780. Students A and B run the risk of "forever losing [their] chance to compete in an application process that is race neutral—a right that the Supreme Court has described as 'foundational,' 'fundamental,' 'transcendent,' and 'universal.'" *Founders First*, 2024 WL 3625684, at *5. And any compliance burden that the Fund might face "pales in comparison to the [Alliance's] interest in rooting out race discrimination in all its forms." *Fearless Fund*, 103 F.4th at 780. In any event, no one has a valid interest in giving or getting benefits based on ethnicity—especially through a program that likely violates federal law. *See id.* What's more, any harm to the Fund from a preliminary injunction can be reduced by "expedit[ing]" this case. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024).

### D. The public interest favors the Alliance.

"[T]he public interest" favors the Alliance too. *Fearless Fund*, 103 F.4th at 780. The public has a strong interest in "vindicating §1981's terms and aims by ensuring racial equality in contracting." *Id.*; *accord Founders First*, 2024 WL 3625684, at *5. But the public has no valid interest "in the perpetuation of unlawful" programs, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)—especially when those programs involve "discriminatory practices," *Founders First*, 2024 WL 3625684, at *5.

## II. If the Court needs more time to consider a preliminary injunction, then it should enter a TRO to preserve the status quo.

At a minimum, the Court should enter a TRO preventing the Fund from closing the application window or picking winners until further order of the Court. While granting that relief through a preliminary injunction would preserve the status quo until this Court enters final judgment, a TRO would last only until this Court resolves the preliminary-injunction motion. *See Hum. Touch DC v. Merriweather*, 2015 WL 12564162, at *2 (D.D.C. May 18). Apart from that difference in timeframe, the

11

standard for getting a TRO is essentially "the same" as the standard for getting a preliminary injunction. *Cook v. Trump*, 2025 WL 2607761, at *1 (D.D.C. Sept. 9). So the Alliance is entitled to that relief as well, for the same reasons identified above.

If anything, the standard for a TRO that simply gives the parties and the Court sufficient time to consider a preliminary injunction is easier. This Court can enter that relief even without assessing the likely merits. A court can issue "administrative" relief that "buys … time to deliberate" on a request for lengthier relief. *United States v. Texas*, 144 S.Ct. 797, 798 (2024) (Barrett, J., concurring) (discussing administrative stays); *accord Klay v. United Healthgrp.*, 376 F.3d 1092, 1099-1100 (11th Cir. 2004) (discussing administrative injunctions). This authority comes from the federal courts' inherent authority and the All Writs Act, 28 U.S.C. §1651, which allows courts to issue what are essentially "status quo orders." *V.N.A. of Greater Tift Cnty., Inc. v. Heckler*, 711 F.2d 1020, 1028 (11th Cir. 1983); *see, e.g.*, *Texas*, 144 S.Ct. at 798 (Barrett, J., concurring) (collecting cases); *Trump v. Thompson*, 2021 WL 5239098 (D.C. Cir. Nov. 11); *Trump v. Vance*, 2019 WL 5703884 (2d Cir. Oct. 7) (similar). Because these orders are needed to let the court "make an intelligent decision" on the broader request, they don't require the court to predict how it will resolve that request on "the merits." *Texas*, 144 S.Ct. at 799; *accord Klay*, 376 F.3d at 1100-01. They are appropriate if they are "calculated in the court's sound judgment to achieve the ends of justice," *Klay*, 376 F.3d at 1100, which a short pause on the Fund's arbitrary deadline for its private program would be.

## CONCLUSION

For all these reasons, the Alliance respectfully asks this Court to preliminarily enjoin the Fund from closing the application window or picking winners for its program until further order of this Court. Given the need to build in time for an emergency appeal, the Alliance respectfully asks this Court **to enter a TRO or rule on the preliminary injunction by January 30, 2026**.

Dated: December 3, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
  (D.D.C. No. 489651)
Cameron T. Norris
  (D.D.C. No. VA083)
  *Lead Counsel*
R. Gabriel Anderson
  (TX Bar #24129302)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com

*D.D.C. bar application forthcoming

*Attorneys for American Alliance for Equal Rights*

## Certificate of Service

On December 3, 2025, I mailed this motion, the Alliance's verified complaint, the accompanying declarations, and all other record materials to the Fund's registered agent. I mailed all these materials via first class mail, return receipt requested, to National Registered Agents Inc. and the Fund's general counsel at:

- **National Registered Agents, Inc.:** 1015 15th St. NW, Suite 1000, Washington, D.C., 20005; CT-StateCommunications@wolterskluwer.com

- **Araceli Ruano:** 1411 West 190 St., Suite 700, Gardena, California, 90248; aruano@hsf.net