# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN ALLIANCE FOR EQUAL RIGHTS**<br>3571 Far West Blvd #17<br>Austin, TX 78731,<br><div align="right">*Plaintiff*,</div><br>v.<br><br>**HISPANIC SCHOLARSHIP FUND**<br>1015 15th St. NW, Ste. 1000<br>Washington, D.C. 20005,<br><div align="right">*Defendant*.</div> | Case No. 1:25-cv-4207-LLA |

## AMENDED COMPLAINT

Plaintiff, the American Alliance for Equal Rights, brings this civil-rights action against the Hispanic Scholarship Fund under 42 U.S.C. §1981, Title VI, and state law. The Alliance seeks declaratory relief, injunctive relief, and nominal damages.

1.     Racial and ethnic discrimination are "invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). Ethnic discrimination is never benign: It always "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Id.* at 220 (cleaned up).

2.     Despite the *Harvard* decision, the Hispanic Scholarship Fund refuses to stop discriminating against students based on their ethnicity. Its HSF Scholars Program doesn't just consider ethnicity; it flatly bars all non-Hispanic students—black, white, Asian, or Arab. The program's first "Eligibility Requiremen[t]" makes clear that the program is "open" only to students who "identify as being of Hispanic Heritage." Lest anyone misunderstand, HSF defines just how "Hispanic" students must be: "students

must be at least one-quarter Hispanic/Latino (meaning: at least one of your grandparents must be Hispanic)."

3.      This ethnic discrimination is illegal. Because the HSF Scholars Program involves contracts, it violates §1981. And because HSF receives federal assistance, it violates Title VI too. Its ethnic discrimination also violates similar state laws.

4.      The American Alliance for Equal Rights has members who are being excluded from HSF's program because of their ethnicity. The Alliance is entitled to relief.

## PARTIES

5.      Plaintiff, the American Alliance for Equal Rights, is a nationwide membership organization dedicated to ending racial and ethnic classifications across America. This case falls squarely within the Alliance's mission. *E.g.*, *AAER v. Southwest Airlines*, 2024 WL 5012055, at *3 (N.D. Tex. Dec. 6) (Alliance's successful challenge to airline's Hispanics-only program); *AAER v. Fearless Fund*, 103 F.4th 765, 772 (11th Cir. 2024) (Alliance's successful challenge to nonprofit's blacks-only program); *AAER v. Founders First*, 2024 WL 3625684, at *2 (N.D. Tex. July 31) (Alliance's successful challenge to nonprofit's minorities-only program).

6.      The Alliance was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization the same year. The Alliance has more than 300 members, and its membership continues to grow.

7.    The Alliance's standing members are actively involved in the organization and its affairs. Members voluntarily join the Alliance. They pay dues. They receive regular updates. And they offer input on the Alliance's litigation and other activities. The Alliance represents its standing members in good faith.

8.    The Alliance has members who are ready and able to apply for HSF's program, including in the currently open 2026 cycle, but are ineligible to apply because of their ethnicity. Those members include Students A and B.

9.    The Hispanic Scholarship Fund calls itself "the nation's largest nonprofit organization supporting Hispanic American higher education." HSF provides "scholarships and support services" to "Hispanic American students" and "strives to help … Latino students attend college." HSF created and runs the HSF Scholars Program at issue here.

## JURISDICTION & VENUE

10.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" the Civil Rights Acts of 1866 and 1964, two federal laws.

11.    This Court has supplemental jurisdiction under 28 U.S.C. §1367 because the state-law claims share a common nucleus of operative fact with the federal claims. All turn on HSF's ethnic exclusion of the Alliance's members from the HSF Scholars Program.

12.    Venue is proper in this district because HSF "reside[s]" in Washington, D.C. 28 U.S.C. §1391(b)(1). A corporation is a resident of the State where it is incorporated, *Hazen v. NRA*, 101 F.2d 432, 437 (D.C. Cir. 1938); *Mylan Lab'ys v. Akzo*, 1990 WL 58466, at *12 n.14 (D.D.C. Mar. 27), and HSF is incorporated in D.C. According to HSF's most-recent federal tax form, D.C. is HSF's "State of legal domicile."

# FACTS
## I.    The Hispanic Scholarship Fund runs the HSF Scholars Program, which is open only to Hispanics.

13.    HSF's flagship program is the HSF Scholars Program. Every year, that program selects 10,000 students from a broad pool of more than 69,000 applicants. Winners receive a range of benefits and opportunities, including:

- Access to a full range of invaluable Scholar support services, including career services, mentorship, leadership development, knowledge building, and wellness training
- Assistance getting internships and full-time job opportunities from HSF's corporate partners, which span the biggest and best-known companies in the nation
- Eligibility to apply for all Scholar Conferences, including a National Leadership Conference; STEM Summit; Finance Conference; Sports, Media, & Entertainment Summit; and more
- Exclusive access to the HSF Insider, which shares invaluable information and career opportunities
- Eligibility to participate in HSF's Fund A Scholar Program, a platform that allows individuals to donate directly to HSF Scholars through HSF
- Eligibility to receive a scholarship of $500–$5,000 awarded directly to the student

14.    The program's application opens in January each year. The 2026 application—which is open now—went live as of 12:26 am EST on January 6 (9:26 pm PST on January 5).

15.     February 15 is the deadline to complete Phase I of the application. According to HSF, Phase I "will only tak[e] 30 minutes." This "initial application is a short questionnaire that should take no more than one hour to complete." To complete Phase I, applicants must give HSF detailed information about their demographics, education, career interests, future plans, campus involvement, family, finances, and other personal details. Applicants do not upload any supporting documents at Phase I. "The application that opens January 5 and closes on February 15," HSF explains, "does not require" letters of recommendation, transcripts, or any other external documents.

