**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

             *Plaintiff*,

v.

HISPANIC SCHOLARSHIP FUND,

             *Defendant*.

Case No. 1:25-cv-4207

## BRIEF OF AMICI CURIAE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW AND LATINO JUSTICE AND ADDITIONAL AMICI IN SUPPORT OF DEFENDANT HISPANIC SCHOLARSHIP FUND

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ..................................................................................................................... 3

ARGUMENT ............................................................................................................................. 4

I.     Section 1981 is a Remedial Statute that Actualized the Thirteenth Amendment's
Abolition of Slavery................................................................................................................. 4

     A.     Congress Enacted Section 1981 in the Aftermath of the Black Codes that, Despite
Ratification of the Thirteenth Amendment, Obstructed Black Citizens' Freedom
of Contract. ........................................................................................................... 6

     B.     Congress Authorized Section 1981 as a Remedial Law Based on the Thirteenth
Amendment............................................................................................................ 7

II.     Hispanic Students Face Disparities in Schools and the Workplace That Reflect Historical
Systemic Discrimination Against Hispanic Communities.................................................. 9

     A.     Hispanic Communities Face Discriminatory Barriers in School and the
Workplace. ............................................................................................................ 9

     B.     The Disparities Endured by Hispanic Communities Today Reflect Historical
Systemic Discrimination..................................................................................... 12

III.     The Scholars Program is a Lawful Program that Effectuates Section 1981's Remedial
Intent, and Prohibiting the Program Would Diminish Hispanic Students' Economic
Freedom. ............................................................................................................................... 15

CONCLUSION....................................................................................................................... 18

**Cases**

*Am. Alli. for Equal Rights v. Fearless Fund Mgmt.*,
LLC, 103 F.4th 765 (2024) ............................................................................1

*Aponte v. Nat'l Steel Ser. Ctr.*,
500 F. Supp. 198 (N. D. Ill. 1980) ...............................................................8

*Boston Parent Coal. for Academic Excellence Corp. v. Sch. Comm. for City of
Boston*,
89 F.4th 46 (1st Cir. 2023)............................................................................3

*Budinsky v. Corning Glass Works*,
425 F. Supp. 786 (W.D. Pa. 1977)................................................................9

*City of Memphis v. Greene*,
451 U.S. 100 (1981) (White, J. concurring) ..............................................7, 8

*Coal. for T.J. v. Fairfax Cnty. Sch. Bd.*,
68 F.4th 864 (4th Cir. 2023) .........................................................................3

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020).................................................................................1, 7

*Doe v. Kamehameha Schs.*,
470 F.3d 827 (9th Cir. 2006) (en banc) ........................................................5

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
458 U.S. 375 (1982).......................................................................................7

*Jones v. Alfred H. Mayer Co.*,
392 U.S. 409 (1968)...............................................................................5, 7, 8

*Moini v. LeBlanc*,
456 F. Supp. 3d 34 (D.D.C. 2020) ................................................................5

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....................................................................................1, 3

**Statutes**

29 U.S.C. § 152(3) .........................................................................................13

42 U.S.C. § 1981........................................................................................ *passim*

Civil Rights Act of 1866 § 1 ...................................................................6, 7

**Other Authorities**

Albert H. Kauffman, Latino Education in Texas: A History of Systematic
  Recycling Discrimination, 50 *St. Mary's L.J.* 861, 867 (2019) ...............14

Alicia Delaney, *Juan Crow: A Discriminatory Past with Contemporary Impacts
  Against Mexican Americans*, 17 Undergraduate Rev. 217 (2019)..........12

Am. Bar Ass'n, *Profile of the Legal Profession 2024* (2024) .......................16

Anthony P. Carnevale & Megan L. Fasules, *Latino Education and Economic
  Progress: Running Faster but Still Behind* 5 (Georgetown Univ. Ctr. on Educ.
  & the Workforce 2017)....................................................................14, 15

Are You Covered?, National Labor Relations Board (last visited Dec. 29, 2025),
  https://www.nlrb.gov/about-nlrb/rights-we-protect/the-law/employees/are-
  you-covered....................................................................................13

Ashley Quarcoo & Medina Husakovic, *Racial Reckoning in the United States:
  Expanding and Innovating on the Global Transitional Justice Experience*
  (Oct. 26, 2021)*, Carnegie Endowment for International Peace*,
  https://carnegieendowment.org/research/2021/10/racial-reckoning-in-the-
  united-states-expanding-and-innovating-on-the-global-transitional-justice-
  experience?lang=en.........................................................................13

Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the
  Proper Scope of Section 1981*, 98 YALE L.J. 541, 550 (1989) ................7

Christina A. Medina & Carlos E. Posadas, Hispanic Student Experiences at a
  Hispanic-Serving Institution, 11 *J. Latinos & Educ.* 182 (2012) ..........10

Danielle Tarantolo, *From Employment to Contract: Section 1981 and
  Antidiscrimination Law for the Independent Contractor Workforce*, 116
  YALE L.J. 170, 186 (2006) .................................................................6

David Cooper, Workers of Color Are Far More Likely to Be Paid Poverty-Level
  Wages Than White Workers, Econ. Pol'y Inst. (June 21, 2018),
  https://www.epi.org/blog/workers-of-color-are-far-more-likely-to-be-paid-
  poverty-level-wages-than-white-workers/ ...........................................17

Douglas, Karen Manges et al., *"The Criminalization of Immigrants & the
  Immigration-Industrial Complex"*, 142 Immigration & the Future of America
  3, 199-227 (Summer 2013), www.jstor.org/stable/43297260 ................12

E Fajardo-Alvarez, *Latinos Rise in Education Rates, but The Wage Gap Continues* (June 30, 2024), Issue Number One, https://issuenumberone.journalism.cuny.edu/2024/06/30/latinos-rise-in-education-rates-but-the-wage-gap-continues/ .........................................................16

Ella Nilsen, These Workers Were Left Out of the New Deal. They've Been Fighting for Better Pay Ever Since, *Vox* (May 18, 2021), https://www.vox.com/22423690/american-jobs-plan-care-workers-new-deal ......................13