16.     In March, HSF evaluates the applications from Phase I and narrows them down to a group of finalists. Only the finalists are asked to complete Phase II of the application (the "Finalist Phase").

17.     In June, HSF preliminarily selects the winning HSF Scholars. From June to October, pre-selected scholars must submit the required documentation. It is not until this phase that students must submit documents to "confirm" their "financial aid information (including submission of the FAFSA, if applicable), GPA, the institution [they] will attend in the fall, [their] class level, and major or field of study." HSF Scholar designations are finalized at the end of October, after this verification process is complete.

18.     Students who receive the HSF Scholar designation are considered HSF Scholars throughout their entire academic careers. Even after their academic careers, HSF Scholars can access "a range of programs and support services" as "HSI Alumni"

"for life," and are "entitled to list … this honor in any future applications, profiles, or forums that recognize honors and awards."

19.    Students who are not selected for the program in a given cycle can apply again in future cycles. And students who do not apply in an earlier cycle can apply for the first time in a later cycle.

20.    Non-Hispanic students cannot apply, be selected, or equally compete for the HSF Scholar Program. According to HSF, the program "is open to students of all races that identify as being of Hispanic Heritage." That ethnic bar is a strict "Eligibility Requirement[]." In response to the FAQ "Do I have to be Hispanic/Latino to apply?", HSF answers that "students must be at least one-quarter Hispanic/Latino (meaning: at least one of your grandparents must be Hispanic)." Their family "must" be "from at least one of these countries: Argentina, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Portugal, El Salvador, Spain, Uruguay, or Venezuela."

21.    HSF strictly enforces the program's Hispanics-only requirement. On the program's Phase I application, HSF asks applicants, "Are you Hispanic or Latino?" The only two options are "Yes" and "No." If an applicant refuses to click yes or no, HSF bars her from applying until she answers this "required field."

22.    To make doubly sure, the application requires students to prove their Hispanic ancestry. As required fields that must be completed before the application can be

submitted, an applicant must reveal whether each of her parents is Hispanic. And an applicant must provide the same ethnic information for all four of her grandparents.

23.    In response to the FAQ "Does HSF verify the information applicants enter into the application," HSF responds "Yes." It stresses its right to "ensure the validity of the information entered in applications," which includes the required information about Hispanic ethnicity. During the verification process, HSF also makes pre-selected Scholars provide a headshot.

24.    In this litigation, HSF has conceded that, "since 1975," its program has given "scholarships and other benefits to students of Hispanic Heritage" and that the program is directed "exclusively to Hispanic students." In fact, the program has awarded more than $750 million to more than 65,000 students—not one of whom has ever been identified as non-Hispanic.

25.    As the Justice Department's Office of Legal Counsel recently found, "HSF Scholars … must identify as being of Hispanic Heritage." *Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. at 46 (Dec. 2, 2025) (cleaned up). "HSF confer[s] scholarships" and "make[s] awards" "based on race," and the organization's "function" is "race-based." *Id.* The federal government thus cannot provide unique benefits to HSF, like preferential access to FAFSA data, without satisfying strict scrutiny. *Id.* at 46-47.

26.    When this lawsuit was originally filed, HSF criticized it as "premature," arguing that the 2026 criteria were not yet available and suggesting that the 2026 criteria

might drop the Hispanic-ethnicity requirement. But now that the 2026 application is live, HSF has made no material change to the program—including the key discriminatory requirement that students must be Hispanic. Fully aware of OLC's opinion and the filing of this lawsuit in early December 2025, HSF has intentionally reaffirmed its commitment to outright excluding all non-Hispanics from the HSF Scholars Program.

27.    Aside from requiring students to be a quarter Hispanic, the program has few eligibility requirements.

28.    An applicant must be a current high-school senior, college student, or graduate student. High schoolers cannot "begin to apply for the HSF Scholar Program," according to HSF, until "January 5th" of their senior year.

29.    Though applicants can be any age, an applicant must plan to be a full-time student at an accredited, public or not-for-profit, four-year institution in the United States the following school year. Many students who attend community colleges are thus not eligible.

30.    High-school students must have a minimum cumulative GPA of 3.0 based on a 4.0 scale (or equivalent), and college and graduate students must have a minimum cumulative GPA of 2.5 on a 4.0 scale (or equivalent).

31.    An applicant must be a U.S. Citizen, permanent legal resident, or DACA recipient, though HSF is willing to consider applicants who "do not fall into any of [these] citizenship/residency categories."

32.    An applicant need not "come from a low-income family." "Financial need is not considered during the selection process."

33.    Applicants are also "not required" to "complete a Free Application for Federal Student Aid (FAFSA)." Students can apply "for the HSF Scholar designation" and "opt into the Fund A Scholar Program" without completing a FAFSA. Though a FAFSA is required if the applicant also wants to be "considered for … a scholarship award," the FAFSA need not be completed by the deadline for Phase I of the application (the part that is due on February 15). A FAFSA need not be submitted until October—after the applicant submits Phase I in February, is selected as a finalist in March, is pre-selected as an HSF Scholar in June, and is asked to verify her information by October.

## II.    The HSF Scholars Program involves many contracts.

34.    The HSF Scholars Program is contractual.

35.    Applicants cannot apply to the program unless they use HSF's online application portal. To access the portal, students must create an account with HSF. After creating an account, students can fill out Phase I of the application.

36.    Once they create an account and fill out Phase I of the application, students cannot submit the application unless they first click a checkbox that says "I agree" on a final page titled "Accept terms and conditions."

37.    One of the application's terms and conditions is that the student must "acknowledge and agree that all applications and submitted materials shall become the

property of HSF and will not be returned to you." This contract requires students to give HSF their intellectual-property, privacy, and other rights to the information in their applications and other materials in exchange for a chance to apply, be considered, and win.