Excelencia in Educ., *Advancing What Works to Intentionally Serve Latino Students: Opportunities for Action—2024* (Apr. 2024) ..........................................10

Excelencia in Educ., *Latino College Completion: United States 2023* (2023) ...........................17

Francisco Contreras, Access, Achievement, and Social Capital: Standardized Exams and the Latino College-Bound Population, 4 J. Hispanic Higher Educ. 197 (2005) ......................................................................................................................10

Gary M. Stern, Closing the Gap: Pew Study Calls for More Latino Graduate Students, *Hispanic Outlook* (Jan. 2025), https://www.hispanicoutlook.com/articles/closing-the-gap-pew-study-calls-for-more-latino-graduate-students; .........................................................16

Gonzalez, G., *Increasing Latino Student College Enrollment; a Marketing Perspective*, 23 Journal of Latinos and Education 5, 1794–1816 (2024), https://doi.org/10.1080/15348431.2024.2333885 ............................................15

Govtrack, https://bit.ly/2lfzg3k (last accessed Sep. 1, 2023) ...........................................7

Govtrack, https://bit.ly/2nlDaID (last accessed Dec. 29, 2025) ..........................................7

Henry A.J. Ramos & Gabriel Kasper, *Building a Tradition of Latino Philanthropy: Hispanics as Donors, Grantees, Grantmakers, and Volunteers* .................9, 10

Ibero Aztlan, *Hispanics, Voting Rights and the New Texas Juan Crow Laws*, https://iberoaztlan.com/articles/hispanics-voting-rights-and-the-new-texas-juan-crow-laws/ ..............................................................................................................12, 13

Jocelyn Frye & Rose Khattar, *Women of Color and the Wage Gap*, Center for American Progress (November 2021), https://www.americanprogress.org/article/women-of-color-and-the-wage-gap/ ....................11

Kelly Field, More Hispanics Are Going to College and Graduating, but Disparity Persists, *PBS NewsHour* (May 14, 2018), https://www.pbs.org/newshour/education/more-hispanics-are-going-to-college-and-graduating-but-disparity-persists ..........................................................11

Lilia Fernández, *Latino Struggles for Civil Rights in the Cold War Era* .......................................12

M. A. Clark et al., *Supports and Barriers for Latino Males' Educational Pursuits*......................16

Mark Hugo Lopez, et al., *Who is Hispanic* Pew Rsch. Ctr,
    https://www.pewresearch.org/short-reads/2024/09/12/who-is-hispanic....................................4

Pew Rsch. Ctr., *Key Facts About U.S. Latinos with Graduate Degrees* (Oct. 3,
    2023), https://www.pewresearch.org/short-reads/2023/10/03/key-facts-about-
    us-latinos-with-graduate-degrees/ ........................................................................................17

*Latino Students in Higher Education: Fact Sheet* (Sept. 2022), Postsecondary
    National Policy Institute, https://pnpi.org/wp-
    content/uploads/2022/09/LatinoStudentsFactSheet_September_2022.pdf ...........................10

Raquel E. Aldana, *Contesting Whiteness - Inventing "Hispanic"* (Sept. 25, 2024),
    https://law.ucdavis.edu/aoki-blog/contesting-whiteness-inventing-
    hispanic#:~:text=In%20fact%2C%20some%20scholars%20have,the%20same
    %20parks%20as%20whites; .................................................................................................12

Rebecca E. Zietlow, *Slavery, Liberty and the Right to Contract*, 19 NEV. L.J.
    447, 448 (2018) ......................................................................................................................6

Rogelio Salazar, *"Mentorship Experiences of Latinos Students Among University
    Mentors of Color in a California State University-Hispanic Serving
    Institution"*, 1 Journal of the Alliance for Hispanic Serving Institution
    Educators 1, 15-35 (2021), https://ahsie.org/v1-i1-mentorship-experiences .........................15

Sara Weissman, Degree-Completion Gap Widens for Latino Students, *Inside
    Higher Ed* (July 19, 2023),
    https://www.insidehighered.com/news/quick-takes/2023/07/19/widening-degr
    ee-completion-gap-among-latino-students. .....................................................................10, 11

Shauna Dyer & Giovanni Román-Torres, *Latina/o Postsecondary Education:
    Trends in Racial/Ethnic Education Gaps and the Role of Citizenship in Access
    to Higher Education*, 59 Demography 2053 (2022),
    https://pmc.ncbi.nlm.nih.gov/articles/PMC10990005/ .........................................................10

Nat'l Ass'n of Colls. & Emps., *Position Statement: Unpaid Internships and the
    Need for Federal Action* 2 (May 2023),
    https://www.naceweb.org/uploadedfiles/files/2023/resources/nace-position-
    statement-unpaid-internships-and-the-need-for-federal-action-may-2023.pdf; .....................17

U.S. Census Bureau, CPS Historical Time Series Tables, Table A-3. Mean
    Earnings of Workers 18 Years and Over, by Educational Attainment, Race,
    Hispanic Origin, and Sex: 1975 to 2023, https://www2.census.gov/programs-
    surveys/demo/tables/educational-attainment/time-series/cps-historical-time-
    series/taba-3.xlsx (last visited Jan. 13, 2026) .................................................................11, 12

U.S. Bureau of Labor Statistics, College Enrollment and Work Activity of Recent High School and College Graduates Summary (Apr. 22, 2025), https://www.bls.gov/news.release/hsgec.nr0.htm#:~:text=The%20jobless%20rates%20of%20young,were%20employed%20in%20October%202024 ...............................10

U.S. Dept. of Labor, Labor, *Earning Disparities by Race and Ethnicity* ....................................11

U.S. Const. Amend. XIII ......................................................................................................4

U.S. Constitution Thirteenth Amendment .......................................................................... *passim*

U.S. Dep't of Educ., *Winning the Future: Improving Education for the Latino Community* (Sept. 2011) .................................................................................10

*UnidosUS Blog* (Sept. 29, 2021), https://unidosus.org/blog/2021/09/29/racial-segregation-of-latino-students-continues-with-english-only-laws/ ...................................13, 14

UnidosUS, *Survey of Latinos in Higher Education: Unveiling Barriers, Celebrating Persistence, and Identifying Opportunities for Tomorrow* 6 (Oct. 2024) ............................................................................................................10, 11

<u>**INTEREST OF AMICI**</u>[1]

Amici are organizations committed to equal educational opportunity for Latino and other students. They have an interest in ensuring that the Hispanic Scholarship Fund continues to afford resources, support services, and scholarships to qualified and deserving students of all races, particularly those of Hispanic heritage, to accelerate their successful completion of higher education.