38.    Another one of the application's mandatory terms and conditions is that the student must "acknowledge and agree that [he] ha[s] read the Terms of Use and Privacy Policy and agree to the terms and conditions therein." Both the terms of use and the privacy policy are contracts.

   a.    As HSF's terms of use warn, "this is a contract between you and HSF" that "gives you specific legal rights." *Terms of Use Agreement*, HSF (last modified Dec. 14, 2021), perma.cc/UE33-KQ2T (archived Jan. 6, 2026); *accord id.* ("binding contract with HSF"). Applicants must give away important rights to HSF, including a "worldwide license" to use their "name, voice, and/or likeness"; "consent to the collection, use, and disclosure" of their personal data; and other legal rights. *Id.*

   b.    HSF's privacy policy imposes more obligations on applicants. When they assent to HSF's privacy policy, applicants must give HSF the right to "collect" all the "information" they provide to HSF. *Privacy Policy*, HSF (last modified January 2021), perma.cc/Z8Z8-G3D4 (archived Jan. 6, 2026). Applicants also must give HSF the right to use their personal information for "marketing," "promot[ions]," or "shar[ing]" with "third-party business partners." *Id.*

10

39.    Applicants do not agree to HSF's terms of use or privacy policy just by visiting or using HSF's website, even if the terms say otherwise. *See Walker v. Uber Techs.*, 749 F. Supp. 3d 134, 148 (D.D.C. 2024). Even if an applicant agreed to the terms of use and privacy policy before submitting Phase I of the application, an applicant who agrees to the terms and conditions at the end of the application gives up new rights— namely, rights tied to the application and its contents.

40.    Phase II of the program's application process is also contractual in nature. Students who make it past Phase I "must submit essays." These essays are "one of the most important parts of [the] HSF application." Per HSF, the essay plays a "critical role" in how it decides which of the many applicants to select for its program. Every year the applications "greatly outnumber the awards [HSF has] available," so HSF must select just 10,000 winners from "a highly competitive pool of over 69,000 applicants." HSF thus uses readers and staff to go through the essays and ensure that the "best" students are chosen for its program based on "merit." The "rigorous process of selection" does not "begin" until the "essays have been read."

41.    After Phase II, HSF selects a total of 10,000 applicants to be HSF Scholars. That designation imposes more obligations on the winners. For example, after an applicant is dubbed an HSF Scholar, she must agree to fill out "periodic surveys" for HSF. By committing to fill out and submit numerous "online Scholar surveys," students give a valuable benefit to HSF, as their responses "provide HSF with insight on the

profile and needs of our Scholars to provide relevant and effective Scholar Support Services."

42.    In exchange for all these promises and performances, eligible applicants get valuable consideration from HSF.

43.    Most fundamentally, applicants get the chance to compete for a spot in the program. Program recipients receive many valuable benefits immediately, are eligible for other monetary and nonmonetary benefits, and get exclusive opportunities to enter into still more contracts.

44.    Though not all HSF scholars receive a scholarship, the HSF Scholar designation makes recipients "eligible" to compete to receive a scholarship. HSF does, in fact, award scholarships to HSF Scholars every year—"more than $30 million in Scholarships annually." Each individual HSF Scholar can receive anywhere "from $500-$5,000" per cycle. Scholars can also be "waitlisted for a monetary award," which means they "will continue to be considered for an award if additional funding becomes available during the current award cycle." And HSF Scholars can "re-apply … each year" for a monetary award. Scholarship recipients must "us[e]" the money "for tuition, fees, books, and other academic related supplies, as well as for room/board and transportation expenses related to school."

45.    Whether or not they receive scholarships or submit a FAFSA, HSF Scholars gain "[e]ligibility to participate in HSF's Fund A Scholar Program, a public-facing platform that allows individuals to donate directly to HSF Scholars through HSF." This

program involves contracts. To participate, Scholars must agree to the Fund a Scholar Terms of Use Agreement, which is independent from HSF's other terms of use and privacy policies. *See Fund a Scholar Terms of Use Agreement*, HSF, perma.cc/D3BV-2D2Z (archived Jan. 7, 2026). In exchange for "using the Fund a Scholar Platform," a student must "agree to the collection and use of [his] information" by HSF; give HSF a perpetual worldwide license to use his "name, voice, and/or likeness"; agree to indemnify HSF; and more. Another contract governs the relationship between HSF and the Fund-A-Scholar donors, and Scholars are third-party beneficiaries of that contract. In exchange for access to the Fund-A-Scholar platform, donors waive various rights. *See id.* And both students and donors must agree to give "10 cents" of "every dollar" donated to the Scholar to HSF.

46.    HSF Scholars gain access to HSF's job bank. Once they become HSF Scholars, students receive "exclusive" access to the HSF Insider, a proprietary platform that "shares invaluable information and career opportunities." That platform offers students exclusive internship and job opportunities with HSF corporate partners—a group that includes some of the nation's largest companies, like JPMorgan Chase, Morgan Stanley, and Wells Fargo. One of those corporate partners is Orrick, the law firm that represents HSF here.

47.    HSF Scholars likewise get access "to HSF's invaluable Scholar Support Services." Those services include "career coaching," "mentoring," "leadership development," and "wellness resources."

48.    HSF Scholars are also eligible to attend exclusive Scholar Conferences, including the National Leadership Conference, STEM Summit, Finance Conference, Media and Entertainment Summit, Entrepreneurship Summit, and Healthcare Summit. At the Scholar Conferences, HSF helps Scholars obtain internship and entry-level employment opportunities. Due to "a high volume of applications," HSF has "many more qualified applicants than can be accommodated at any of the conferences"; not all Scholars who apply are selected. To attend a conference, Scholars must submit an application, draft "two essays," and be selected by HSF—another contest. Selected students also must "confirm" that they will "attend" the conference "in its entirety" and "complete the required homework assignment prior to the conference." Scholars who renege are "responsible for covering 100% of the costs incurred by HSF," including travel, lodging, and three meals per day. "Until funds are repaid, all HSF Scholar privileges will be suspended."