**LAWYERS' COMMITTEE.** The Lawyers' Committee is a nonpartisan, nonprofit civil rights organization founded in 1963 by the nation's leading lawyers at the request of President John F. Kennedy to secure equal justice for all through the rule of law by targeting the inequities confronting Black communities and other communities of color. The Lawyers' Committee uses legal advocacy to achieve racial justice and ensure that Black people and other people of color have the voice, opportunity, and power to make the promises of our democracy real. As part of this work, the Lawyers' Committee has participated as counsel or amicus curiae in cases addressing race, ethnicity, and national origin discrimination in a wide range of subjects, including education, employment, health care and fair housing. *See, e.g., Am. Alli. for Equal Rights v. Fearless Fund Mgmt.*, LLC, 103 F.4th 765 (2024); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327 (2020).

**EXCELENCIA IN EDUCATION**. Founded in 2004, Excelencia in Education's mission is to advance excellence and success in higher education for Latino and all students. Excelencia's

---

[1] The parties have consented to the filing of this brief. No counsel to a party in this case authored this brief in whole or in part. No party or party's counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief. No person or entity other than the amici and their counsel made any monetary contribution that was intended to or did fund the preparation or submission of this brief.

approach is grounded in data, strengthened by leadership, and tested by practice. It researches and publishes evidence-based practices that improve student success in higher education, designs a national acceleration plan, particularly for Latino students in higher education, promotes the societal benefits of raising degree completion rates, affords technical support, and partners with leaders, including the Hispanic Scholarship Fund, to transform higher education in service of the human capital our nation needs to thrive.

**AFRO LATINO FORUM**. The Afro Latino Forum centers Blackness within Latinidad focusing on Latinos of African descent in the United States. The organization works to provide a bridge that expands understanding about the African Diaspora. It supports the struggles for racial and social justice. Its work is guided by a communal perspective that recognizes the centrality of race. The Afro Latino Forum has an interest in maintaining the pathways to educational and employment opportunity provided by the Hispanic Scholarship Fund.

**EL PUENTE**. El Puente was founded in 1982 to give voice to young people fleeing violence and seeking justice. It is a grassroots organization whose mission is to inspire and nurture leadership for peace and justice through holistic leadership and community development. Since its founding, education has been integral to its mission. It runs four schools, including the Academy for Peace and Justice for high school students. It also promotes art-based learning, curating artistic expressions of young people depicted in many mural exhibitions. El Puente has an interest in maintaining the pathways to educational opportunity afforded by the Hispanic Scholarship Fund.

**LATINOJUSTICE PRLDEF** is a civil rights organization with a longstanding history of advocating for the rights of the Latinx community. Since its founding in 1972 as the Puerto Rican Legal Defense & Education Fund, LatinoJustice has fought for high-quality K-12 schools and access to higher education for Latinx students. Notably, LatinoJustice played a key role in

establishing the right of non-English-speaking Puerto Rican and Latinx students to receive bilingual education in New York City. LatinoJustice has served as counsel for amici in many cases advancing educational equity, including *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023); *Coal. for T.J. v. Fairfax Cnty. Sch. Bd.,* 68 F.4th 864 (4th Cir. 2023); *Boston Parent Coal. for Academic Excellence Corp. v. Sch. Comm. for City of Boston*, 89 F.4th 46 (1st Cir. 2023).

## INTRODUCTION

The Hispanic Scholarship Fund ("HSF")[2] operates a privately-funded scholarship program that advances—rather than contravenes—the Congressional goals and intent of 42 U.S.C. § 1981. HSF's Scholars Program works with high school and college students of all races who identify as being of Hispanic heritage. The program addresses entrenched educational barriers unique to Hispanic students, which are rooted in the enduring and systemic economic oppression of Hispanic communities in the United States. Plaintiff's challenge misreads Section 1981 by attacking a program that addresses enduring harms from laws and policies mirroring the "badges and incidents of slavery" that Section 1981 was enacted to eliminate.

Rooted in the Thirteenth Amendment to the U.S. Constitution, Congress enacted Section 1981 as a remedial measure during the Reconstruction era to secure the rights of newly emancipated Black citizens, who historically had been deprived of the ability to make and enforce economic contracts. The freedom to contract and participate in the economy on equal terms "as is enjoyed by white citizens" was central to overcoming the legacy of slavery and economic oppression targeting Black communities. 42 U.S.C. § 1981(a). It has since been expanded to

---

[2] https://www.hsf.net/.

protect people of all races,[3] community. That remedial purpose, which is at the very heart of Section 1981, is under attack in this case.

In the face of our country's history of racism, its pervasive structural discrimination, and the pernicious effects of both, Plaintiff attempts to upend the spirit and the purpose of Section 1981 to further entrench the status quo of inequitable access to higher education. Notwithstanding Plaintiff's claims that necessarily brings about that end is a statute that has co-existed with scholarship opportunities for students from all racial and ethnic backgrounds, including from majority and minority groups, for a century.[4] Plaintiff's challenge to the HSF, a scholarship program that awards grants to high school and college students of all races that identify as being of "Hispanic Heritage,"[5] is contrary to Section 1981's congressional purpose and intent and should not succeed.