49.    Any suggestion that HSF's ethnic discrimination in contracting is crucial to its mission or meant to express a message is insincere. As a recipient of federal financial assistance and a 501(c)(3) tax-exempt organization, HSF agreed and understood that it could not discriminate based on race or ethnicity in its operations. *See* 42 U.S.C §2000d; *Bob Jones Univ. v. United States*, 461 U.S. 574, 594-95. Tellingly, in its formal mission statement and nonprofit compliance documents, HSF uses entirely ethnic-neutral terms, describing its "mission" as helping "students and parents" generally and providing "scholarships to as many exceptional students … as possible." That mission

to reach as many students as possible is only furthered by opening HSF's Scholars Program to students of all ethnicities. Even now, some HSF programs are available to non-Hispanics.

### III.     The scholarship's ethnic bar injures the Alliance's members.

50.     The Alliance has members who are being harmed by HSF's discrimination, including Students A and B. Both students are members of the Alliance. They authorized the Alliance to vindicate their rights in this suit because they lack the expertise and resources to bring a lawsuit themselves. And both are ready and able to apply for the program today, but are ineligible to apply because of their ethnicity. Both find it hurtful and offensive that HSF is excluding them from educational opportunities based on arbitrary traits that they cannot control.

51.     **Student A**: Student A is a high-school senior who lives in Maryland. The 2026 cycle is the first time that Student A is eligible to apply to the HSF Scholars Program.

52.     Student A is able to apply to the HSF Scholars program because he satisfies all the eligibility criteria (aside from the ethnic one):

      a.     Student A has a 4.0 GPA, which is well above the 3.0 that HSF requires for high-school students.

      b.     Student A plans to enroll full-time in an accredited, public or not-for-profit, four-year university in the United States during the 2026-2027 academic year. Student A recently submitted his college applications, applying to

15

Duke, Georgetown, and Vanderbilt (among other schools). He was offered admission to one of those three schools and recently accepted. He will attend that private, not-for-profit, four-year university as a full-time student in the fall.

    c.     Student A is a U.S. citizen.

    d.     Because Student A wants to compete for the program's scholarships in addition to the other benefits, he would submit a FAFSA to HSF. He has already completed the 2026-27 FAFSA form.

53.    Student A is ineligible to apply to the HSF Scholars Program, however, because he is not the right ethnicity. Student A does not identify as being of Hispanic heritage. He is Asian-American. Student A's parents and grandparents are not from Argentina, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Portugal, El Salvador, Spain, Uruguay, or Venezuela. They are from China.

54.    If a court orders HSF to stop discriminating, Student A would immediately apply for the program's next open cycle—including the 2026 cycle that opened a few days ago. Student A has reviewed the program's website, benefits, and eligibility requirements. He has also reviewed a copy of the 2026 application and determined how he would answer every question. If a court ordered adequate relief, Student A would quickly complete Phase I of the application, submit it before the deadline, and timely complete all follow-on applications and document requests that HSF requires.

55.    As part of that process, Student A would create an HSF account. He has not yet done so. Though he sincerely wants to apply this cycle, he is not Hispanic, so he knows that formally taking the steps to apply would be futile.

56.    If the Court does not order adequate relief this cycle, Student A will remain ready and able to apply for the program in 2027, 2028, and 2029 when he is a rising sophomore, junior, and senior, respectively. During each of those application cycles, Student A will still satisfy the program's few non-ethnic eligibility criteria. And Student A will remain ready to apply to the program's next open cycle, as soon as a court orders HSF to stop discriminating.

57.    Student A sincerely wants to apply to the HSF Scholars Program, be selected, participate, and take advantage of the program's many benefits. According to Student A, HSF's scholar-support tools would help him succeed in college. HSF's career services would also help Student A find internships during college. And HSF's program would let Student A compete for scholarships and other funding—money that could reduce a sizable amount of Student A's expected student debt.

58.    Because he has unmet financial need, Student A is currently applying for other scholarships. Student A has applied for scholarships at schools like Vanderbilt. He recently applied to a private scholarship that is funded by Coca-Cola. And he has opted into all of the scholarship opportunities that his college applications have offered.

59.    Student A's background also aligns with HSF's values. Throughout his time in middle and high school, Student A has tried to promote civil rights. And as a

racial minority, Student A has worked to oppose discrimination against minority groups, like Asian Americans.

60.    **Student B**: Student B is a second-year law student who attends school in Virginia. Absent relief from a court, the current 2026 cycle is the last time that Student B could apply for HSF's program. He could not have applied for any prior cycle because he is not Hispanic.

61.    Student B is able to apply to the HSF Scholars program because he satisfies all of its eligibility criteria (aside from the ethnic one):

a.    Student B has a 3.65 GPA, which places him in the top 25% of his class—and well over the 2.5 GPA that HSF requires for graduate students.

b.    Student B is a full-time law student and will remain one during the 2026-27 academic year. Student B will complete his third and final year of law school in 2026-27.

c.    Because Student B wants to compete for the program's scholarships in addition to the other benefits, he would submit a FAFSA to HSF. On the 2026 application, HSF only requires students to state their future intent to submit a FAFSA and asks them for a date when they expect to submit the form. As he explained on the application, Student B would file one in March 2026, once he knows whether HSF has selected him as a finalist.

d.    Student B is a U.S. citizen.

62.     Student B does not identify as being of Hispanic heritage. He identifies as non-Hispanic white. Student B's parents do not identify as Hispanic either because they are not from Argentina, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Portugal, El Salvador, Spain, Uruguay, or Venezuela. His ancestors come from Russia and Poland.