## **ARGUMENT**

### I.     Section 1981 is a Remedial Statute that Actualized the Thirteenth Amendment's Abolition of Slavery.

Following the close of the Civil War, Congress ratified the Thirteenth Amendment to the U.S. Constitution. It provides "[n]either slavery nor involuntary servitude . . . shall exist within the United States[.]" U.S. Const. Amend. XIII. Despite the Thirteenth Amendment's clear command, American society systematically denied newly emancipated Black people participation in society

---

[3] This brief uses the terms "Latino" and "Hispanic" interchangeably although the terms have different technical meanings. "Latino" defines individuals from Latin America while the term "Hispanic" refers to individuals who originate from Spanish-speaking countries, including Spain. Mark Hugo Lopez, et al., *Who is Hispanic*, Pew Rsch. Ctr, https://www.pewresearch.org/short-reads/2024/09/12/who-is-hispanic. Latino is intended to be broader and includes Hispanics. Latinos can be of any race, inclusive of White Hispanic people, Afro-Latinos, and Indigenous people who identify as Latino.
[4] Amici agrees with the Defendant's contention that the HSF scholarship is not a contract.
[5] https://www.hsf.net/.

and the marketplace. Congress responded forcefully, enacting Section 1981 as a remedy for the ongoing harms by private actors resulting from the legacy of slavery, and to ensure the full inclusion of recently emancipated Black people in the economy. In drafting Section 1981, Congress intended to protect Black citizens from White citizens "whose object was to make their former slaves, dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices[.]" *Doe v. Kamehameha Schs.*, 470 F.3d 827, 836 (9th Cir. 2006) (en banc) (internal quotation marks and citation omitted). Thus, Section 1981 was enacted to abolish "*all badges and incidents of slavery.*" *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968). Central to the fulfillment of the Thirteenth Amendment in resistant Southern states and elsewhere, Section 1981 mandated newly emancipated Black citizens' freedom of contract. Specifically, Section 1981 guarantees that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

Since its enactment, courts have confirmed that Section 1981 extends to protect the contracting rights of all racial and ethnic groups to dispel the badges and incidents of slavery. *See Moini v. LeBlanc*, 456 F. Supp. 3d 34, 47 (D.D.C. 2020) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987)). This is consistent with the history and purpose of Section 1981, particularly where a given community, such as the Hispanic community, has historically suffered deprivations of economic rights due to discrimination in private contracting.

### A. Congress Enacted Section 1981 in the Aftermath of the Black Codes that, Despite Ratification of the Thirteenth Amendment, Obstructed Black Citizens' Freedom of Contract.

Though Southern states ratified the Thirteenth Amendment, they quickly circumvented its freedoms. Rebecca E. Zietlow, *Slavery, Liberty and the Right to Contract*, 19 NEV. L.J. 447, 448 (2018). In 1865, while the Thirteenth Amendment was in the process of ratification by the States, Southern states implemented the Black Codes—laws that forced Black people to work in a labor economy based on debt or low wages. *Id.* at 462-63. Despite the Thirteenth Amendment's promise, under the Black Codes, newly freed Black people remained trapped in conditions similar to chattel slavery. White southerners refused to contract with formerly enslaved Black people. And when they did, "many used the labor contract itself to restore conditions as onerous as those under slavery[,]" fixing wages, forbidding work outside the contract, and using physical violence to coerce work. Danielle Tarantolo, *From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 YALE L.J. 170, 186 (2006). White southerners also often "simply refused to sell land to" Black people, even when not selling was economically unwise. Mehrsa Baradaran, The Color of Money, Black Banks and the Racial Wealth Gap 9–11, 18 (2017) ("Baradaran"). To bolster this exclusion of Black people from the market by private parties, some states went so far as to forbid such sales. *Id.* at 18. The inability to build wealth or own property forced Black people into sharecropping, where landowners subjected them to debt when the growing season closed, with no hope of recourse against the ever-present manipulation of the ledger. Richard Rothstein, The Color of Law: A Forgotten History of How Our Government Segregated America 154 (2017); Baradaran, supra, at 33–34.

To remedy the shortcomings of the Thirteenth Amendment, Congress passed § 1 of the Civil Rights Act of 1866, later codified as Section 1981. It identified the Black Codes—and all

forms of inequitable economic market and social access impacting Black citizens—as badges and incidents of slavery and sought their eradication. *Jones*, 392 U.S. at 442 (explaining that the Black Codes "were substitutes" for the slave "system").

**B.      Congress Authorized Section 1981 as a Remedial Law Based on the Thirteenth Amendment.**

Just as the Thirteenth Amendment sought to break the shackles of White ownership over formerly enslaved Black citizens, Section 1981 aimed to make Black Americans' economic independence a reality. The 39th Congress found that the Thirteenth Amendment fell short of remedying "the plight of the southern [B]lacks." *City of Memphis v. Greene*, 451 U.S. 100, 131 (1981) (White, J. concurring). To implement the Thirteenth Amendment in all states as a matter of law and fact, and to "vindicate the rights of former slaves," the 39th Congress enacted § 1 of the Civil Rights Act of 1866, later codified as Section 1981.[6] *Comcast Corp.* , 589 U.S. at 333.

The legislative history of the Civil Rights Act of 1866 makes clear that Section 1981 is both firmly rooted in the Thirteenth Amendment and squarely aimed at "providing an instrument by which [Black people] could strike down barriers to their participation" in our nation's economic marketplace. *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 411 (1982). On January 5, 1866, Senator Trumbull formally introduced his bill in the Senate. Commenting on the bill's objective, Senator Trumbull emphasized its grounding in the Thirteenth Amendment:

> This measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of abstract truths and principles unless

---

[6] The Civil Rights Act of 1866 was introduced as S. 61 by Sen. Trumbull (R-IL) on Jan. 5, 1866. Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1981*, 98 YALE L.J. 541, 550 (1989). S. 61 passed the United States Senate (33-12) on Feb. 12, 1866. Govtrack, https://bit.ly/2lfzg3k  (last accessed Sep. 1, 2023). S. 61 passed the United States House of Representatives (111-38) on Mar. 13, 1866. Govtrack, https://bit.ly/2nlDaID  (last accessed Dec. 29, 2025). The bill became the law on Apr. 8, 1866. *Jones*, 392 U.S. at 435.

they can be carried into effect, unless the persons who are to be affected by
them have some means of availing themselves of their benefits.