63.     Although Student B's ethnicity means his application would be futile, 2026-27 is Student B's final year of law school, so the 2026 cycle is his last chance to apply to HSF's program in the ordinary course. Student B will apply to the current cycle before the February 13 deadline.

64.     In January 2026, Student B created an account on HSF's website. Once the 2026 application went live on January 6, he opened the application portal and filled out Phase I of the application. Filling it out took him approximately one hour.

65.     Student B's application is complete and accurate. The only step he has not taken yet is checking "I agree" to the final terms and conditions and clicking "Submit." Student B will take that last step and timely submit his application no later than February 12, 2026.

66.     Student B sincerely wants to apply to the HSF Scholars Program, be selected, participate, and take advantage of the program's many benefits. According to Student B, HSF's scholar-support and career-services tools would help him as a student

and future lawyer. HSF's exclusive platform of career opportunities would also be useful for Student B during law school, especially as Student B looks for jobs after graduation. And Student B wants to compete for HSF's lucrative scholarships and other funding, which could help him pay down his law-school debt.

67.    When Student B applied for law school, he applied for scholarships. Some of the law schools that Student B applied to offered him merit-based scholarships. And the law school Student B ultimately chose offered him a scholarship. Yet Student B still has unmet financial need.

68.    The HSF Scholars program is an especially good fit for Student B. When Student B was in high school, he founded an organization that tried to reform high-stakes standardized testing—a form of instruction that many have argued disadvantages underrepresented communities. After high school, Student B worked at an organization that combats antisemitism, a second organization that protects constitutional rights, and the American Civil Liberties Union. And Student B has long promoted civil rights, working to stamp out racism and bigotry at his local meditation center and theatre.

69.    In fact, the HSF Scholars Program has a preference for law students. Though students pursuing all fields of study can apply, HSF gives "special consideration" to applicants, like Student B, who are "graduate students earning a … JD."

70.    The Alliance is referring to Students A and B by pseudonyms—and withholding certain identifying details about them—because the Alliance's members fear

that HSF will hold their involvement in this lawsuit against them when selecting Scholars. Students A and B also fear reprisal from classmates, professors, future employers, the media, and the public for joining the Alliance and supporting this lawsuit.

## CLAIMS FOR RELIEF
### Count I
### Violation of the Civil Rights Act of 1866
### (42 U.S.C. §1981)

71.    The Alliance repeats and realleges each of its prior allegations.

72.    HSF is violating 42 U.S.C. §1981 by intentionally excluding certain applicants from contractual relationships and benefits because of ethnicity.

73.    Section 1981 covers discrimination in contracting by private actors. The statute explicitly covers "nongovernmental discrimination." 42 U.S.C. §1981(c); *accord Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). It covers "private" defendants like HSF. *Fearless Fund*, 103 F.4th at 769.

74.    Section 1981 prohibits discrimination "against, or in favor of, any race" or ethnicity. *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003); *accord Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613 (1987). Titled "Equal rights under the law," Section 1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 768 (2019), thus protecting "the equal right of all persons … to make and enforce contracts without respect to race" and ethnicity. *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up); *accord Al-Khazraji,* 481 U.S. at 613. Section 1981's "broad terms" ban discrimination against "any race." *McDonald v. Santa*

*Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). It protects Asian Americans (like Student A) and non-Hispanic whites (like Student B). *E.g., Al-Khazraji,* 481 U.S. at 613 ("immigrant groups such as the Chinese"); *McDonald,* 427 U.S. at 288 ("whites").

75.    Section 1981 "protects the would-be contractor along with those who already have made contracts." *Domino's*, 546 U.S. at 476. The law provides relief when discrimination "blocks the creation of a contractual relationship"—when, "for racially motivated reasons, [defendants] preven[t] individuals who 'sought to enter into contractual relationships' from doing so." *Id.* (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)). It also bans discrimination in the "performance," "modification," or "benefits, privileges, terms, and conditions" of existing contracts. 42 U.S.C. §1981(b).

76.    HSF's program involves at least one "contract." 42 U.S.C. §1981(a). Under §1981, a contract is merely "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Fearless Fund*, 103 F.4th at 775. HSF's program fits that definition for many independent reasons.

        a.    To submit the application, students must agree to multiple contracts—each of which makes them bargain away valuable rights in exchange for a chance to apply and be selected. *Supra* ¶¶34-39. Those contracts, which are tied explicitly to the application, trigger §1981. *Fearless Fund*, 103 F.4th at 775; *accord Founders First*, 2024 WL 3625684, at *3 n.7 (holding that a similar program was a

contract because it "offer[ed] contestants a grant in exchange for their time, intellectual property, and a promise to use the funds in a manner acceptable to [Defendants]").

b.    The program itself is a contest, *see supra* ¶¶42-43, which makes the program a contract. *E.g.*, *AAER v. Fearless Fund*, 2023 WL 6295121, at *4 (N.D. Ga. Sept. 27) (agreeing that "courts construe contests as offers for a unilateral contract"). "[N]early all jurisdictions have adopted the rule that contract law governs the sponsor-contestant relationship." *Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1104 (10th Cir. 2001) (cleaned up); *see also, e.g.*, *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910); *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994) ("answering an essay question" is "a contest"). "[P]erformance by the entrant of the act requested by the sponsor … constitutes an acceptance of an offer and forms a binding contract." *Hampton*, 247 F.3d at 1104 (cleaned up). So when applicants fill out an application, complete HSF's essays, and agree to HSF's terms, they perform "the act[s]" that HSF "requested," which "constitutes an acceptance" of their "offer." *Id.* That agreement creates a "binding contract." *Id.*; *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8).

c.    By using ethnicity to block students from becoming Scholars, HSF blocks them from entering many more contracts—including the contracts involved with the scholarships, *supra* ¶¶41-42; the Fund A Scholar program, *supra*

¶45; the Scholar Conferences, *supra* ¶48; and the internship and employment agreements with its corporate partners, *supra* ¶¶46-48.