*Jones*, 392 U.S. at 431–32 (internal quotations omitted). The bill aimed to "destroy all (the)

discriminations embodied in the Black Codes." *Id.* at 432 (quoting Cong. Globe, 39th Cong., 1st

Sess. 474 (1886)) (internal quotations omitted); *City of Memphis*, 451 U.S. at 132 (White. J,

concurring) ("The proposed Civil Rights Act was specifically designed to stem this tide of

oppression[.]") (emphasis added).

Senator Wilson, after describing the Black Codes as, "[s]o unjust, so wicked, so

incompatible . . . [with] . . . the expressed will of the nation" explained why the legislation was

necessary notwithstanding the Thirteenth Amendment:

> This measure is called for because these reconstructed Legislatures, in
> defiance of the rights of the freedmen and the will of the nation embodied
> in the amendment to the Constitution, have enacted laws nearly as
> iniquitous as the old slave codes that darkened the legislation of other days.
> The needs of more than four million colored men imperatively call for its
> enactment.

Cong. Globe, 39th Cong., 1st Sess., 603.

If the Black Codes remained in place, Congress knew the Thirteenth Amendment would

become "a mere paper guarantee." *Jones*, 392 U.S. at 443 (quoting the statements of

Representative Thayer of Pennsylvania, at Cong. Globe, 39th Cong., 1st Sess., at 1151).

Recognizing the structural barriers faced by those newly freed from slavery, the goal of the Civil

Rights Act of 1866 was clearly remedial in nature and aimed squarely at enabling equal access to

the economic marketplace for Black people.

Although enacted to dismantle the Black Codes and secure Black Americans' economic

freedom, Section 1981 has been applied in a manner that preserves its core remedial purpose—

extending protection to other groups, including Hispanics, who have been subjected to similar

exclusionary economic and social policies. *See generally Aponte v. Nat'l Steel Ser. Ctr.*, 500 F.

8

Supp. 198, 203 (N. D. Ill. 1980) ("Because Hispanics are frequently identified as 'nonwhites' . . . [§] 1981 is broad enough to extend to that group."); *Budinsky v. Corning Glass Works*, 425 F. Supp. 786, 788 (W.D. Pa. 1977) ("Hispanic persons, and Indians like [B]lacks, have been traditional victims of group discrimination, and, however, inaccurately or stupidly, are frequently and even commonly subject to a 'racial' identification as 'non-whites.' There is accordingly both a practical need and a logical reason to extend [§] 1981's proscription . . . to these groups.").

## II. Hispanic Students Face Disparities in Schools and the Workplace That Reflect Historical Systemic Discrimination Against Hispanic Communities.

Hispanics in this country do not participate in the economy on equal terms "as is enjoyed by white citizens." Applying Section 1981 to prohibit remedial private grantmaking programs like the Scholars Program that increase Hispanic students' access to economic markets and educational opportunities is inconsistent with its purpose and history.[7] *See Budinsky*, 425 F. Supp. at 788 (recognizing that there is "a practical need and a logical reason" to extend Section 1981 to Hispanic communities). This Court should reject Plaintiff's attempt to invalidate a program that intended to address the entrenched barriers to education that are unique to Hispanic students and seeks to mitigate inequitable economic access currently faced by Hispanic communities.

### A. Hispanic Communities Face Discriminatory Barriers in School and the Workplace.

Recent data demonstrates that entrenched barriers and inequitable economic access create disparities for Hispanic students and Hispanic communities in a variety of education and

---

[7] Indeed, Philanthropic efforts to ensure Hispanic communities' equitable market access and educational opportunities is a longstanding practice. *See generally* Henry A.J. Ramos & Gabriel Kasper, *Building a Tradition of Latino Philanthropy: Hispanics as Donors, Grantees, Grantmakers, and Volunteers*, Research Paper No. 4, Ctr. on Philanthropy & Pub. Policy, Univ. of S. Cal. (Jan. 2000). Private philanthropy identifies gaps in access for Hispanic communities and provides resources to bring them parity with White citizens' access.

workplace contexts. For example, multiple studies have indicated that financial constraints are the primary barrier for Hispanic students to access post-secondary education.[8] As a result, post-secondary education remains financially out of reach since Hispanic students must use their own earnings, rather than savings or outside wealth, to pay for college expenses. And despite substantial increases in educational attainment since the late 1950s, Hispanic individuals continue to have lower Bachelor's degree attainment rates than Black and White men and women.[9] For example:

- Since 1992, Hispanic postsecondary degree attainment has only increased by 10%, compared to a 16% increase for White students, and a 22% increase for Black students.[10]
- Among 2024 high school graduates, the college enrollment rate for Hispanic and Latino students was 55.4% compared to 62.2% of White students.[11]

Degree completion is a persistent challenge for Hispanic college students, who trail their White peers in graduation rates for four-year programs, with 65% of White students completing their degrees in four years in comparison to 52% of Hispanic students.[12] There are comparable

---

[8] *Id; see generally* U.S. Dep't of Educ., *Winning the Future: Improving Education for the Latino Community* (Sept. 2011); Excelencia in Educ., *Advancing What Works to Intentionally Serve Latino Students: Opportunities for Action—2024* (Apr. 2024); Francisco Contreras, Access, Achievement, and Social Capital: Standardized Exams and the Latino College-Bound Population, 4 *J. Hispanic Higher Educ.* 197, 203–05 (2005); Christina A. Medina & Carlos E. Posadas, Hispanic Student Experiences at a Hispanic-Serving Institution, 11 *J. Latinos & Educ.* 182, 188–91 (2012).

[9] Shauna Dyer & Giovanni Román-Torres, *Latina/o Postsecondary Education: Trends in Racial/Ethnic Education Gaps and the Role of Citizenship in Access to Higher Education*, 59 Demography 2053 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC10990005/.