77.    HSF is intentionally discriminating based on ethnicity. "[P]roof of a facially discriminatory … policy"—or even "a corporate decision maker's express[ed] statement of a desire to avoid" contracting with members of a certain ethnicity—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). With either kind of evidence, the plaintiff "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014). Here, there's both.

    a.    The program "facially discriminat[es]" against anyone who isn't Hispanic. *Id.* Being Hispanic is an explicit eligibility requirement. Only Hispanics are welcome to apply or have ever been selected. *Supra* ¶¶20-25.

    b.    HSF's "corporate decision maker[s]" have expressed a "desire to avoid" contracting with non-Hispanics. *Amini*, 440 F.3d at 359. HSF's website repeatedly states that students must be Hispanic to apply or participate. *Supra* ¶¶20-21. HSF likewise states on its social-media accounts that the students it wants for the program "must be of Hispanic/Latino heritage." And in this litigation, its president and CEO submitted sworn testimony that the program "is intended" for students "of Hispanic Heritage."

78.    At a minimum, HSF discriminates in the performance, modification, and terms of its contracts with students. 42 U.S.C. §1981(b). Even if all students had to

give up the same rights to HSF regardless of ethnicity, HSF extends different terms and benefits to students depending on whether they are Hispanic. Most obviously, only Hispanic students can participate in or be considered for the HSF Scholars Program, and thus the many benefits that come with that program. *See supra* ¶¶13, 20.

79.    Because the program intentionally discriminates in contracting, it must at least survive strict scrutiny. *Gratz*, 539 U.S. at 276 n.23. HSF "bears the burden" of proving that its program satisfies that "daunting" test. *Fisher v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up); *Harvard*, 600 U.S. at 206-07. It cannot.

80.    HSF has no compelling interest. The Supreme Court "ha[s] identified only two compelling interests" in this context: "One is remediating specific, identified instances of past discrimination that violated the Constitution or a statute," and the other is "avoiding imminent and serious risks to human safety in prisons." *Id.* at 207. Neither exists here. HSF does not ask applicants if they have suffered prior discrimination—or even require that they have financial need. *Supra* ¶¶27-32. Any supposed interest in diversity is not compelling. *See Lutheran Church-Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998) ("We do not think diversity can be elevated to the 'compelling' level.").

81.    Nor is the program narrowly tailored to achieve any compelling interest. To name a few reasons:

      a.    The program, by flatly barring all non-Hispanics from funding, imposes an illegal "quota," which could not be narrowly tailored to any permissible

goal. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 507 (1989); *Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987).

b.    The program uses ethnicity as a negative for non-Hispanics by treating ethnicity as a positive for Hispanics in a competitive, zero-sum process. *Harvard*, 600 U.S. at 218-19. As HSF stresses, its application process is "rigorous," and "selection is highly competitive"—with nearly 70,000 applicants for only 10,000 spots.

c.    HSF's definition of "'Hispanic'" is fatally "arbitrary." *Harvard*, 600 U.S. at 216. HSF adds to the arbitrariness by treating anyone as Hispanic who has one grandparent who comes from one of 22 specific countries. What a white student whose grandmother is from Spain has in common with a DACA recipient who was born in Mexico—let alone what these accidents of birth say about these students' need for support in college—is anyone's guess.

d.    HSF never "considered" or reasonably rejected strategies "other than" the program's scheme of "explicit racial classifications." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 735 (2007). HSF thus cannot show "the most exact connection between justification and classification" that strict scrutiny requires. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280 (1986); *Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994).

**Count II**
**Title VI of the 1964 Civil Rights Act**
**(42 U.S.C. §2000d *et seq.*)**

82.    The Alliance repeats and realleges each of its prior allegations.

83.    HSF is violating Title VI of the 1964 Civil Rights Act by excluding non-Hispanic students from participating in the HSF Scholars Program.

84.    Under Title VI, "[n]o person in the United States shall … be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

85.    HSF receives federal financial assistance, including its exclusive access to FAFSA data.

86.    Under the Higher Education Act, the Department of Education discloses FAFSA data to "scholarship organizations (designated (prior to December 19, 2029) by the Secretary …)." 20 U.S.C. §1090(a)(2)(D).

87.    HSF is one of "only two" scholarship organizations that meet this definition and so are eligible to receive this otherwise private data. 49 Op. O.L.C. at 46. "Other scholarship-granting organizations may not obtain FAFSA data, even with student consent." *Id.* Indeed, few organizations of any kind receive access to the highly sensitive data that the Department of Education makes available to HSF. Only state higher education agencies and two scholarship organizations—one of which is HSF itself—receive directly from the Department both the information on the applicant's

tax returns and "[a]ll information provided by the applicant … to determine the appli-cant's eligibility for Federal financial aid." 20 U.S.C. §1090(a)(2)(D).

88.    Under Title VI, this exclusive access to FAFSA data counts as "Federal financial assistance." 42 U.S.C. §2000d. "[F]ederal financial assistance may take non-money form." *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 n.11 (1986). It encompasses any "thing of value" that is "extended by" the government pursuant to statute. *Id.*; *accord Federal Financial Assistance,* Black's Law Dictionary (12th ed. 2024). This "inclusive terminology"—"Federal financial assistance"—"encompass[es] *all* forms of federal aid." *Grove City Coll. v. Bell*, 465 U.S. 555, 563-64 (1984). So "arrangements providing services [and] research," like the FAFSA data here, qualify as financial assis-tance, even without direct monetary "payments." *Kamen v. AT&T Co.*, 791 F.2d 1006, 1013 (2d Cir. 1986).