[10] *Latino Students in Higher Education: Fact Sheet* 1–* (Sept. 2022), Postsecondary National Policy Institute, https://pnpi.org/wp-content/uploads/2022/09/LatinoStudentsFactSheet_September_2022.pdf; *see also* UnidosUS, *Survey of Latinos in Higher Education: Unveiling Barriers, Celebrating Persistence, and Identifying Opportunities for Tomorrow* 6 (Oct. 2024).

[11] U.S. Bureau of Labor Statistics, College Enrollment and Work Activity of Recent High School and College Graduates Summary (Apr. 22, 2025), https://www.bls.gov/news.release/hsgec.nr0.htm#:~:text=The%20jobless%20rates%20of%20young,were%20employed%20in%20October%202024.

[12] Sara Weissman, Degree-Completion Gap Widens for Latino Students, *Inside Higher Ed* (July 19, 2023),

disparities in 2-year programs, with 38% of White students completing their programs compared with 33% of Hispanic students.[13]

A Unidos Survey[14] of approximately 3,000 Hispanic students across the country highlights the structural barriers driving these disparities:

- 80% reported working while in college—49% part-time and 26% full-time—struggling to balance employment and academics.

- 85% also reported lacking consistent access to affordable, nutritious food. Over 50% had food insecurity issues "a few times a week" or "daily."

These hardships take a measurable toll: approximately 67% of surveyed students considered dropping out, and roughly one third took a leave of absence. The burdens are even heavier for Hispanic students who are gender non-conforming or single parents.[15]

Research also demonstrates that when education and other characteristics are controlled for, Latino men earn less than White men, while Latina women experience the largest pay gap, earning 57 cents to the dollar.[16] In 2023, the mean employment income of Hispanic college graduates with a Bachelor's degree was $70,500 compared to $91,430 for White college graduates.[17] Furthermore, Hispanic and first-generation students remain underrepresented in paid

---

https://www.insidehighered.com/news/quick-takes/2023/07/19/widening-degree-completion-gap-among-latino-students.

[13] *Id.; see also* Kelly Field, More Hispanics Are Going to College and Graduating, but Disparity Persists, *PBS NewsHour* (May 14, 2018), https://www.pbs.org/newshour/education/more-hispanics-are-going-to-college-and-graduating-but-disparity-persists.

[14] UnidosUS, *Survey of Latinos in Higher Education: Unveiling Barriers, Celebrating Persistence, and Identifying Opportunities for Tomorrow* 6 (Oct. 2024).

[15] *Id.*

[16] For data on Latino workers, *see*, U.S. Dept. of Labor, *Earning Disparities by Race and Ethnicity*. For Latino women wage gap, see Jocelyn Frye & Rose Khattar, *Women of Color and the Wage Gap*, Center for American Progress (November 2021), https://www.americanprogress.org/article/women-of-color-and-the-wage-gap/

[17] U.S. Census Bureau, CPS Historical Time Series Tables, Table A-3. Mean Earnings of Workers 18 Years and Over, by Educational Attainment, Race, Hispanic Origin, and Sex: 1975 to 2023,

internship opportunities, while White, male, and continuing-generation students are disproportionately represented.[18] Internships are often the decisive factor when employers evaluate otherwise equally qualified candidates and students who complete paid internships receive more job offers and higher starting salaries than those who participate in unpaid internships.[19]

## B. The Disparities Endured by Hispanic Communities Today Reflect Historical Systemic Discrimination.

The current disparities faced by Hispanic communities in the United States reflect historic systemic discrimination on the basis of their ethnicity. Hispanic communities faced a unique form of systemic discrimination often described as the "Juan Crow" era.[20] In addition to economic exploitation, this discrimination meant that Hispanic communities were excluded from serving on juries, public accommodations (like restaurants, theaters, and shops), and from voting.[21] For

---

https://www2.census.gov/programs-surveys/demo/tables/educational-attainment/time-series/cps-historical-time-series/taba-3.xlsx (last visited Jan. 13, 2026).

[18] *Id.*

[19] Nat'l Ass'n of Colls. & Emps., *Position Statement: Unpaid Internships and the Need for Federal Action* 2 (May 2023).

[20] Alicia Delaney, *Juan Crow: A Discriminatory Past with Contemporary Impacts Against Mexican Americans*, 17 Undergraduate Rev. 217 (2019). During the "Juan Crow" era, Mexicans were—and remain—the largest group of Hispanics targeted by exclusionary practices. *Id.* at 217. However, other Hispanic immigrants also endured segregation and discrimination under the "Juan Crow Laws." *Id.* at 223.

[21] Douglas, Karen Manges et al., *"The Criminalization of Immigrants & the Immigration-Industrial Complex"*, 142 Immigration & the Future of America 3, 199-227 (Summer 2013), www.jstor.org/stable/43297260; Raquel E. Aldana, *Contesting Whiteness - Inventing "Hispanic"* (Sept. 25, 2024), https://law.ucdavis.edu/aoki-blog/contesting-whiteness-inventing-hispanic#:~:text=In%20fact%2C%20some%20scholars%20have,the%20same%20parks%20as%20whites; Lilia Fernández, *Latino Struggles for Civil Rights in the Cold War Era*, https://www.oah.org/tah/cold-war-prosperity-and-civil-rights/latino-struggles-for-civil-rights-in-the-cold-war-era/; Ibero Aztlan, *Hispanics, Voting Rights and the New Texas Juan Crow Laws*, https://iberoaztlan.com/articles/hispanics-voting-rights-and-the-new-texas-juan-crow-laws/.

example, in the early 1900s, Texas adopted "'white' primaries" which excluded Hispanic and Black people from voting in political primaries.[22]

The segregationist policies of the "Juan Crow" era extended to the exclusion of Hispanic communities in educational institutions. Zoning laws in the early 1900s in heavily Hispanic populated areas, particularly Texas and California, were explicitly used to institutionalize the segregation of Mexican-American communities into poorly equipped schools.[23]

The New Deal legislation of the 1930s, such as the Farm Labor Standards Act of 1938, further entrenched segregation by deliberately excluding domestic workers, tipped workers, and agricultural laborers from core protections such as minimum wage, Social Security, and overtime pay.[24] These occupations were overwhelmingly held by Black workers nationwide and Hispanic workers—primarily Mexicans—in the Southwest, making job classification a racial proxy that denied workers of color crucial benefits extended to most White workers.[25] These exclusions did not end with the close of the New Deal era. The National Labor Relations Act of 1935 continues to exclude the same job categories today from the same core workplace protections and benefits.[26]

---

[22] Ibero Aztlan, *Hispanics, Voting Rights and the New Texas Juan Crow Laws*, https://iberoaztlan.com/articles/hispanics-voting-rights-and-the-new-texas-juan-crow-laws/.