89.    HSF is currently "receiving" this FAFSA data. 42 U.S.C. §2000d. The pro-gram's current application cycle is scheduled to close on February 15, 2026. Still today, HSF continues to receive exclusive access to FAFSA data. Though OLC recently opined that the continued provision of that data to HSF is unconstitutional, the De-partment of Education has not terminated HSF's access to the data, and HSF's 2026 application process still contemplates that students will send HSF their 2026-27 FAFSA. Nor could the Department terminate HSF's access to the data without first going through a lengthy process that will not end before the program's 2026 cycle ends. *See* 42 U.S.C. §2000d-1.

90.     This assistance renders all of HSF's operations, including the HSF Scholar Program, subject to Title VI. The unrestricted FAFSA data is "extended" to HSF "as a whole." §2000d-4a(3)(A)(i). And HSF is a "private organization" that is "principally engaged in the business of providing education [or] social services." §2000d-4a(3)(A)(ii). According to its mission statement, HSF provides "the knowledge and resources to successfully complete a higher education" and offers "support services and scholarships to" students. So its "entire" operations are subject to Title VI's ban on ethnic discrimination. §2000d-4a(3)(A).

91.     The FAFSA data goes to HSF, moreover, to be used by HSF in administering the HSF Scholar Program—its flagship program for awarding scholarships. HSF uses the FAFSA data that it gets from the Department to calculate the amount of a winner's scholarship award. So even if HSF were not generally subject to Title VI's ban on ethnic discrimination, the HSF Scholars Program is. *See* §2000d.

92.     The HSF Scholars Program violates Title VI by discriminating based on "race" and "national origin." §2000d. To qualify, students must be "Hispanic" and "from a family whose ancestors came from … Argentina, Belize, Bolivia, Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Portugal, El Salvador, Spain, Uruguay, or Venezuela." This requirement "excludes" students who lack Hispanic ethnicity and an-

cestry "from participation," "denies" them "benefits," and "subject[s]" them "to discrimination." 42 U.S.C. §2000d. And that exclusion and discrimination appears both on the face of the program and was HSF's intent. *Supra* ¶¶20-24.

93.    Because HSF discriminates based on ethnicity and national origin, Title VI requires it to satisfy strict scrutiny. *Harvard*, 600 U.S. at 214. As explained, HSF cannot satisfy that standard. *Supra* ¶¶79-81.

### Count III
### D.C. Human Rights Law
### (D.C. Code Ann. § 2-1402.01 *et seq.*)

94.    The Alliance repeats and realleges each of its prior allegations.

95.    D.C. law applies here. HSF is not only incorporated in D.C., but also has a substantial presence here, including its 29-person D.C. Advisory Council. Its website is open to and reaches individuals in D.C. HSF advertises the HSF Scholars Program in D.C., receives applications from and rejects and accepts students in D.C., and supports Scholars who attend schools in D.C. It works with D.C. schools, including Georgetown University, to encourage students in D.C. to apply for the program. Its "Strategic Partners" for the program include George Washington University in D.C. And it regularly hosts events for HSF Scholars in D.C. HSF also instructs applicants to submit FAFSAs to, and receives the FAFSA data for its program from, the Department of Education in D.C.

96.    DCHRA bans discrimination based on race, color, ethnicity, and national origin by many actors and in many contexts across the District. Because HSF is at least

one of an employment agency, educational institution, or public accommodation—if not all three—its program violates DCHRA.

97.    DCHRA prohibits any "employment agency" from discriminating based on "race, color, [or] national origin." D.C. Code Ann. §2-1402.11(a)(2). An employment agency may not, among other things, "refuse to refer" a job applicant based on ethnicity. *Id.*

98.    HSF is an employment agency. It "regularly undertak[es] or attempt[s] … to procure employees for an employer or to procure for employees, opportunities to work for an employer." D.C. Code Ann. §2-1401.02(11).

a.    One of the key "benefits" of being an HSF Scholar is that HSF provides "assist[ance]" in helping Scholars secure "internships and full-time job opportunities."

b.    HSF regularly holds job fairs for HSF Scholars, including six Scholar Conferences held once a year. At these conferences, HSF introduces Scholars to recruiters from its corporate partners and has them interview for exclusive internships and full-time jobs.

c.    HSF also makes job listings available year-round on its HSF Insider portal. This portal is "[e]xclusive" to HSF Scholars. It, too, lists "select career opportunities with HSF corporate partners."

99.    Non-Hispanic students cannot become HSF Scholars. So they are excluded from attending the job fairs, seeing the job listings, and participating in the procurement opportunities that HSF provides to Hispanic students. HSF refuses to refer non-Hispanic students for job opportunities, in violation of DCHRA.

100.    DCHRA separately prohibits ethnic and racial discrimination by "educational institutions." D.C. Code Ann. §2-1402.41. Such institutions may not "restrict … access to, any … program[s] or benefits" based on "race, color, [or] national origin." *Id.*

101.    HSF is an educational institution under D.C. law. Educational institutions include "private institution[s]," such as "academ[ies]," "extension course[s]," and professional-training programs. D.C. Code Ann. §2-1401.02(8); *see also* §2-1402.42(b). HSF offers an extensive collection of educational courses and trainings for students year-round on its website, including many that are exclusively available to Scholars. It offers many educational courses and trainings throughout the year in person as well. To name just a few examples, HSF's College 101 course, offered six times between now and March, teaches students about "applying to college, researching financial aid and scholarship opportunities, understanding the real cost of a college education, maximizing the college experience, and successfully transitioning to a career after college." And HSF's Youth Leadership Institute, "held virtually and at two top universities," provides "college and career workshops," teaching students to "interact with college students and professionals who serve as their mentors."

102.    As an educational institution, HSF is forbidden from excluding access to its programs based on ethnicity. D.C. Code Ann. §2-1402.41(1). Yet most of HSF's educational programming, and the entirety of its flagship HSF Scholars program, excludes students who do not identify as Hispanic.