[23] Julisa Acre, Racial Segregation of Latino Students Continues with English-Only Laws, *UnidosUS Blog* (Sept. 29, 2021), https://unidosus.org/blog/2021/09/29/racial-segregation-of-latino-students-continues-with-english-only-laws/.

[24] Ella Nilsen, These Workers Were Left Out of the New Deal. They've Been Fighting for Better Pay Ever Since, *Vox* (May 18, 2021), https://www.vox.com/22423690/american-jobs-plan-care-workers-new-deal.

[25] Ashley Quarcoo & Medina Husakovic, *Racial Reckoning in the United States: Expanding and Innovating on the Global Transitional Justice Experience* (Oct. 26, 2021), *Carnegie Endowment for International Peace*, https://carnegieendowment.org/research/2021/10/racial-reckoning-in-the-united-states-expanding-and-innovating-on-the-global-transitional-justice-experience?lang=en.

[26] 29 U.S.C. § 152(3); *see also* Are You Covered?, National Labor Relations Board (last visited Dec. 29, 2025), https://www.nlrb.gov/about-nlrb/rights-we-protect/the-law/employees/are-you-covered.

As a result, Black and Hispanic workers have faced generations of compounded harm because of systemic restrictions on access to labor protections, entry to the social safety net, and diminished opportunities to build wealth on par with White workers. Cumulatively, these restrictions have entrenched the occupational segregation of workers of color into low-wage and unstable jobs that persist today.

The discriminatory architecture of the Juan Crow era—reinforced by the New Deal's economic exclusions—did not fade with time, but intensified into widespread, state-sanctioned educational segregation well into the mid-twentieth century. For example, by 1940, over 80% of Mexican-American students in California attended "Mexican-only schools."[27] And by 1956, 80% of school districts in Texas were segregated, with the Texas constitution's requirement of separate schools for Black students also applying to Mexican-American students.[28] Texas also relegated English-speaking Latino students to segregated English instructional schools because they had Spanish surnames.[29]

This history does not reflect isolated acts of discrimination but a racially-charged legal and policy framework that was intentionally sustained for generations leading to the disparities faced by Hispanic communities today. Hispanic families currently have one of the highest workforce participation rates, but they are more likely to live in poverty, have lower median incomes, and have lower wealth compared to their White peers.[30] This gap is driven by limited citizenship

---

[27] Julisa Acre, Racial Segregation of Latino Students Continues with English-Only Laws, *UnidosUS Blog* (Sept. 29, 2021), https://unidosus.org/blog/2021/09/29/racial-segregation-of-latino-students-continues-with-english-only-laws/.

[28] Albert H. Kauffman, Latino Education in Texas: A History of Systematic Recycling Discrimination, 50 *St. Mary's L.J.* 861, 867 (2019), https://commons.stmarytx.edu/thestmaryslawjournal/vol50/iss3/4.

[29] *Id.*

[30] Anthony P. Carnevale & Megan L. Fasules, *Latino Education and Economic Progress: Running Faster but Still Behind* 5 (Georgetown Univ. Ctr. on Educ. & the Workforce 2017), chrome-

pathways, unequal educational access, and precarious low-wage employment,[31] all modern manifestations of exclusionary policies that mirrored the "badges and incidents" of slavery that the Scholars Program seeks to improve today that today.

### III. The Scholars Program is a Lawful Program that Effectuates Section 1981's Remedial Intent, and Prohibiting the Program Would Diminish Hispanic Students' Economic Freedom.

The Scholars Program confronts these deeply rooted barriers directly by providing merit-based financial support, targeted mentorship, and comprehensive career development services. These initiatives do not diminish the rights or educational opportunities of non-Hispanic students.

The mentorship programs provided by the Scholars Program, for example, have proven to be effective at increasing retention rates for Hispanic students. Research demonstrates that the level of support students receive to pursue their education has a strong indirect effect on Hispanic student retention, particularly for first-generation students.[32] Many Hispanic students are often isolated in their classes, and access to mentors provides essential guidance, encouragement, and social capital.[33] Mentors share personal experiences and practical strategies that help students navigate undergraduate and graduate programs. As a result, targeted mentorship programs in high school and college significantly improve persistence and graduation rates.

---

extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cew.georgetown.edu/wp-content/uploads/Latinos-FR.pdf.

[31] Anthony P. Carnevale & Megan L. Fasules, *Latino Education and Economic Progress: Running Faster but Still Behind* 5 (Georgetown Univ. Ctr. on Educ. & the Workforce 2017), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cew.georgetown.edu/wp-content/uploads/Latinos-FR.pdf.

[32] Gonzalez, G., *Increasing Latino Student College Enrollment; a Marketing Perspective*, 23 Journal of Latinos and Education 5, 1794–1816 (2024), https://doi.org/10.1080/15348431.2024.2333885.

[33] *Id.;* Rogelio Salazar, *"Mentorship Experiences of Latinos Students Among University Mentors of Color in a California State University-Hispanic Serving Institution"*, 1 Journal of the Alliance for Hispanic Serving Institution Educators 1, 15-35 (2021), https://ahsie.org/v1-i1-mentorship-experiences.