103.    D.C. also forbids educational institutions like HSF from inquiring about the "race, color, [or] national origin" of students applying for admission. §2-1402.41(2). But HSF's application form directly asks applicants whether they (and their family) are Hispanic and requires them to answer those questions before they can proceed or apply. *Supra* ¶21-22.

104.    Finally, DCHRA prohibits ethnic discrimination by places of public accommodation. D.C. Code Ann. §2-1402.31.

105.    HSF is a place of public accommodation. In D.C., this term includes "any person or place that provides, to a person in the District, access to an accommodation, service, or good, whether or not that person or place maintains a physical location in the District or charges for those goods or services." D.C. Code Ann. §2-1401.02(24). According to HSF, its website provides services—including its "Scholarship Finder" and "College Prep" resources—to the public at large.

106.    Because it is a place of public accommodation, HSF may not "deny … any person the full and equal enjoyment of the [its] goods, services, facilities, [and] privileges" based on ethnicity.  D.C. Code Ann. §2-1402.31(1). But HSF prevents non-

Hispanics from qualifying as HSF Scholars and from accessing many of its website's benefits. *Supra* ¶¶13, 20, 47.

107.    As a place of public accommodation, HSF also may not "post … a statement … that the full and equal enjoyment of [its] goods, services, facilities, [and] privileges, … will be unlawfully refused" based on ethnicity. D.C. Code Ann. §2-1402.31(2). HSF has publicly posted that only students who "identify as being of Hispanic heritage" are eligible to be HSF Scholars, as well as many other similar statements excluding non-Hispanics or stating a preference for Hispanics. *See supra* ¶¶2, 20, 24 Students A and B have seen these statements; both are disappointed and offended that a prominent non-profit would use their ethnicity and ancestry, which they cannot control, against them when deciding whether their education should be supported. These statements, too, violate D.C. law.

### Count IV
### California Unruh Civil Rights Act
### (Cal. Civ. Code §51)

108.    The Alliance repeats and realleges each of its prior allegations.

109.    If D.C. law does not apply to HSF, then the law of California—where HSF is headquartered and rejects applicants for the HSF Scholars Program—applies, including California's Unruh Civil Rights Act.

110.    Under Unruh, all persons "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever," no matter their race, color, or national origin. Cal. Civ. Code §51(b).

34

The Unruh Act also prohibits a "business establishment of any kind whatsoever" from discriminating against "any person" based on his race, color, or national origin with respect to contracting. Cal. Civ. Code §51.5(a).

111.    HSF is a business establishment under Unruh. The Act uses this term "in the broadest sense reasonably possible." *O'Connor v. Vill. Green Owners Assn.*, 662 P.2d 427, 430 (Cal. 1983). "Nothing in the … [Act] calls for excluding an organization from its scope simply because it is nonprofit." *Id.* at 430-31.

112.    "[N]onprofit community service organizations" like HSF are business establishments under Unruh. *Isbister v. Boys' Club of Santa Cruz*, 707 P.2d 212, 216 (Cal. 1985). That is especially so where, as here, the nonprofit "employs a substantial paid staff." *Id.* at 218. HSF lists over 70 employees on its website.

113.    HSF is also a business establishment under Unruh because it "publishes an official directory" of the other businesses that it works with. *See Rotary Club of Duarte v. Bd. of Directors*, 224 Cal. Rptr. 213, 224 (Ct. App. 1986), *aff'd sub nom. Bd. of Directors of Rotary Intl v. Rotary Club of Duarte*, 481 U.S. 537 (1987). Its website lists over 50 "corporate partners." "The commercial benefits engendered by th[is] advertisement section of [the website] are obvious." *Rotary Club of Duarte*, 224 Cal. Rptr. at 224.

114.    HSF's program violates Unruh by intentionally discriminating against students based on ethnicity and national origin. *Liapes v. Facebook*, 95 Cal. App. 5th 910, 922 (2023); *see supra* ¶¶20-26. Its denial of equal treatment to non-Hispanics violates Unruh, regardless whether the program is contractual or receives federal funds.

115.    Separately, HSF's program violates Unruh by discriminating and refusing to contract with students based on ethnicity and national origin. Cal. Civ. Code §51.5; *see supra* ¶76-78.

# PRAYER FOR RELIEF

116.    The Alliance respectfully asks this Court to enter judgment in its favor and against HSF and to provide the following relief:

A. A declaratory judgment that the HSF Scholars Program violates 42 U.S.C. §1981, Title VI, and the applicable state antidiscrimination law.

B. A temporary restraining order and preliminary injunction that bars HSF, pending further order of the Court, from closing the application window or selecting winners for the program.

C. A permanent injunction barring HSF from knowing or considering ethnicity in any way in the program—including through criteria that are facially neutral but that can be used as, or are intended to be, proxies for ethnicity.

D. Any equitable relief needed to undo HSF's past discrimination or retaliation, including an order forcing HSF to reopen the application process, to rerun the application process under neutral criteria, and to waive criteria like requiring applicants to be current students.

E. Nominal damages.

F. Reasonable costs and expenses of this action, including attorneys' fees and prejudgment interest, under 42 U.S.C. §1988, Cal. Civ. Code §52, and any other applicable laws.

G. All other relief that the Alliance is entitled to.

Dated: January 9, 2026                    Respectfully submitted,

                                          */s/ Cameron T. Norris*
                                          Thomas R. McCarthy
                                            (D.D.C. No. 489651)
                                          Cameron T. Norris
                                            (D.D.C. No. VA083)
                                            *Lead Counsel*
                                          CONSOVOY MCCARTHY PLLC
                                          1600 Wilson Blvd., Ste. 700
                                          Arlington, VA 22209
                                          (703) 243-9423
                                          tom@consovoymccarthy.com
                                          cam@consovoymccarthy.com

                                          *Attorneys for American Alliance for Equal Rights*