Mentorship programs are also invaluable in the graduate degree context. Hispanic graduates between the ages of 25 to 35 account for only 8% of all advanced degree holders in the U.S., far below their 19% share of the overall population.[34] Researchers found that mentorship programs can help Hispanic students navigate their career path, get letters of recommendation, perform better academically, and offer psychological and emotional support by validating their cultural and educational experiences.[35] For example, mentorship programs have proven to be crucial for female Hispanic law students who account for only 3% of practicing attorneys.[36] Researchers at the Hispanic National Bar Association concluded that mentorship programs and career counseling services help female Hispanic law students overcome structural barriers, graduate, and reach their full potential in the legal profession.[37]

The career services alleged to be provided by the Scholars Program assist Hispanic students with securing internships, which can help curb the unemployment and pay disparities Hispanic college graduates often face. Hispanic college graduates face a higher unemployment rate of 7.6% compared to their White counterparts at 5.1%.[38] Hispanic college graduates are also more likely

---

[34] Gary M. Stern, Closing the Gap: Pew Study Calls for More Latino Graduate Students, *Hispanic Outlook* (Jan. 2025), https://www.hispanicoutlook.com/articles/closing-the-gap-pew-study-calls-for-more-latino-graduate-students; M. A. Clark et al., *Supports and Barriers for Latino Males' Educational Pursuits*, 91 J. Counseling & Dev. 458, 463–66 (2013).

[35] Gary M. Stern, Closing the Gap: Pew Study Calls for More Latino Graduate Students, *Hispanic Outlook* (Jan. 2025), https://www.hispanicoutlook.com/articles/closing-the-gap-pew-study-calls-for-more-latino-graduate-students; M. A. Clark et al., *Supports and Barriers for Latino Males' Educational Pursuits*, 91 J. Counseling & Dev. 458, 463–66 (2013).

[36] Jill Lynch Cruz, Still Too Few and Far Between: The Status of Latina Lawyers in the U.S., 40 Chicanx-Latinx L. Rev. 1 (2024); Am. Bar Ass'n, *Profile of the Legal Profession 2024* (2024).

[37] *Id.*

[38] E Fajardo-Alvarez, *Latinos Rise in Education Rates, but The Wage Gap Continues* (June 30, 2024), Issue Number One, https://issuenumberone.journalism.cuny.edu/2024/06/30/latinos-rise-in-education-rates-but-the-wage-gap-continues/.

to work in fields that pay less compared to college-educated workers of other racial groups even if they have the same qualifications and experience.[39]

Because unpaid internships require students to forgo wages, they are largely inaccessible to students without financial support, effectively reserving career-building opportunities for wealthier students.[40] Unpaid internships are largely inaccessible to students who cannot forgo wages, allowing wealthier students to monopolize valuable work experience, skill development, and professional networks. The career services alleged to be offered by the Scholars Program ensures that Hispanic students can access and benefit from these vital internship experiences so that they are on the same footing as their peers when they enter the workforce.

Mentorship programs like those Plaintiff points to in the Scholarship Program, have proven to bridge the gaps faced by Hispanic students to ensure that Hispanic students of all races are not left behind. Granting the relief requested by the Plaintiff would deny 70,000 applicants the ability to compete and 10,000 scholars the opportunity to become a Scholar and would directly contradict the purpose of Section 1981.[41]

---

[39] Nat'l Ass'n of Colls. & Emps., *Position Statement: Unpaid Internships and the Need for Federal Action* 2 (May 2023), https://www.naceweb.org/uploadedfiles/files/2023/resources/nace-position-statement-unpaid-internships-and-the-need-for-federal-action-may-2023.pdf; *see also* David Cooper, Workers of Color Are Far More Likely to Be Paid Poverty-Level Wages Than White Workers, Econ. Pol'y Inst. (June 21, 2018), https://www.epi.org/blog/workers-of-color-are-far-more-likely-to-be-paid-poverty-level-wages-than-white-workers/.

[40] Nat'l Ass'n of Colls. & Emps., *Position Statement: Unpaid Internships and the Need for Federal Action* 2 (May 2023), https://www.naceweb.org/uploadedfiles/files/2023/resources/nace-position-statement-unpaid-internships-and-the-need-for-federal-action-may-2023.pdf; Excelencia in Educ., *Latino College Completion: United States 2023* (2023); Pew Rsch. Ctr., *Key Facts About U.S. Latinos with Graduate Degrees* (Oct. 3, 2023), https://www.pewresearch.org/short-reads/2023/10/03/key-facts-about-us-latinos-with-graduate-degrees/.

[41] Def.'s Mot. to Dismiss, Dkt. No. 12 at 11-15

## **CONCLUSION**

For the foregoing reasons, the Court should reject Plaintiff's challenge. The Scholars Program is a lawful initiative that advances—rather than undermines—the remedial purpose and intent of Section 1981. The program operates within the statute's core mandate by addressing the persistent educational and economic barriers faced by Hispanic students resulting from exclusionary economic and social inequities that were reinforced with violence. Plaintiff's interpretation would distort Section 1981 into a tool for dismantling efforts aimed at eradicating the very "badges and incidents of slavery" that the statute was enacted to confront. Section 1981 does not compel such a result, and this Court should decline to adopt it.

For the reasons stated above, Amici respectfully urge the Court to deny Plaintiff's motion for a preliminary injunction and grant Defendants' Motion to Dismiss.

Respectfully submitted,                                    Dated:     January 28, 2025

*/s/Keith J. Harrison*
Keith J. Harrison (NY #2054187)
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: 202.624.2560
KHarrison@crowell.com


Francisca D. Fajana (NY # 5475405)*
Rafaela Uribe (NY # 6073332)*
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
Tel: 212.219.3360
Fax:212.739.7507
FFajana@latinojustice.org
RUribe@latinojustice.org
* Admitted Pro Hac Vice

Maya Brodziak*
Sabrina Talukder
Michael Pillera*
Sumayya Saleh
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K St. NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8600
mbrodziak@lawyerscommittee.org
stalukder@lawyerscommittee.org
mpillera@lawyerscommittee.org
ssaleh@lawyerscommittee.org

*Pro Hac Vice Forthcoming

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5, a copy of the foregoing filing is being served

electronically on those parties who have appeared and registered with the Court's ECF system.


*/s/Keith J. Harrison*
Keith J. Harrison (NY #2054187)
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: 202.624.2560
KHarrison@crowell.com