# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff,*

v.

HISPANIC SCHOLARSHIP FUND,

*Defendant.*

Case No. 1:25-cv-4207-LLA

# OPPOSITION TO MOTION TO DISMISS
# AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of Authorities ..........................................................................................................................ii

Introduction ...................................................................................................................................... 1

Argument ........................................................................................................................................... 2

    I.   The complaint plausibly alleges standing. ................................................................... 3

    II.  The complaint plausibly alleges violations of federal law........................................ 13

        A.  Section 1981 ........................................................................................................ 13

            1.   The complaint plausibly alleges contracts. ................................................. 13

            2.   Section 1981's application to contract-based scholarships is neither ambiguous nor arguably unconstitutional. .......................................................................... 23

        B.  Title VI................................................................................................................. 25

            1.   The FAFSA data are federal financial assistance. ..................................... 26

            2.   The assistance goes to a program or activity. ............................................. 28

    III. The complaint plausibly alleges violations of state law within this Court's supplemental jurisdiction.................................................................................................................. 31

        A.  D.C. Human Rights Act..................................................................................... 31

            1.   HSF is plausibly an employment agency. .................................................. 31

            2.   HSF is plausibly an educational institution. ............................................... 33

            3.   HSF is plausibly a public accommodation. ................................................ 34

        B.  California Unruh Civil Rights Act ...................................................................... 36

        C.  Supplemental jurisdiction.................................................................................... 38

            1.   The state and federal claims share a common nucleus of fact.................... 38

            2.   The state claims are not novel or complex. ................................................. 39

    IV. This Court should not preemptively deny the Alliance leave to amend. ................... 42

Conclusion........................................................................................................................................ 43

Certificate of Service ...................................................................................................................... 45

# TABLE OF AUTHORITIES

*principal authority

## Cases

*7241 W. 100th Place Corp. v. Bridgeview,*
  2014 WL 517961 (N.D. Ill. Feb. 6) ..................................................................................24

*\*AAER v. ABA,*
  2026 WL 161596 (N.D. Ill. Jan. 21) .............................................................................passim

*\*AAER v. Fearless Fund,*
  103 F.4th 765 (11th Cir. 2024) ....................................................................................passim

*AAER v. Fearless Fund,*
  2023 WL 6295121 (N.D. Ga. Sept. 27) ...........................................................................19

*AAER v. Founders First CDC,*
  2024 WL 3625684 (N.D. Tex. July 31) ........................................................................ 15, 20

*AAER v. Pritzker,*
  2025 WL 2229995 (C.D. Ill. Aug. 5) .................................................................................6

*AAER v. Sw. Airlines,*
  2024 WL 5012055 (N.D. Tex. Dec. 6) ..............................................................................3

*Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans,*
  525 F.3d 8 (D.C. Cir. 2008) .............................................................................................2

*Al Bahlul v. United States,*
  767 F.3d 1 (D.C. Cir. 2014) ..........................................................................................24

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ......................................................................................................29

*Ali v. Al-Nahyan,*
  2025 WL 3250945 (D.D.C. Oct. 31) ..............................................................................43

*Almendarez-Torres v. United States,*
  523 U.S. 224 (1998) ......................................................................................................24

*Am. Nat. Ins. Co. v. FDIC,*
  642 F.3d 1137 , 1139 (D.C. Cir. 2011) ...........................................................................12

*Ark Initiative v. Tidwell,*
  64 F. Supp. 3d 81 , 90 (D.D.C. 2014) .............................................................................29

*Ark Initiative v. Tidwell,*
  816 F.3d 119 (D.C. Cir. 2016) .......................................................................................29

*Axness v. Aqreva LLC,*
  118 F. Supp. 3d 1144 (D.S.D. 2015) ..............................................................................33

*Bagley v. Yale Univ.,*
  42 F. Supp. 3d 332 (D. Conn. 2014) ........................................................................... 40, 41

*Banneker Ventures v. Graham,*
  798 F.3d 1119 (D.C. Cir. 2015) ...................................................................................2, 3

*Berger v. Iron Workers Reinforced Rodmen*,
  170 F.3d 1111 (D.C. Cir. 1999) ............................................................................22

*Berk v. Choy*,
  2026 WL 135974 (U.S. Jan. 20) ..........................................................................2, 3

*Berman v. Freedom Fin. Network*,
  30 F.4th 849 (9th Cir. 2022) ..................................................................................18

*Bingler v. Johnson*,
  394 U.S. 741 (1969) ...............................................................................................14

*Bldg. & Const. Trades Council v. Downtown Dev.*,
  448 F.3d 138 (2d Cir. 2006)......................................................................................6

*Blodgett v. Univ. Club*,
  930 A.2d 210 (D.C. 2007)........................................................................ 31, 32, 34, 41

*Bondi v. VanDerStok*,
  604 U.S. 458 (2025) ...............................................................................................25

*Bradley v. Meijer Stores L.P.*,
  2023 WL 3042984 (N.D. Ill. Apr. 21) ....................................................................39

*Brooklyn Daily Eagle v. Voorhies*,
  181 F. 579 (C.C.E.D.N.Y. 1910) ...........................................................................19

*Bruni v. Pittsburgh*,
  824 F.3d 353 (3d Cir. 2016)....................................................................................24

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979) ...............................................................................................27

*Carney v. Adams*,
  592 U.S. 53 (2020) .......................................................................................7, 8, 9, 10

*Chavous v. D.C. FRMAA*,
  154 F. Supp. 2d 40 (D.D.C. 2001) ............................................................................2

*Christian Lab. Ass'n v. Duluth*,
  2021 WL 2783732 (D. Minn. July 2)........................................................................7

*Collins v. Giving Back Fund*,
  2019 WL 3564578 (S.D.N.Y. Aug. 6)....................................................................30

*Conrad v. D.C. Alcoholic Beverage Control Bd.*,
  287 A.3d 635 (D.C. 2023)......................................................................................35

*Cooper v. Abdul–Aziz*,
  2015 WL 12552064 (D. Minn. Nov. 4) ..................................................................41

*Covington v. Hamilton Twp. Bd. of Educ.*,
  2015 WL 3746338 (D.N.J. June 15)........................................................................41

*Crawford v. Uber Techs.*,
  2021 WL 3810259 (N.D. Cal. Aug. 26)....................................................................7

*Ctr. for Biological Diversity v. EPA,*
  56 F.4th 55 , 66 (D.C. Cir. 2022)........................................................................................9

*Ctr. for Biological Diversity v. Regan,*
  597 F. Supp. 3d 173 (D.D.C. 2022) ...................................................................................3

*Cureton v. Nat'l Collegiate Athletic Ass'n,*
  198 F.3d 107 (3d Cir. 1999).......................................................................................28, 29

*Curran v. Mt. Diablo Council of Boy Scouts,*
  952 P.2d 218 (Cal. 1998)...................................................................................................37

*Daniels v. Pipefitters' Ass'n,*
  945 F.2d 906 (7th Cir. 1991) ...........................................................................................22

*Defending Educ. v. Olentangy Sch. Dist.,*
  158 F.4th 732 (6th Cir. 2025) (en banc) ...........................................................................3

*Deide v. Day,*
  676 F. Supp. 3d 196 (S.D.N.Y. 2023)..............................................................................23

*Dep't of Transp. v. Paralyzed Veterans of Am.,*
  477 U.S. 597 (1986) ..........................................................................................................27

*Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians,*
  2025 WL 973614 (S.D. Miss. Mar. 31, 2025)...........................................................passim

*Doe v. Kamehameha Schs.,*
  295 F. Supp. 2d 1141, 1162 n.18 (D. Haw. 2003).........................................................25

*Doe v. Salvation Army,*
  685 F.3d 564 (6th Cir. 2012) .....................................................................................30, 31

*Dynalantic Corp. v. DOD,*
  115 F.3d 1012 (D.C. Cir. 1997) .......................................................................................11

*Eagle F. v. Phyllis Schlafly's Am. Eagles,*
  2020 WL 374557 (S.D. Ill. Jan. 23) .................................................................................20

*Erickson v. Pardus,*
  551 U.S. 89 (2007) ..........................................................................................................2, 6

*Firestone v. Firestone,*
  76 F.3d 1205 (D.C. Cir. 1996)..........................................................................................42

*Foster v. BJC Health Sys.,*
  121 F. Supp. 2d 1280 (E.D. Mo. 2000) ...........................................................................20

*Fresno Cmty. Hosp. & Med. Ctr. v. Cochran,*
  987 F.3d 158 (D.C. Cir. 2021)..........................................................................................29

*Gard v. Teletronics Pacing Sys.,*
  859 F. Supp. 1349 (D. Colo. 1994) ..................................................................................40

*Ghawanmeh v. Islamic Saudi Acad.,*
  268 F.R.D. 108 (D.D.C. 2010)..........................................................................................42

*Girard v. Int'l Ass'n of Approved Basketball Offs.*,
2020 WL 13664730 (D. Conn. Feb. 27),...........................................................................41

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016)..................................................................................................3

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ...........................................................................................4, 8, 24

*Grimes v. Superior Home Health Care*,
929 F. Supp. 1088 (M.D. Tenn. 1996)...............................................................................29

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ............................................................................................................27

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ............................................................................................................24

*GTE New Media Servs. v. Ameritech Corp.*,
21 F. Supp. 2d 27 (D.D.C. 1998)........................................................................................40

*Hall v. San Francisco*,
2017 WL 5569829 (N.D. Cal. Nov. 20) ..........................................................................6, 7

*Hamer v. Sidway*,
27 N.E. 256 (N.Y. 1891)......................................................................................................21

*Hampton v. Dillard Dep't Stores,*
247 F.3d 1091 , 1104 (10th Cir. 2001) ...............................................................................19

*Harrison v. Rancho Mirage*,
243 Cal. App. 4th 162 (2015) ..............................................................................................41

*Hart v. Cult Awareness Network*,
16 Cal. Rptr. 2d 705 (1993) ................................................................................................42

*Haskell v. Time, Inc.*,
857 F. Supp. 1392 (E.D. Cal. 1994) ...................................................................................19

*Haskell v. Time, Inc.*,
857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994)...................................................................19

*Hassan v. Iowa*,
2012 WL 12974068 (S.D. Iowa Apr. 26)...............................................................................6

*Hassan v. Iowa*,
493 F. App'x 813 (8th Cir. 2012).............................................................................................6

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ..............................................................................................................25

*Hunter ex rel. A.H. v. D.C.*,
64 F. Supp. 3d 158 (D.D.C. 2014) ......................................................................................34

*In re M.M.D.*,
662 A.2d 837 (D.C. 1995).....................................................................................................35

*In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*,
298 F. Supp. 3d 1285 (N.D. Cal. 2018) ................................................................................16

*Isbister v. Boys' Club of Santa Cruz, Inc.*,
707 P.2d 212 (Cal. 1985) ...................................................................................... 36, 37

*Itar-Tass Russian News Agency v. Russian Kurier*,
140 F.3d 442 (2d Cir. 1998) .....................................................................................40

*James v. Team Washington, Inc.*,
1997 WL 633323 (D.D.C. Oct. 7) ...........................................................................35

*\*Joyner v. Morrison & Foerster LLP*,
140 F.4th 523 (D.C. Cir. 2025) ...............................................................................38

*Koons v. Attorney Gen. New Jersey*,
156 F.4th 210 (3d Cir. 2025) .....................................................................................9

*Koons v. Platkin*,
673 F. Supp. 3d 515 (D.N.J. 2023).............................................................................9

*Larsen v. U.S. Navy*,
486 F. Supp. 2d 11 (D.D.C. 2007) ...................................................................... 5, 12

*Lindsay v. GEICO*,
448 F.3d 416 (D.C. Cir. 2006).......................................................................38, 39, 40

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................................................2

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273 (1976) ...................................................................................................1

*McWilliams Ballard, Inc. v. Level 2 Dev.*,
697 F. Supp. 2d 101 (D.D.C. 2010) .........................................................................21

*Mead v. City First Bank of D.C.*,
256 F.R.D. 6 (D.D.C. 2009) .....................................................................................43

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .................................................................................8

*Mobley v. Workday, Inc.*,
740 F. Supp. 3d 7969 (N.D. Cal. 2024) ...................................................................41

*Moore v. USDA*,
993 F.2d 1222 (5th Cir. 1993) ...................................................................................4

*Newman v. Howard Univ. Sch. of L.*,
715 F. Supp. 3d 86 (D.D.C. 2024) .................................................................14, 20, 34

*Nielsen v. Preap*,
586 U.S. 392 (2019) .................................................................................................24

*Nuziard v. MBDA*,
676 F. Supp. 3d 473 (N.D. Tex. 2023) .......................................................................4

*O'Connor v. Vill. Green Owners Assn.,
    662 P.2d 427 (Cal. 1983) ................................................................................36

O'Donnell v. Barry,
    148 F.3d 1126 (D.C. Cir. 1998) .....................................................................42

Omnicare, Inc. v. UnitedHealth Grp.,
    594 F. Supp. 2d 945 (N.D. Ill. 2009) ........................................................40, 42

Omnipoint Corp. v. FCC,
    78 F.3d 620 , 628 (D.C. Cir. 1996) ...............................................................11

Ortega v. Champion Room BK,
    2023 WL 5279368 (E.D.N.Y. May 1) .............................................................39

Osborn v. Visa Inc.,
    797 F.3d 1057 (D.C. Cir. 2015) .....................................................................12

Pappas v. D.C.,
    513 F. Supp. 3d 64 (D.D.C. 2021) .................................................................42

Parents Involved v. Seattle Sch. Dist. No. 1,
    551 U.S. 701 (2007) .....................................................................................12

Patterson v. McLean Credit Union,
    491 U.S. 164 (1989) .....................................................................................24

Peart v. Latham & Watkins,
    985 F. Supp. 2d 72 (D.D.C. 2013) .................................................................39

Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.,
    2021 WL 1313108 (E.D. Pa. Apr. 8) ..............................................................19

Phillips v. Del Toro,
    2022 WL 1597583 (D.D.C. May 19) ...............................................................42

Pietersen v. DOS,
    138 F.4th 552 (D.C. Cir. 2025) .......................................................................6

Pietrangelo v. Refresh Club,
    2024 WL 3400258 (D.D.C. July 12) ................................................................40

Pines v. Tomson,
    206 Cal. Rptr. 866 (Ct. App. 1984) ...........................................................36, 42

R.A.V. v. St. Paul,
    505 U.S. 37 (1992) .......................................................................................25

Randall v. UNOS,
    720 F. Supp. 3d 864 (C.D. Cal. 2024) .......................................................38, 39

RELX, Inc. v. Baran,
    397 F. Supp. 3d 41 (D.D.C. 2019) ..................................................................2

Richardson v. Nat'l R.R. Passenger Corp.,
    2025 WL 1568198 (D.D.C. June 3) ................................................................40

*Robertson v. United States*,
    343 U.S. 711 (1952) ................................................................................................19

*Rodemaker v. Valdosta Bd. of Educ.*,
    110 F.4th 1318 (11th Cir. 2024) .............................................................................39

*Rotary Club of Duarte v. Bd. of Directors*,
    224 Cal. Rptr. 213 (Ct. App. 1986) .................................................................. 36, 37

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) .................................................................................................25

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
    786 F.3d 510, 519 (7th Cir. 2015) ..................................................................... 30, 31

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ........................................................................................ 24, 25

*Scaglione v. Chappaqua Cent. Sch. Dist.*,
    209 F. Supp. 2d 311 (S.D.N.Y. 2002) ....................................................................41

*Settles v. U.S. Parole Comm'n*,
    429 F.3d 1098 (D.C. Cir. 2005) ..........................................................................5, 8

*SFFA v. Harvard*,
    600 U.S. 181 (2023) ..............................................................................................1, 3

*Shah v. Spirit Airlines*,
    2024 WL 4527353 (S.D. Fla. Oct. 18) ...................................................................39

*Shea v. Kerry*,
    796 F.3d 42 (D.C. Cir. 2015) ............................................................................ 5, 11

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
    797 F. Supp. 3d 440 (D. Md. 2024) .......................................................................11

*Smith v. K-Mart Corp.*,
    899 F. Supp. 503 (E.D. Wash. 1995) ....................................................................42

*Sporhase v. Neb. ex rel. Douglas*,
    458 U.S. 941 (1982) .................................................................................................8

*Stevens v. Optimum Health Inst.*,
    2010 WL 1838252 (S.D. Cal. May 5) ....................................................................38

*Tanner-Brown v. Haaland*,
    105 F.4th 437 (D.C. Cir. 2024) ...............................................................................3

*The Bail Project v. Comm'r*,
    76 F.4th 569 (7th Cir. 2023) ..................................................................................25

*Triple AAA Ass'n for Child. with Developmental Disabilities v. Del Taco*,
    2007 WL 9776739 (S.D. Cal. Feb. 26) ....................................................................6

*Tucker v. Howard Univ. Hosp.*,
    764 F. Supp. 2d 1 (D.D.C. 2011) ...........................................................................39

*U.S. AirWaves, Inc. v. FCC,*
   232 F.3d 227 (D.C. Cir. 2000) ........................................................................5

*U.S. Jaycees v. Bloomfield,*
   434 A.2d 1379 (D.C. 1981) ..............................................................33, 34, 41

*UMWA v. Gibbs,*
   383 U.S. 715 (1966) ...............................................................................38, 40

*United States v. Blewett,*
   746 F.3d 647 (6th Cir. 2013) ......................................................................24

*United States v. Collins,*
   56 F.3d 1416, 1420 (D.C. Cir. 1995) ..........................................................27

*United States v. McAusland,*
   979 F.2d 970 (4th Cir. 1992) ......................................................................27

*United States v. Schwartz,*
   785 F.2d 673 (9th Cir. 1986) ......................................................................27

*Viardo v. Fams. USA Found.,*
   2025 WL 2336223 (D.D.C. Aug. 13) ..........................................................40

*Walker v. Uber Techs.,*
   749 F. Supp. 3d 134 (D.D.C. 2024) ...........................................................18

*Warfield v. Peninsula Golf & Country Club,*
   896 P.2d 776 (Cal. 1995) .....................................................................36, 37

*Watson v. Fraternal Ord. of Eagles,*
   915 F.2d 235 (6th Cir. 1990) ...............................................................11, 21

*Wellington v. D.C.,*
   851 F. Supp. 1 (D.D.C. 1994) ....................................................................29

*Whitbeck v. Vital Signs,*
   116 F.3d 588 (D.C. Cir. 1997) ...................................................................41

*Wilborn v. S. Union State Cmty. Coll.,*
   720 F. Supp. 2d 1274 (M.D. Ala. 2010) .....................................................32

*Williams v. 5300 Columbia Pike Corp.,*
   891 F. Supp. 1169 (E.D. Va. 1995) ...........................................................40

*Williams v. Brennan,*
   285 F. Supp. 3d 1 (D.D.C. 2017) ...............................................................43

*Wisconsin v. Mitchell,*
   508 U.S. 476, 487 (1993) ...........................................................................25

*Worth v. Jackson,*
   451 F.3d 854 (D.C. Cir. 2006) ................................................................6, 11

## Statutes, Rules and Regulations

20 U.S.C. §1090(a)(2)(D) .................................................................................28, 30

28 C.F.R. §42.102(c)(5) ........................................................................................27

28 U.S.C. §1367 ................................................................................................... 38, 39

28 U.S.C. §2403 .......................................................................................................... 23

42 U.S.C. §1981 ............................................................................................... 13, 18, 24

42 U.S.C. §2000d ................................................................................................. passim

42 U.S.C. §2000e(c) .............................................................................................. 32, 41

Cal. Civ. Code §51 ................................................................................................. 36, 39

D.C. Code §2-1401 ............................................................................................... passim

D.C. Code §2-1402 ............................................................................................... 31, 39

Fed. R. Civ. P. 15(a)(2) .............................................................................................. 42

Fed. R. Civ. P. 5.1 ..................................................................................................... 23

Fed. R. Civ. P. 9(b) ...................................................................................................... 5

## Other Authorities

*"Place of Public Accommodation" Under the D.C. Human Rights Act*,
  D.C. Office of Human Rights (Dec. 16, 2021), perma.cc/R2V2-A58S. .......................... 34

13D Fed. Prac. & Proc. Juris. §3567.1 (Wright & Miller, 3d ed.) ............................... 38

5B Fed. Prac. & Proc. Civ. §1357 (Wright & Miller, 4th ed.) ..................................... 42

Black's Law Dictionary (12th ed. 2024) ...................................................................... 26

*Oxford English Dictionary* ........................................................................................... 31

*Rest. (2d) Contract* (1981) .................................................................................... 13, 21

Sunstein, *On Analogical Reasoning*,
  106 Harv. L. Rev. 741, 741 (1993) ......................................................................... 42

*Title VI Legal Manual* §V(c)(1),
  DOJ, justice.gov/crt/fcs/T6manual5 ................................................. 27, 28, 29, 30

## INTRODUCTION

HSF starts its motion with an appeal to policy, hoping this Court will view its Scholars Program as a benign gift for "Hispanic students." MTD (Doc.19) 1. But under the law, barring students from educational opportunities based on their ethnicity is never benign. *SFFA v. Harvard*, 600 U.S. 181, 214 (2023). And on the facts, HSF discriminates against most racial minorities too, including non-Hispanic Arabs, Asians, and even blacks—"the immediate impetus" for the Civil Rights Act. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 289 (1976). HSF never denies that its 100% Hispanic quota intentionally discriminates, or that its discrimination has no justification under state or federal law. HSF's motion argues only that this otherwise illegal discrimination is beyond the power of the federal courts and the scope of existing antidiscrimination laws. If the Court accepts *those* arguments, then a "White Anglo-Saxon Scholars Program" would be equally lawful. *See AAER v. Fearless Fund*, 103 F.4th 765, 779 (11th Cir. 2024) (making the same point). That's bad policy, even if courts decided cases based on policy rather than the neutral synthesis of binding law.

Though HSF is "aware of no case" where "an educational scholarship awarded by a charitable nonprofit" was "deemed a contract" under §1981, MTD 1-2, the Alliance has won that point many times—including in a decision issued one day after HSF wrote that sentence. In the Alliance's case against the ABA, the court rejected a motion to dismiss raising the same standing and merits arguments that HSF raises here. *See AAER v. ABA*, 2026 WL 161596, at *3-5 (N.D. Ill. Jan. 21). After the Alliance sued the ABA, moreover, that defendant changed its minorities-only scholarship to instead require "'a strong commitment to advancing diversity, equity, and inclusion.'" *Id.* at *3. McDonald's did something similar in response to another Alliance suit, *AAER v. McDonald's*, Doc.21, No. 3:25-cv-50 (M.D. Tenn. Jan. 31, 2025), changing its Hispanics-only scholarship to instead require a demonstrated "impact and contribution to the Hispanic/Latino community," *Safeguarding HACER Scholarships in Light of Recent Litigation*, McDonald's (Jan. 31, 2025), perma.cc/J9YA-SVDJ. Though HSF

1

hinted it might do the same here, *see* Am.-Compl. (Doc.15) ¶26; Doc. 12 at 18, it has decided to keep its outright ban on all ethnicities but one. A bold choice, but one that HSF will have to defend on the facts at summary judgment.

This Court should deny HSF's motion to dismiss the amended complaint.

## ARGUMENT

HSF's motion is judged under the normal pleading standard. Though jurisdictional challenges can be "factual," HSF's challenge to the Alliance's standing is "facial." *RELX, Inc. v. Baran*, 397 F. Supp. 3d 41, 47-48 (D.D.C. 2019). HSF introduces no outside evidence. It accepts the Alliance's factual allegations as true. MTD 4 n.1. And its motion tests only whether the complaint plausibly alleges standing. *See* MTD 8. Such facial challenges to standing under Rule 12(b)(1) are assessed under the same liberal pleading standard that governs motions to dismiss for failure to state a claim under Rule 12(b)(6). *Chavous v. D.C. FRMAA*, 154 F. Supp. 2d 40, 44-45 (D.D.C. 2001).

Under the normal pleading standard, the Court "construes the complaint liberally in the plaintiff's favor," "accepting as true all of the factual allegations" and drawing "all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans*, 525 F.3d 8, 15 (D.C. Cir. 2008) (cleaned up). "Specific facts are not necessary," *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), and the Court must "presume that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (cleaned up). After all that accepting, construing, and presuming, the question is whether the plaintiff's standing and the defendant's legal violation are "'plausible.'" *Berk v. Choy*, 2026 WL 135974, at *4 (U.S. Jan. 20). Plausible means a "'reasonable inference,'" not likely or more plausible than alternatives. *Banneker Ventures v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). A plausible theory "'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Berk*, 2026 WL 135974, at *4. "By design, this

system of pleading makes it relatively easy for plaintiffs" to avoid dismissal, "even for claims that are likely to fail." *Id.*

Lastly, the Court "may consider only 'the facts contained within the four corners of the complaint.'" *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 186 (D.D.C. 2022). Though it can also consider documents that are "integral" to the complaint, integral is a high bar. *Banneker*, 798 F.3d at 1133. A document is not integral unless the complaint "'relies heavily upon its terms and effect'"; "mentioning a document" and "offering limited quotations" are "not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (cleaned up). Here, the only documents that arguably qualify as integral are the terms of the agreements that the Alliance contends are contracts. *E.g.*, Am.-Compl. ¶38(a)-(b), ¶45. Contra HSF, *see* MTD 20 n.3, the homepage for HSF's 2026 application is not integral to the complaint, *see Banneker*, 798 F.3d at 1133-34

## I.    The complaint plausibly alleges standing.

As an association representing its members, the Alliance has standing if one of its members has standing, the case is germane to its mission, and the claims and relief do not require its members' participation. *Harvard*, 600 U.S. at 199. The last two requirements are unchallenged and met. *See* MTD 10. This case against an ethnic preference is plainly germane to the Alliance's mission of ending ethnic preferences. Am.-Compl. ¶5; *see Fearless Fund*, 103 F.4th at 771. And the Alliance's facial challenges and requests for forward-looking relief and nominal damages do not require its members' participation. Am.-Compl. ¶77, ¶116; *see Fearless Fund*, 103 F.4th at 771; *AAER v. Sw. Airlines*, 2024 WL 5012055, at *3-4 (N.D. Tex. Dec. 6). This no-participation requirement is also not jurisdictional, *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024); so by failing to challenge it in its opening brief, HSF forfeits the point, *Defending Educ. v. Olentangy Sch. Dist.*, 158 F.4th 732, 741 (6th Cir. 2025) (en banc).

The Alliance also has at least one member with standing. When a "'discriminatory policy'" prevents someone from equally "'compet[ing]'" for a benefit, that person suffers a "'denial of equal treatment'" that is an "'injury in fact.'" *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003). This injury occurs regardless of whether the student would have been selected, *id.*, and regardless of whether the student took the futile step of applying, *Fearless Fund*, 103 F.4th at 774; *Moore v. USDA*, 993 F.2d 1222, 1223-24 & n.2 (5th Cir. 1993). Causation is satisfied because this injury is "traceable" to the discriminatory "exclusion," and redressability is satisfied by an order stopping the discrimination. *Fearless Fund*, 103 F.4th at 772.

To "'establish standing'" for prospective relief, a plaintiff asserting this injury "'need only'" allege that she is "'able and ready' to apply … should the [defendant] cease to use race." *Gratz*, 539 U.S. at 262. HSF agrees that this ready-and-able test applies to all the Alliance's claims. MTD 11-13. HSF further agrees that a plaintiff who satisfies this test has a concrete, personalized "injury" and thus does not assert a mere "generalized grievance." MTD 14. The Alliance's identified members, Students A-B, both satisfy the ready-and-able test at this stage.

Students A-B are "able" to apply because they meet the program's nonethnic requirements. *Nuziard v. MBDA*, 676 F. Supp. 3d 473, 480 (N.D. Tex. 2023). As the complaint alleges and HSF never denies, the program has only four objective eligibility criteria, Am.-Compl. ¶¶27-33, and Students A-B satisfy them all. As a high-school senior and 2L in law school, Students A-B are the right age. ¶51, ¶60. They will attend post-secondary institutions as full-time students in the upcoming year. ¶52(b), ¶61(b). Both are U.S. citizens. ¶52(c), ¶61(d). And their GPAs are well above the cutoffs. ¶52(a), ¶61(a).

Students A-B are also "ready" to apply because they have the requisite "intent." *Gratz*, 539 U.S. at 261-62. Per the complaint, Student A "would immediately apply" to the program if a court ordered HSF to stop discriminating. Am.-Compl. ¶54. He "would create an HSF account," "quickly

4

complete Phase I of the application," and "submit it before the deadline," ¶¶54-55—a simple process that HSF says takes less than an hour, Am.-Compl. ¶15. As for Student B, he "will apply" in the current cycle. ¶63, ¶65. These unequivocal allegations about the members' intent are "sufficient" for readiness, especially at the pleading stage. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005); *accord Shea v. Kerry*, 796 F.3d 42, 50-51 (D.C. Cir. 2015); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 21-22 (D.D.C. 2007); *U.S. AirWaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000).

Though no more is needed, *see* Fed. R. Civ. P. 9(b) ("intent … may be alleged generally"), the complaint adds details that corroborate the members' intent. The complaint "pinpoint[s]" a specific opportunity that these students are ready for: the program's 2026 cycle, which is open now. *Fearless Fund*, 103 F.4th at 774; *Do No Harm v. NAEMT*, 2025 WL 973614, at *4-5 (S.D. Miss. Mar. 31); *see* Am.-Compl. ¶15. It alleges how Students A-B are qualified for the program, why they want to be Scholars, and what they would do with the prizes. *Fearless Fund*, 103 F.4th at 774; *see* Am.-Compl. ¶52, ¶¶57-59, ¶61, ¶¶66-68. And it alleges "'some'" steps that each student has taken. *Fearless Fund*, 103 F.4th at 774 n.3; *accord Larsen*, 486 F. Supp. 2d at 22 (explaining that a plaintiff can be ready to apply without taking every procedural step). Though HSF says Student A "does not allege a single affirmative step that he has taken," MTD 11, the complaint alleges multiple steps: he "reviewed" the program and "determined how he would answer every question" on "the 2026 application." Am.-Compl. ¶54. And Student B has taken every step short of clicking submit, which he'll also do before the deadline. Am.-Compl. ¶¶64-65. For Student B especially, "it is hard to imagine what else [he] could have done, short of submitting an application, to demonstrate his readiness, willingness, and ability to apply." *ABA*, 2026 WL 161596, at *4.

Relying exclusively on *Carney v. Adams*, HSF claims that Students A-B aren't *really* ready to apply because their stated intentions are insincere. It claims that, because Student A has not created an account and filled out the application, he must not "actually" want to apply. MTD 11. And it claims

5

that, because Student B has not yet clicked submit, he must have no "'actual desire'" to apply. MTD 12-13 & n.2. This argument fails for at least four reasons.

**1.** HSF cannot challenge the "sincerity" of the complaint's factual allegations "at the pleading stage," especially on a "facial attack" to standing. *Triple AAA Ass'n for Child. with Developmental Disabilities v. Del Taco*, 2007 WL 9776739, at *5 (S.D. Cal. Feb. 26). "There is no heightened pleading requirement for allegations of standing." *Bldg. & Const. Trades Council v. Downtown Dev.*, 448 F.3d 138, 145 (2d Cir. 2006). HSF cannot contradict the complaint's factual allegations: On a facial challenge, this Court must accept those facts as true, including the factual allegations about the members' intent. *NAEMT*, 2025 WL 973614, at *3-5; *accord Worth v. Jackson*, 451 F.3d 854, 859 (D.C. Cir. 2006) (courts must "take seriously" a plaintiff's alleged intent to "apply"). Nor can HSF fault the complaint for omitting certain details: Complaints can plead standing "'general[ly]'" because courts "'presume that general allegations embrace those specific facts that are necessary.'" *AAER v. Pritzker*, 2025 WL 2229995, at *5 (C.D. Ill. Aug. 5); *accord Hall v. San Francisco*, 2017 WL 5569829, at *6 (N.D. Cal. Nov. 20) ("detailed allegations" not needed to plead "'able and ready'"); *Hassan v. Iowa*, 2012 WL 12974068, at *3 n.4 (S.D. Iowa Apr. 26) ("general allegations as to 'readiness' will suffice"), *aff'd*, 493 F. App'x 813 (8th Cir. 2012). Contra HSF, the Court's task at this stage is not to decide the "truth" of any fact or weigh the sufficiency of the "'evidence.'" MTD 11, 13. The question is whether HSF has "notice" of the Alliance's basis for standing, which it plainly does. *See Erickson*, 551 U.S. at 93-94; *Pietersen v. DOS*, 138 F.4th 552, 559-60 (D.C. Cir. 2025).

HSF likewise cannot construe any allegations or omissions in the complaint *against* the Alliance. *NAEMT*, 2025 WL 973614, at *5. "The Alliance receives the benefit of a favorable construction of the amended complaint's allegations." *ABA*, 2026 WL 161596, at *4. So HSF cannot construe Student A's decision not to apply as proof that, contra the complaint, he "likel[y]" has no "actua[l]" interest in applying. *Cf.* MTD 11. And it cannot construe the fact that Student B had not yet submitted

6

his application on January 9 as proof that, contra the complaint, he "refuses" or has no "'actual desire'" to apply. *Cf.* MTD 12 n.2. Nor can HSF use an omission in the complaint—that Student B "does not claim to have applied for even one scholarship since he 'applied for law school,'" MTD 12—as proof of the opposite or as evidence that he doesn't want scholarships. Even if it could, HSF cites no case suggesting that a plaintiff who pleads he is ready to apply to the challenged program must also plead that he's ready to apply to some other program. *See NAEMT*, 2025 WL 973614, at \*3-5 (holding the opposite); *Fearless Fund*, 103 F.4th at 774 & n.3 (same).

Though HSF relies entirely on *Carney*, that "summary judgment" case "does not opine on the pleading standard that applies to The Alliance's amended complaint." *ABA*, 2026 WL 161596, at \*4 (distinguishing *Carney*). Based on the "evidence" unearthed in "discovery," *Carney* rejected the plaintiff's testimony that he was ready to apply as false. 592 U.S. 53, 61-66 (2020); *see Crawford v. Uber Techs.*, 2021 WL 3810259, at \*3 (N.D. Cal. Aug. 26) (explaining *Carney*). "[T]he *Carney* opinion emphasizes that it is 'a highly fact-specific case,' decided based on the summary judgment 'record evidence.'" *ABA*, 2026 WL 161596, at \*4 (quoting *Carney*). Contra HSF, *Carney* even left open "whether a statement of intent alone under other circumstances could be enough." 592 U.S. at 64; *cf.* MTD 13. As explained, the Alliance's complaint offers more than a general statement of intent; and at the pleading stage, general statements are fine, factual allegations must be accepted as true, and no "contrary evidence" can be weighed, *cf. Carney*, 592 U.S. at 64. "[M]easur[ing] the amended complaint's allegations," as the Court did "in *Carney*," would be "improper" at this stage. *ABA*, 2026 WL 161596, at \*4; *accord Christian Lab. Ass'n v. Duluth*, 2021 WL 2783732, at \*9 n.12 (D. Minn. July 2) (distinguishing *Carney* "because proof is not required at [the pleading] stage"); *Hall*, 2017 WL 5569829, at \*6 (similar).

**2.** HSF's arguments, which criticize Students A-B for not doing enough to apply, ignore that these students' applications would be futile. As the Alliance alleges and HSF concedes, the program outright bans students who are not Hispanic. Am.-Compl. ¶2, ¶¶20-25; *see, e.g.*, MTD 1, 4. Because

Students A-B are not Hispanic, they are not "presumptively eligible" for the program, *cf.* MTD 12, and neither "could apply" at any time, *cf.* MTD 11. Article III does not require them to "engage in a futile act" by "go[ing] through the motions" of applying for a program with an ethnicity requirement that precludes them from being selected. *Settles*, 429 F.3d at 1102. And for the same reason, Students A-B need not "engage in a futile act to prove [their] sincerity." *Mendoza v. Perez*, 754 F.3d 1002, 1014 n.6 (D.C. Cir. 2014). Courts find standing in futility cases even where there is "no evidence that [the] plaintiff had applied and been rejected." *Gratz*, 539 U.S. at 261 (summarizing *Turner v. Fouche*, 396 U.S. 346, 361-62, n.23 (1970)).

"The *Carney* court reaffirmed" this principle. *ABA*, 2026 WL 161596, at *4. It "contrast[ed]" cases where an applicant could apply from cases, like this one, where the application would be futile. *Carney*, 592 U.S. at 66. The Court stressed that it did not "depart from or modify" its prior precedents, including its precedents holding that "a plaintiff need not translate his or her desire … into a formal application where that application would be merely a futile gesture." *Id.* (cleaned up; citing *Teamsters v. United States*, 431 U.S. 324, 365-66 (1977); and *Sporhase v. Neb. ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982)). So even if this Court could draw adverse inferences against the Alliance at this stage, it cannot draw any adverse inference based on a member's failure to apply. The more reasonable inference (and certainly a *plausible* one) is that the member did not apply because applying is futile. *See* Am.-Compl. ¶55. Because the Alliance's members "would not have been" selected "had they applied," any "failure to submit an application … does not deprive them of standing." *Sporhase*, 458 U.S. at 945 n.2; *accord Fearless Fund*, 103 F.4th at 774.

**3.** HSF's criticisms are particularly weak for Student B. Though he completely filled out the application before the deadline, HSF thinks he lacks standing until he takes the last step of "submitting the application." MTD 12. But as just explained, Article III does not require him to even start a futile application, let alone take the last step of "submitting" one. *ABA*, 2026 WL 161596, at *4. More

8

fundamentally, HSF ignores the complaint's allegations that Student B "will" submit his application before the deadline. Am.-Compl. ¶65, ¶63. Student B is not just ready and able to apply; he "is apply-ing." *Koons v. Platkin*, 673 F. Supp. 3d 515, 559 (D.N.J. 2023) (cleaned up), *aff'd on standing*, 156 F.4th 210 (3d Cir. 2025), *reh'g en banc granted, op. vacated*, 162 F.4th 100 (3d Cir. 2025). As HSF concedes, it cannot question whether someone who is "submitting the application" would submit the application. MTD 12. And because an association needs only "one" member with standing, this Court could begin and end with Student B. *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022).[1]

**4.** Even ignoring all these core differences from *Carney*—that this case is not being decided at summary judgment after discovery, that the members' applications are futile, and that Student B is applying right now—-this case would be nothing like *Carney* on the facts. The plaintiff in *Carney* said he wanted to be a judge, but that state law required judges to be Democrats or Republicans. 592 U.S. at 56. "After discovery" on the plaintiff's "history and intentions in seeking a judgeship," including "interrogatories" and a "deposition," the Supreme Court found his stated intent insincere. *Id.* at 56, 60, 62-64. Among other "highly fact-specific" problems with his testimony, that plaintiff could've applied for 14 prior judgeships but didn't; he wasn't aware of any upcoming vacancies; he admitted that he sued because he got the idea from a law-review article; and he abruptly came out of retirement and changed his lifelong party registration to no longer be a Democrat. *Id.* at 61-64.

For the same reasons the *Carney* plaintiff lacked standing, Students A-B have it here. *See Fearless Fund*, 103 F.4th at 773-74 (distinguishing the Alliance's members from the *Carney* plaintiff). They iden-tified a specific opportunity and "timeframe" in early 2026 when they would apply. *Carney*, 592 U.S.

---

[1] HSF cannot argue—for the first time in reply—that Student B's decision to apply somehow undermines Student A's intent to apply. Even if the Court could draw inferences against the Alliance at this stage, the two members are not similarly situated. As a rising 3L in law school, the 2026 cycle is Student B's "last chance" to apply in the normal course. Am.-Compl. ¶63. His now-or-never dilemma does not apply to Student A, who is a rising college freshman with several more chances. ¶¶51-52.

at 63; *see* Am.-Compl. ¶54, ¶63. And they did not fail to apply in other cycles "when [they] w[ere] eligible." *Carney*, 592 U.S. at 62-63. Because the scholarship is not available until students are seniors in high school, Student A could not apply until this cycle. Am.-Compl. ¶28, ¶51. And neither student was ever eligible because HSF outright bans non-Hispanics. ¶2, ¶20. Even still, Student B is applying right now and has already finished Phase I. Am.-Compl. ¶¶64-65; *cf. Carney*, 592 U.S. at 63 (faulting the plaintiff for giving no "anticipated timeframe" for applying and making no "preparations or investigations" into applying). Also unlike *Carney*, Students A-B obviously did not change their ethnicity to make themselves ineligible for HSF's program, or decide to become students so they could sue over this scholarship. *Cf. Carney*, 592 U.S. at 62. There's nothing unusual about these actual students wanting—what HSF surely agrees is—a lucrative scholarship program that offers many educational and career benefits and lifelong networking opportunities. *See* Am.-Compl. ¶13, ¶¶43-48. So even if the amended complaint were a summary-judgment record, the Alliance would have carried its burden on standing.

*     *     *

In a separate section of its motion, HSF appears to challenge the Alliance's "standing" to make certain arguments. It stresses that the program's application has several phases: Only applicants who make it past Phase I are asked to submit essays in Phase II, and only applicants who make it past Phase II can apply for scholarships, join the Fund-A-Scholar program, or submit the required surveys. Because HSF thinks it's too "speculative" that Students A-B would get past Phase I, HSF says "this Court may not rely on the Alliance's allegations" about the many contracts that the program employs after that first phase. MTD 13-16. HSF also speculates that Members A-B aren't eligible for the Fund-A-Scholar program because they might have no "unmet financial need." MTD 15-16. These arguments are confused.

HSF cannot use standing to stop the Alliance from making certain arguments. "'Standing is assessed based on the claims asserted and the type of injury alleged, not argument-by-argument.'"

10

*Sierra Club v. Nat'l Marine Fisheries Serv.*, 797 F. Supp. 3d 440, 473 (D. Md. 2024) (cleaned up; quoting *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 910 (9th Cir. 2020)). The complaint discusses the essays, scholarships, Fund-A-Scholar program, surveys, and more to prove that, for purposes of §1981, HSF's program involves contracts. *See* Am.-Compl. ¶¶34-49. To get any of those contracts, students must be Hispanic: Only finalists can participate in the essay contest, ¶16, ¶40; only Scholars can be parties to the other contracts, ¶¶43-48; and only Hispanics can be finalists or Scholars, ¶¶20-25. So HSF runs a program that involves contracts but that excludes non-Hispanics right out of the gate. By preventing non-Hispanics from entering, HSF bars certain ethnicities from making the contracts it offers to finalists and Scholars—a classic violation of §1981. *See Watson v. Fraternal Ord. of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990).

For purposes of standing, it does not matter whether Students A-B would make it to Phase II, be selected as Scholars, or get any particular benefits or contracts. HSF has "'erect[ed] a barrier'" that bars non-Hispanics from joining the program or getting any of its benefits. *Worth*, 451 F.3d at 858-59. The "imposition of the barrier" itself, and the resulting "inability to compete on an equal footing," is a complete "'injury in fact.'" *Id.* at 859; *accord Fearless Fund*, 103 F.4th at 774. To "establish standing," a non-Hispanic student "need not allege that he would have obtained the benefit but for the barrier.'" *Worth*, 451 F.3d at 858-59. In other words, it doesn't matter how unlikely it is that Students A-B would be selected as finalists or Scholars, or how speculative it is that they "would have won (or will win) the award of a particular contract." *Dynalantic Corp. v. DOD*, 115 F.3d 1012, 1016 (D.C. Cir. 1997); *accord Omnipoint Corp. v. FCC*, 78 F.3d 620, 628 (D.C. Cir. 1996). "Because the injury lies in the denial of an equal *opportunity* to compete," courts in this circuit "do not inquire into the plaintiff's qualifications (or lack thereof) when assessing standing." *Shea*, 796 F.3d at 50.

Even if qualifications mattered, HSF cannot win—at the pleading stage—that Students A-B are ineligible for any of the program's contracts on grounds other than ethnicity. As the Alliance

11

alleges and HSF never denies, students who are selected as finalists are automatically eligible to compete in Phase II's essay contest. Am.-Compl. ¶16, ¶40. And all students who are selected as Scholars must complete the required surveys, ¶41; are automatically eligible to apply for scholarships, ¶44; and are automatically eligible to apply for the conferences and job fairs, ¶48.

Though HSF questions whether Students A-B have "unmet financial need" for the Fund-A-Scholar program, this argument fails for many reasons. For starters, nothing in the complaint—or the program's terms, for that matter—states that "unmet financial need" is a requirement to participate in that program. HSF would have to prove that argument later with "evidentiary support." *Larsen*, 486 F. Supp. 2d at 22. Even if unmet financial need were an eligibility requirement, the complaint alleges that both students have "unmet financial need." Am.-Compl. ¶58, ¶67. That factual allegation must be accepted as true, *Am. Nat. Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), and the Alliance had no duty to plead the details of these students' family finances with specificity, *Osborn v. Visa Inc.*, 797 F.3d 1057, 1063-64 (D.C. Cir. 2015). The Alliance added corroborating details anyway: These students know their own financial situations, ¶58, ¶¶66-67; both have sought out other scholarships, ¶58, ¶67; Student A just completed the FAFSA, the same form that HSF uses to calculate need, ¶52(d); and Student B *already* has "law-school debt," meaning his existing funds do not cover his existing costs, ¶66.

In all events, "[f]or purposes of standing," this Court should at most "assess whether it is *possible* for the plaintiffs to meet the eligibility requirements." *Larsen*, 486 F. Supp. 2d at 22 (emphasis added). Because the Alliance challenges "a more grievous and fundamental impediment to their candidacy"—the bar on non-Hispanics that stops Students A-B from even trying to qualify for any of HSF's contracts—the Alliance plausibly alleged standing. *Id.*; *accord Parents Involved v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718-19 (2007) (relevant question is whether race "may prejudice" the association's members, even if it's "possible" they would be denied on race-neutral grounds).

12

## II.     The complaint plausibly alleges violations of federal law.

Section 1981 bans ethnic discrimination in contracting, 42 U.S.C. §1981; and Title VI bans ethnic discrimination by recipients of federal assistance, 42 U.S.C. §2000d. The complaint plausibly alleges violations of both federal statutes.

### A.  Section 1981

In its motion, HSF does not challenge that most of the elements of §1981 are met. It never denies that §1981 covers discrimination based on ethnicity, no matter which ethnicity is helped or harmed. Am.-Compl. ¶74 (citing *McDonald*, 427 U.S. at 295; *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006)). It never denies that, by facially excluding non-Hispanics, its program intentionally discriminates. ¶¶77-78 (citing *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006)). And it never denies that intentional discrimination in contracting must survive strict scrutiny, ¶79 (citing *Gratz*, 539 U.S. at 276 n.23), or that its program fails that daunting standard, ¶¶80-81 (citing *Harvard*, 600 U.S. at 207; *Hammon v. Barry*, 826 F.2d 73, 79 (D.C. Cir. 1987)).

HSF's sole argument is that the Alliance fails to plausibly allege a contract. Though one would be enough, the complaint plausibly alleges many contracts. And HSF's constitutional-avoidance argument under the First Amendment meets none of the requirements for that canon.

#### 1.  The complaint plausibly alleges contracts.

HSF's main argument is that scholarships are unconditional gifts, where the donor gives money but the student gives no consideration in return. Of course, a scholarship *can* be a noncontractual gift. But as HSF's sources explain, gifts become contracts when they require the recipient's "promise or performance." *Rest. (2d) Contracts* §24 cmt. b (1981); *accord* §71 cmt. c ("Even where both parties know that a transaction is in part a bargain and in part a gift, the element of bargain may nevertheless furnish consideration for the entire transaction."). In our modern world, most scholarships are contracts because they demand performance from students, and because sophisticated nonprofits require students to make various promises via rules, terms and conditions, and other binding agreements. *E.g.*,

13

*Newman v. Howard Univ. Sch. of L.*, 715 F. Supp. 3d 86, 104 (D.D.C. 2024) (scholarship that paid student $26,000 per year "in exchange for his meeting certain eligibility criteria" was a "classic example of a contract").[2]

While HSF "is aware of no case where a scholarship from a charitable organization has given rise to a contract," MTD 21, 1-2, the Alliance is aware of plenty. To name three from recent years:

- The Alliance sued the American Bar Association, a 501(c)(3) nonprofit, over its Legal Opportunity Scholarship. The scholarship was open only to law students who are an "underrepresented racial and/or ethnic minority"—though, after the Alliance sued, the ABA changed that racial bar to instead require a "strong commitment to advancing [DEI]." When the ABA moved to dismiss the complaint on the ground that its scholarship is not a contract, the district court disagreed. The ABA makes applicants "agre[e] to allow the ABA to use their written application materials for promotional purposes, if selected," which is "sufficient" for a contract under §1981. *ABA*, 2026 WL 161596, at *1, *8.

- In *Do No Harm v. NAEMT*, the plaintiff sued a trade association, whose foundation arm (a 501(c)(3) nonprofit) offered a diversity scholarship. This scholarship was open only to "students of color." To get the money, the association made students agree to go to school, get good grades, graduate, get certified, and "[p]rovide follow up information and respond to NAEMT requests pertaining to their education and career." The plaintiff stated a claim under §1981. *See* 2025 WL 973614, at *1-2, *6 (denying motion to dismiss).

---

[2] HSF cites *Bingler v. Johnson*, but that case considered whether scholarships are "income" under the Tax Code, not whether they are contracts. 394 U.S. 741, 755 (1969). And its reasoning supports the Alliance. The Supreme Court upheld the IRS's decision not to treat all scholarships as "'gifts.'" *Id.* at 753. And it deemed the scholarship there to be income because, under the "contrac[t]," the offeror "unquestionably extracted a quid pro quo." *Id.* at 755-57 & n.31.

- In a case briefly before this Court, Do No Harm sued the American Association of University Women, a 501(c)(3) nonprofit, over its Selected Professions Fellowship. Despite the name, this "fellowship" was a $20,000 scholarship for graduate students who are "ethnic minorit[ies]." *Do No Harm v. AAUW*, Doc.1 ¶11, Doc.17 ¶1, No. 1:24-cv-1782-LLA (D.D.C. 2024). Recipients had to agree to be a full-time student and spend the money only on approved expenses. *AAUW*-Doc.1 ¶¶36-38. In its brief, the defendant did not deny that its scholarship was a contract under §1981. *See AAUW*-Doc.14. The case quickly ended because the defendant agreed to "no longer require applicants to belong to historically underrepresented ethnic minority groups" *AAUW*-Doc.17.

Section 1981 also applies to "'grants'" that involve contracts, even though grants are no less "canonical gifts" than scholarships. *Cf.* MTD 18, 24. Though HSF concedes that the grant program in *Fearless Fund* was a contract, *see* MTD 17, 27, the defendant there strongly disagreed. Zero judges agreed with the defendant, but that nonprofit argued that its grants were "'discretionary gifts' that confer 'no enforceable rights.'" 103 F.4th at 776; *see* Fearless-Br.50, 2023 WL 8596169 (arguing, just like HSF, that "the Alliance cites no case, nor has the Foundation located one, that applied §1981 to a private party's distribution of charitable grants"). Contra HSF, the Eleventh Circuit did not find a contract because the defendant's terms and conditions used the word "contest." *Cf.* MTD 21. The Eleventh Circuit denied the relevance of the defendant's terminology, ruling instead on the substance of the terms that governed applicants. 103 F.4th at 775. The terms and conditions created a contract because they gave "an entrant" the "chance to win $20,000 and obtain benefits" in exchange for its "submission," "permission to use its submission," and the "waive[r of] various claims." *Id.* at 770; *accord id.* at 776 (stressing that "§1981 protects would-be contractors—here, the contestants—to the same extent" as the ultimate winners (cleaned up)); *AAER v. Founders First CDC*, 2024 WL 3625684, at *3 & n.7 (N.D. Tex. July 31) (finding a contract where the grant program "offers contestants a grant

in exchange for their time, intellectual property, and a promise to use the funds in a manner acceptable to [defendant]").

Compared to the cases above, this one is even easier: The HSF program is crawling with contracts. From start to finish, the program makes students sign written terms and conditions that waive important rights, demands their performance in exchange for benefits, and offers Scholars exclusive contracting opportunities. HSF cannot defeat the existence of any of these contracts—let alone all of them. It especially cannot do so at the pleading stage, with no evidence and where the Alliance's facts are assumed true and all inferences are drawn in its favor. *ABA*, 2026 WL 161596, at *7.

**Terms & Conditions**: Phase I of HSF's application requires students to accept several contracts. Applicants cannot submit the application unless they click "I agree"; and by clicking "I Agree," the applicant agrees to "[a]ccept terms and conditions." Am.-Compl. ¶37. The words "*terms* and *conditions*" are "classic contractual language." *In re Samsung Galaxy Smartphone Mktg. & Sales Pracs. Litig.*, 298 F. Supp. 3d 1285, 1294 (N.D. Cal. 2018). That these terms are contracts for the HSF Scholars Program is obvious—and certainly well-pleaded.

The first contract in the application's terms and conditions requires applicants to "'acknowledge and agree that all applications and submitted materials shall become the property of HSF and will not be returned to you.'" Am.-Compl. ¶37. HSF does not deny that applicants who must give this "property" to HSF suffer a legal detriment. These "materials" include sensitive personal and financial information, original copyrightable essays, and more. ¶15, ¶37. And because the materials become HSF's "property," HSF can use them as it sees fit. This "license" to use "application materials" is "valuable consideration sufficient to form a contract." *ABA*, 2026 WL 161596, at *1, *8.

HSF's responses to this contract are unpersuasive. It spins out a theory that this term and condition is "not a contract" because it "just" states a "fact": that "once a document is submitted online, HSF's electronic database cannot spit it back out and pretend that it was never submitted."

16

MTD 26-27. Respectfully, that's not remotely what the term and condition says. It makes applicants "agree"—as a "term and condition" of applying—that their materials "shall become *the property* of HSF," meaning HSF gains (and applicants lose) the right to the materials. Am.-Compl. ¶37 (emphasis added). Nor is it a "fact" that, absent this term and condition, these materials would become HSF's "property." HSF could have let applicants retain the right to their materials by, for example, agreeing that HSF will destroy them or not use them without the applicant's permission. *Cf. Fund a Scholar Terms of Use Agreement*, HSF, perma.cc/D3BV-2D2Z (archived Jan. 7, 2026) ("HSF claims no ownership rights over Scholar Content. The Scholar Content you create remains yours"). HSF's alternative reading has no basis in the language of the terms and conditions. And it cannot be credited at this stage, where the complaint's facts are assumed true and all reasonable inferences are drawn in the Alliance's favor. *See ABA*, 2026 WL 161596, at *7.

Equally unpersuasive is HSF's suggestion that, "[e]ven if it is a contract," this term and condition "does not concern the benefits of the Scholar Program." MTD 26. HSF does not let students *apply* for the Scholar Program *at all* unless they "accept" and "agree" to all the terms and conditions, including this one. Am.-Compl. ¶¶35-36. Just like the rules for "entering" the contest in *Fearless Fund*, the application's terms and conditions are the consideration that students give HSF in exchange for the chance to apply to the program and compete for a spot. *Fearless Fund*, 103 F.4th at 775-76. By denying its side of the bargain to non-Hispanics, HSF violates §1981. *Id.* at 776, 779.

Aside from giving HSF property rights over their materials, the terms and conditions require applicants to "acknowledge and agree" that they have "read the Terms of Use and Privacy Policy and agree to the terms and conditions therein." Am.-Compl. ¶38. HSF concedes that the Terms of Use and Privacy Policy are contracts. *See* MTD 2, 7. They are, since they force students to give up many "rights to HSF." MTD 26; *see* Am.-Compl. ¶38(a)-(b); *Fearless Fund*, 103 F.4th at 775. The Terms even say "this is a contract between you and HSF." Am.-Compl. ¶38(a).

17

HSF argues that the Terms of Use and Privacy Policy are "contracts to use HSF's website," "not contracts for access to the benefits of the HSF Scholar Program," MTD 25; but that argument fails on multiple levels. To start, it's not true. Though the terms insist otherwise, students do not agree to these contracts merely by "'accessing or using'" the website. *Cf.* MTD 25. Such "browsewrap" agreements are common, but they aren't contracts because merely visiting a website does not manifest mutual assent. Am.-Compl. ¶39; *see Walker v. Uber Techs.,* 749 F. Supp. 3d 134, 147-48 (D.D.C. 2024); *Berman v. Freedom Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022). HSF understands this, which is why the application's terms and conditions make applicants click a box and affirmatively "acknowledge" that they have "*read* the Terms of Use and Privacy Policy and *agree* to the terms and conditions therein." Am.-Compl. ¶38 (emphases added). In other words, the application's terms and conditions *make* contracts out of the Terms of Use and Privacy Policy. ¶39.

HSF also misses that §1981 bans not just discrimination in making contracts, but also discrimination in the "performance" of contracts and the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b). If HSF is right that the Terms and Use and Privacy Policy are "contracts to use HSF's website," MTD 25, then it creates contracts with all users but denies the "benefits" of those contracts and offers "unequal" terms to non-Hispanic users, *see* Am.-Compl. ¶20, ¶78. The only way to apply for the Scholars Program, after all, is by using HSF's website. ¶35. So these contracts make Hispanics and non-Hispanics give up the same rights, but they give only Hispanics all the benefits of the bargain, including the right to submit a non-futile application to the Scholars Program and the ability to access the parts of the website available only to Scholars. ¶20, ¶78. In short, even under HSF's reading of the Terms of Use and Privacy Policy, HSF is violating §1981. ¶78.

18

**Performance**: Though this Court could stop with the application's terms and conditions, HSF's program is contractual for other reasons too. Those contracts are available to finalists, Scholars, and scholarship winners; but non-Hispanics are barred from even trying to get them.

Per the complaint, Phase II of the application includes an essay contest. HSF requires finalists to draft original essays. Am.-Compl. ¶40. And those essays are the most important part of the process: As HSF stresses, its program is highly competitive, MTD 14, so the quality of the essays is the key way that HSF chooses who among the finalists will be Scholars, Am.-Compl. ¶40. This process meets all the elements of a contest, where entrants create original submissions to compete against each other to win the ultimate prize. *Haskell v. Time, Inc.,* 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994); *Brooklyn Daily Eagle v. Voorhies,* 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910). Contests are contracts, *AAER v. Fearless Fund,* 2023 WL 6295121, at *4 (N.D. Ga. Sept. 27), even when no written agreement exists, *Hampton v. Dillard Dep't Stores,* 247 F.3d 1091, 1104 (10th Cir. 2001). The sponsor offers a chance to compete for the prize, which the entrant accepts by creating a submission. *Hampton,* 247 F.3d at 1104; *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8).

HSF cannot defeat this contract by insisting that its contest is not a "marketing too[l]" that benefits HSF by "draw[ing] people in." MTD 21. Contests are contracts because they elicit performance; as HSF's authorities admit, "it is irrelevant that the donor derives no economic benefit from" the performance. *Robertson v. United States*, 343 U.S. 711, 714 (1952). And the notion that HSF's Scholars Program does not benefit HSF is fanciful. The Scholars Program is HSF's "flagship," the nonprofit's reason for existing. Am.-Comp. ¶13. Its popularity and prestige have let HSF raise hundreds of millions of dollars and support the salaries of 70 employees. ¶24, ¶44, ¶112. And because the program is a competitive contest, HSF has attracted prestigious corporate partners, who offer exclusive jobs and internships to Scholars. ¶46, ¶98(b)-(c), ¶113. Nonprofits market to donors and "compete" with other nonprofits for limited donations, *Eagle F. v. Phyllis Schlafly's Am. Eagles*, 2020 WL 374557,

19

at *2 (S.D. Ill. Jan. 23), which is why contests held by nonprofit entities are deemed contracts too, *e.g.*, *Founders First*, 2024 WL 3625684, at *1, *3 n.7.[3]

HSF offers still more contracts to students who are selected as Scholars. These students are eligible to apply for scholarships from HSF. Am.-Compl. ¶13, ¶44. Those scholarships are contracts because HSF requires the recipients to, among other things, spend the money only on "expenses related to school." ¶44; *see Founders First*, 2024 WL 3625684, at *3 n.7 (finding that a contest where contestants must "promise to use the funds in a manner acceptable to [the Defendant]" was a contract). Whether they receive scholarships or not, all Scholars must submit surveys to HSF. Am.-Compl. ¶41. The program itself is thus a contract because, in exchange for the benefits, Scholars must perform certain tasks for HSF. *See NAEMT*, 2025 WL 973614, at *1-2, *6 (scholarship requiring students to "[p]rovide follow up information and respond to NAEMT requests pertaining to their education and career"); *Newman*, 715 F. Supp. 3d at 98, 104 (scholarship requiring student to "rank in the top half of his law school class").

HSF's responses to the contracts are both unpersuasive and impermissible at the pleading stage. HSF says scholarship recipients can use the money "as they see fit," MTD 19, but that assertion is false and impermissibly contradicts the complaint, Am.-Compl. ¶44; *see also* MTD 5-6 (admitting that recipients must use the funds on the specified categories). HSF also notes that it tells Scholars they are "'eligible to receive a scholarship, *depending on available funds*.'" MTD 20. But that kind of caveat does not defeat the existence of a contract. The implied duty of good faith and fair dealing requires

---

[3] It does not matter that California exempts nonprofits from certain statutes regulating contests and sweepstakes. *Cf.* MTD 21, 30 (citing Cal. Bus. & Prof. Code §17539.3(b)). The statute does not say nonprofits cannot engage in contests, let alone that nonprofits' contests are not contracts. Even if it did, HSF elsewhere notes, correctly, that the meaning of "contracts" under §1981 is a question of federal law that turns on traditional principles of contract law, not the law of any particular State. *See* MTD 16 (citing *Player v. Ala. Dep't of Pensions & Sec.*, 400 F. Supp. 249, 264 (M.D. Ala. 1975)); *accord Foster v. BJC Health Sys.*, 121 F. Supp. 2d 1280, 1287-88 (E.D. Mo. 2000).

HSF to seek funding and award scholarships when funds are available, *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 107 (D.D.C. 2010); *Rest. (2d) Contracts* §205 (1981); and HSF *has* raised funds and awarded scholarships every year since 1975, to the tune of three-quarters of a billion dollars, Am.-Compl. ¶24. As for the surveys, HSF says that requirement benefits "the Scholars," not HSF. MTD 29. Even ignoring that few people forced to fill out a survey find that chore a "benefit," HSF is again trying to contradict the complaint, which alleges that the surveys benefit HSF. Am.-Compl. ¶41. And requiring someone's performance creates a contract, even if the performance has benefits for him too. *Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1891).

Nor can HSF say that essays and surveys are too insignificant to be "the type of consideration required to form a contract." *Cf.* MTD 30. "Under fundamental principles of contract law," courts "'do not even permit inquiry into the adequacy of the consideration for a promise or a transfer.'" *ABA*, 2026 WL 161596, at *6. That rule "particularly" applies "where one or both of the values exchanged are difficult to measure." *Rest. (2d) Contracts* §71. "Applied here, this principle means that this court cannot accept [HSF's] invitation to compare the amount" that HSF gives Scholars "to the value of the consideration [HSF] received in return." *ABA*, 2026 WL 161596, at *6.

**Contracting Opportunities**: If more were needed, HSF also gives Scholars several exclusive opportunities, including contracting opportunities. These opportunities involve conferences, jobs and internships, and the Fund-A-Scholar program. HSF cannot argue that, because all "HSF Scholar[s]" can apply for these opportunities, these contracts do not discriminate "based on race or ethnicity" and thus are irrelevant to §1981. *E.g.*, MTD 28, 43. HSF does not let anyone *be* an HSF Scholar unless they are Hispanic. Am.-Compl. ¶2, ¶¶20-25. A restaurant that bars blacks from entering cannot escape §1981 by arguing that it serves food to everyone inside. *See Watson*, 915 F.2d at 243. By blocking non-Hispanics from entering the program, HSF refuses to offer them the contracts that are available to Scholars, thus violating §1981. *See id.*

For several of these contracting opportunities, HSF's motion offers no response. It does not discuss the exclusive conferences that Scholars can apply to attend. *See* Am.-Compl. ¶13, ¶48. These valuable networking events and job fairs require Scholars to agree to contracts, including another essay contest, a promise to complete certain assignments, and an agreement to repay HSF if certain conditions aren't met. ¶48. HSF also does not discuss the HSF Insider, an exclusive job bank for Scholars, or the jobs and internships that Scholars get through HSF's job banks and job fairs. ¶46, ¶48, ¶98. Those jobs and internships with large corporations are contracts, and HSF creates these opportunities solely for its Scholars (who are, by HSF's rules, solely Hispanic). ¶46, ¶48, ¶99. By enabling these corporations to hire based on ethnicity, HSF violates §1981. *Daniels v. Pipefitters' Ass'n*, 945 F.2d 906, 915 (7th Cir. 1991); *e.g.*, *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1116 (D.C. Cir. 1999) (union that preferenced its members when making job referrals violated §1981 because it excluded certain workers from being members based on race).

Though HSF at least discusses the Fund-A-Scholar program, its responses are unpersuasive. HSF concedes that, to participate in this program, students and donors each "must agree to Fund A Scholar's separate 'Terms of Use Agreement.'" MTD 28; Am.-Compl. 45. HSF never denies that this agreement is a contract. *See* Am.-Compl. ¶45, ¶76(c). Though it says the Fund-A-Scholar program "does not promise Scholars any funds," MTD 29, the agreement remains a contract. HSF promises Scholars the opportunity to use its donation platform in exchange for the collection of their personal information, a license to use their name and likeness, and ten cents of every dollar donated to the Scholars. *See* Am.-Compl. ¶45.

HSF downplays the Fund-A-Scholar agreement as containing "*nearly* the same terms as HSF's Terms of Use and Privacy Policy." MTD 28 (emphasis added). But as the word "nearly" betrays, this agreement has new and different terms, including that Scholars must "indemnif[y]" HSF and give it a "license" to the "Scholar Content" posted on the Fund-A-Scholar platform. *Fund a Scholar Terms of*

22

*Use Agreement*, HSF, perma.cc/D3BV-2D2Z (archived Jan. 7, 2026); *see* Am.-Compl. ¶45. HSF also never denies that the Fund-A-Scholar agreement for donors creates a contract, not least because donors agree that HSF gets to keep "10 cents of every dollar" they donate. Am.-Compl. ¶45; *see* MTD 28-29. Though HSF says this contract is irrelevant because it's a contract with donors, not "with the scholars," MTD 29, that argument is not a defense to §1981. As the complaint alleges and HSF never denies, Scholars are the intended third-party beneficiaries of these contracts between HSF and donors. Am.-Compl. ¶45. By barring certain students from the chance to get contractual benefits based on ethnicity, HSF violates §1981. *See Deide v. Day*, 676 F. Supp. 3d 196, 227 (S.D.N.Y. 2023) ("Section 1981 claims are available to third party beneficiaries.").

### 2. Section 1981's application to contract-based scholarships is neither ambiguous nor arguably unconstitutional.

Though HSF responds to §1981 by invoking the "First Amendment," it does not contend that §1981 is *unconstitutional* as applied to its Scholars Program. It uses the First Amendment to argue that §1981 should not be read to cover its program in the first place. *See* MTD 22-23.

Had it made the stronger argument, HSF would have to notify the U.S. Attorney General that HSF is challenging the constitutionality of a federal statute. *ABA*, 2026 WL 161596, at *10; Fed. R. Civ. P. 5.1; 28 U.S.C. §2403. This Court could not accept HSF's constitutional attack (though it could reject it) before notifying the United States and giving it 60 days to intervene and defend §1981. *ABA*, 2026 WL 161596, *10; Fed. R. Civ. P. 5.1(c).

Nor could a First Amendment challenge to §1981 prevail at the pleading stage, where the Court is limited to the four corners of the complaint. *See ABA*, 2026 WL 161596, at *9 ("The general rule against deciding an affirmative defense at the Rule 12(b)(6) stage applies with full force to a First Amendment defense") The Alliance's complaint contains none of the facts that HSF would need to prove its supposed "intent," MTD 23; that the program's conduct is expressive; or that §1981 fails intermediate scrutiny. *See, e.g., 7241 W. 100th Place Corp. v. Bridgeview*, 2014 WL 517961, at *3 (N.D. Ill.

23

Feb. 6) (refusing to consider defendants' claim of constitutionally protected intent at the pleading stage); *Bruni v. Pittsburgh*, 824 F.3d 353, 371-73 (3d Cir. 2016) (same for the "rigorous and fact-intensive nature of intermediate scrutiny's narrow-tailoring analysis"). Instead, the complaint affirmatively refutes HSF's defense. *See* Am.-Compl. ¶49; *ABA*, 2026 WL 161596, at \*9.

Instead of directly arguing that §1981 is unconstitutional, HSF raises the First Amendment as a statutory-interpretation argument. HSF claims that, under the constitutional-avoidance canon, §1981 should be "interpret[ed]" to exclude "scholarships" because "charitable financial activities" are "expressive conduct." MTD 2, 22-23. But to invoke constitutional avoidance, HSF must show two things: The statute is ambiguous, *Nielsen v. Preap*, 586 U.S. 392, 419 (2019), and HSF's permissible reading avoids "grav[e]" constitutional doubts, *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998). HSF makes neither showing. Its "weak statutory argument" and "weak constitutional argument" cannot "add up to a strong constitutional avoidance argument." *United States v. Blewett*, 746 F.3d 647, 660 (6th Cir. 2013).

Section 1981 is not ambiguous. Per the Supreme Court, "§1981 covers all types of contracts." *Patterson v. McLean Credit Union*, 491 U.S. 164, 183 (1989). The text says "contracts"; it has no exception for any type of contract or contracting party. 42 U.S.C. §1981; *e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 172 (1976) (private-school admission); *Fearless Fund*, 103 F.4th at 775-76 (private grant); *ABA*, 2026 WL 161596, at \*1 (private scholarship). It covers college admissions, for example, *Gratz*, 539 U.S. at 276 n.23; *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003), even though colleges are nonprofits with special "First Amendment" interests, *Grutter*, 539 U.S. at 329. True, because §1981 covers contracts, it does not cover scholarships that are not contracts. But courts could not carve out scholarships that *are* contracts without rewriting the statute—something constitutional avoidance does not allow. *Al Bahlul v. United States*, 767 F.3d 1, 16 (D.C. Cir. 2014). HSF does not even try to defend its preferred carveout for contract-based scholarships based on the "'text, context, and structure'" of §1981, so avoidance

24

cannot apply. *Bondi v. VanDerStok*, 604 U.S. 458, 484 (2025); *see Doe v. Kamehameha Schs.*, 295 F. Supp. 2d 1141, 1162 n.18 (D. Haw. 2003) (rejecting a similar attempt to use the "First Amendment" to narrow the category of contracts that §1981 covers).

Independently, avoidance does not apply because §1981 can ban racial discrimination in contract-based scholarships without raising any grave question under the First Amendment. The Supreme Court has rejected First Amendment challenges to antidiscrimination laws, including §1981, many times. *E.g.*, *Runyon*, 427 U.S. 160. Per the Court, "§1981" is a "permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Though racial discrimination can "express a discriminatory idea or philosophy," it remains pure conduct that does not implicate the First Amendment. *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992); *accord Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984). Section 1981 does not regulate "charitable solicitations," "charitable donating," or charitable "spend[ing]," MTD 22-23; it regulates only the conduct of racial discrimination in contracting. *Runyon*, 427 U.S. at 175-76. And HSF cannot make that conduct expressive by surrounding it with other speech. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006); *The Bail Project v. Comm'r*, 76 F.4th 569, 575-77 (7th Cir. 2023). As the Eleventh Circuit explained in rejecting the same argument in *Fearless Fund*, HSF "simply—and flatly—refuses to entertain applications from" non-Hispanic students. 103 F.4th at 779. "If that refusal were deemed sufficiently 'expressive' to warrant protection under the Free Speech Clause, then so would be *every* act of race discrimination." *Id.*

### B. Title VI

The complaint also alleges a plausible violation of Title VI. That statute bars ethnic discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. As with §1981, HSF does not contest that its Scholars Program discriminates based on ethnicity, that strict scrutiny applies, or that HSF cannot meet that standard. Am.-Compl. ¶¶79-81, ¶¶92-93. HSF instead claims that it receives no "Federal financial assistance." MTD 31-37. And in a lengthy, single-

25

spaced footnote, it says its Scholars Program is not a "program or activity" receiving federal assistance. MTD 31 n.7. These arguments are unpersuasive, forfeited, or both.

### 1. The FAFSA data are federal financial assistance.

As the complaint alleges and HSF concedes, the Department of Education gives HSF exclusive access to students' FAFSA data. Am.-Compl. ¶85, ¶89. FAFSA data is otherwise private. The Department directly sends the data only to state higher education agencies and two scholarship organizations, one of which is HSF. ¶87. "Other scholarship-granting organizations may not obtain FAFSA data, even with student consent." ¶87 (quoting *Constitutionality of Race-Based Department of Education Programs*, 49 Op. O.L.C. at 46 (Dec. 2, 2025)).

The complaint plausibly alleges that the FAFSA data are federal financial assistance under Title VI. The term "federal financial assistance" broadly covers all "economic benefit provided by the federal government" through a "federal program or activity." *Federal Financial Assistance*, Black's Law Dictionary (12th ed. 2024); *accord Financial Assistance*, Black's Law Dictionary (12th ed. 2024) ("any economic benefit"). As the complaint alleges, the FAFSA data have economic benefit to HSF because it uses them to run its flagship scholarship program. Am.-Compl. ¶87. According to the federal guidance cited by HSF, it uses the FAFSA data for "the application, award, and administration of their specific aid programs." *Free Application for Federal Student Aid (FAFSA®) Data, and Non-FAFSA Data (FAFSA Guidance)*, U.S. Dep't of Educ., No. GEN-25-08 (Sep. 30, 2025), perma.cc/CQ4Z-HNBY, *cited in* MTD 31 n.7. It can access the FAFSA data "without additional prior written consent of the applicant." *Id.* In other words, the FAFSA data are at the core of HSF's business model, which seeks donations and corporate sponsorships so that it can disburse scholarships with the help of the federal government's exclusive data. Am.-Compl. ¶13, ¶45, ¶113. Because the data are economically beneficial to HSF, they count as federal financial assistance.

26

This conclusion is confirmed by Title VI's title and regulatory history. The title says the law bans "discrimination under federally *assisted* programs." 42 U.S.C. §2000d (emphasis added). HSF is federally assisted because the government helps HSF run its program by providing crucial financial data that only the federal government otherwise has. Similarly, the regulations construing the term "federal financial assistance" in Title VI define it to include "[a]ny Federal … arrangement … which has as one of its purposes the provision of assistance." 28 C.F.R. §42.102(c)(5). Here, the federal government has an arrangement with HSF to provide the information that assists its program. It thus directly violates what "Congress wanted": to "avoid the use of federal resources to support discriminatory practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). And "the amount of federal financial assistance does not affect Title VI coverage." *Title VI Legal Manual* §V(c)(1), DOJ, justice.gov/crt/fcs/T6manual5 (citing *K.H. v. Vincent Smith Sch.*, 2006 WL 845385, *11 (E.D.N.Y. Mar. 29)).

Contra HSF, Title VI is not limited to "money." MTD 32-33. Under binding Supreme Court precedent, the statute's "inclusive" terminology "encompass[es] *all* forms of federal aid." *Grove City Coll. v. Bell*, 465 U.S. 555, 563-64 (1984). "[F]ederal financial assistance may take nonmoney form." *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 n.11 (1986). It encompasses any "thing of value" that is "extended by" the government pursuant to statute. *Id.* And courts have recognized that "information," especially exclusive and confidential information, "is a 'thing of value.'" *United States v. McAusland*, 979 F.2d 970, 974 & n.2 (4th Cir. 1992); *see also United States v. Schwartz*, 785 F.2d 673, 679 (9th Cir. 1986) (rejecting the argument that "*thing of value* should be limited to tangible things with ascertainable monetary value," and holding instead that "information can be a *thing of value*"); *United States v. Collins*, 56 F.3d 1416, 1420 (D.C. Cir. 1995) (similar). The exclusive, confidential information that HSF uses to administer its flagship program is a valuable form of federal aid. If it weren't, the Department would have no need to forbid a recipient from "monetizing" FAFSA data. *Cf.* MTD

27

36. HSF derives an immense benefit from getting to use the data to run a scholarship program that raises millions of dollars, doles out money to many students, and pays the salaries of many employees, Am.-Compl. ¶24, ¶44, ¶112, even if it cannot earn even more economic benefit by selling that information. And the fact it "agrees to use" the data "in a manner consistent with the terms of the award" and to "comply with certain terms and conditions" is a hallmark of "federal financial assistance." *Title VI Manual* §V(c)(1).

HSF is also wrong to suggest that students, rather than the federal government, provide the FAFSA data to HSF. *Contra* MTD 35-36. As the statute makes clear, applicants must "provide *the Secretary* with authorization to disclose" their information "to" HSF. 20 U.S.C. §1090(a)(2)(D) (emphasis added). In other words, it is the agency that provides the information, with the mandatory authorization of the applicant. Am.-Compl. ¶91. So HSF receives the assistance from the government. 42 U.S.C. §2000d; *accord FAFSA Guidance* (scholarship organizations "receive" the FAFSA data "directly from the Department").

### 2. The assistance goes to a program or activity.

Under Title VI, a "program or activity" that receives federal assistance cannot discriminate based on ethnicity. 42 U.S.C. §2000d. In general, Title VI does not apply unless the discrimination is occurring within the actual program or activity being assisted. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 198 F.3d 107, 114 (3d Cir. 1999). But Title VI applies to "all of the operations" of several entities, meaning if they receive any federal assistance they cannot discriminate at all. 42 U.S.C. §2000d–4a. That list includes "private" entities that receive federal assistance "as a whole" or that are "principally engaged in the business of providing education … [or] social services." §2000d-4a(3)(A)(i)-(ii).

In a footnote only, HSF disputes whether its whole "operations" are covered by Title VI. *See* MTD 31 n.7 (discussing 42 U.S.C. §2000d-4a(3)(A)(i)-(ii)). This argument is forfeited. "Footnotes" are "'no place to make a substantive legal argument.'" *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987

28

F.3d 158, 163 (D.C. Cir. 2021). And footnotes that "are quite lengthy and advance substantive arguments distinct from and additional to those contained in the body text" are "a transparent effort to circumvent the Court's page limitations." *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81, 90 (D.D.C. 2014), *aff'd*, 816 F.3d 119 (D.C. Cir. 2016). This Court should disregard "arguments" that HSF deemed not "worthy enough to include in the main text." *Ark Initiative*, 64 F. Supp. 3d at 90; *accord Wellington v. D.C.*, 851 F. Supp. 1, 2 n.1 (D.D.C. 1994) ("Lengthy footnotes in defendants' submissions will be ignored").

Even if HSF's argument weren't forfeited, it is irrelevant. It doesn't matter whether HSF's entire operations are covered under Title VI. The discrimination here is occurring in the HSF Scholars Program, the precise "program or activity" that receives the alleged federal financial assistance. 42 U.S.C. §2000d. HSF uses the FAFSA data to determine how to allocate funds to Scholars in the HSF Scholars program. Am.-Compl. ¶87, ¶91; *accord FAFSA Guidance* (HSF uses the data for "administration of [its] specific aid progra[m]"). The provision of Title VI that covers some entities' entire operations expanded Title VI to "cover larger portions of [those] institutions … than it had previously covered," *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001), but it did not eliminate the default rule that "Title VI covers … the part of the recipient's operations that receives funds," *Title VI Legal Manual* §V(e)(4); *Cureton*, 198 F.3d at 114. So the Scholars Program is covered by Title VI, regardless of whether HSF is one of the entities whose entire "operations" are covered. 42 U.S.C. §2000d-4a; *see Grimes v. Superior Home Health Care*, 929 F. Supp. 1088, 1091-92 (M.D. Tenn. 1996).

In case it matters, though, the complaint plausibly alleges that HSF's entire operations are covered by Title VI. HSF receives this federal financial assistance "as a whole." 42 U.S.C. §2000d-4a(3)(A)(i). Assistance is received "as a whole" when it "further[s] the central or primary purpose of the entity." *Title VI Legal Manual* §V(e)(4). And here, the federal government gives, and HSF uses, the

29

FAFSA data for its flagship scholarship program. 20 U.S.C. §1090(a)(2)(D)(i); Am.-Compl. ¶91; *see Collins v. Giving Back Fund*, 2019 WL 3564578, at *11 (S.D.N.Y. Aug. 6).

Independently, HSF is "principally engaged in the business of providing education … [or] social services." 42 U.S.C. §2000d-4a(3)(A)(ii). The phrase "principally engaged' … refer[s] to the primary activities of a business, excluding only incidental activities." *Doe v. Salvation Army*, 685 F.3d 564, 571 (6th Cir. 2012). "[A] private organization … fall[s] within the statute if it engages in a mix of the statutorily enumerated services, *e.g.*, if it provides social services *and* education services and those services in the aggregate make up the primary activities of the private organization." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015); *accord Title VI Legal Manual* §V(e)(4). Education under statutes like Title VI "is not limited to the sort of instruction received in a traditional school system." *Runnion*, 786 F.3d at 527; *accord Title VI Legal Manual* §V(e)(4). And a social service is "'an activity designed to promote social well-being, such as 'organized philanthropic assistance of the sick, destitute, or unfortunate.'" *Runnion*, 786 F.3d at 527.

Per the complaint (and most of HSF's motion), HSF is principally engaged in a mix of education and social services. As its name suggests, HSF is a scholarship fund that provides scholarship and support services to students. Am.-Compl. ¶9. Its "flagship" Scholars Program offers scholarships that are philanthropic assistance to students with financial need. ¶13, ¶44. They are designed to promote Scholars' social wellbeing by helping them fund their higher education, thus setting them up for professional success. ¶13. HSF also offers educational programs, including College 101 and the Youth Leadership Institute. ¶101. Though HSF downplays how much "education" it provides, it never explains how it provides no social services or how the mix of its primary activities are anything other than a combination of social services and education. MTD 31 n.7. Because its scholarships and courses

30

are its core programming—its primary activities—HSF is principally engaged in providing social services or education. *See, e.g.*, *Runnion*, 786 F.3d at 528 (Girl Scouts); *Doe*, 685 F.3d at 574 (Salvation Army).

## III. The complaint plausibly alleges violations of state law within this Court's supplemental jurisdiction.

The complaint plausibly alleges claims under both D.C.'s and California's antidiscrimination laws. Because it is an employment agency, an educational institution, or a public accommodation, HSF is covered by the D.C. Human Rights Act. And because it is a business establishment of any kind, HSF is covered by the California Unruh Civil Rights Act. This Court can and should exercise supplemental jurisdiction over these claims, as courts typically do when plaintiffs argue that the same conduct violates parallel state and federal antidiscrimination laws.

### A. D.C. Human Rights Act

The DCHRA is a "'powerful, flexible, and far-reaching prohibition against discrimination of many kinds.'" *Blodgett v. Univ. Club*, 930 A.2d 210, 218 (D.C. 2007). It prohibits racial discrimination by, among other entities, an "employment agency," D.C. Code §2-1402.11(a)(2); an "educational institution," §2-1402.41(1); and a "public accommodatio[n]," §2-1402.31(1). HSF falls within at least one of these definitions. If doubts remain about any category, the DCHRA "is a broad remedial statute" that must be "generously construed." *Blodgett*, 930 A.2d at 218.

#### 1. HSF is plausibly an employment agency.

HSF is an employment agency under DCHRA's plain terms. It "regularly undertak[es] or attempt[s] … to procure employees for an employer or to procure … [work] opportunities" for employees. D.C. Code §2-1401.02(11). "Regularly" means "[a]t fixed times or uniform intervals; repeatedly, without interruption; frequently, often." *Oxford English Dictionary*, *s.v. regularly*. HSF attempts to procure employment for its Scholars "repeatedly" and "at fixed intervals": year after year, HSF consistently holds multiple scholars conferences, where it "introduces Scholars to recruiters from its corporate partners and has them interview for exclusive internships and full-time jobs." Am.-Compl.

31

¶98(b). HSF also attempts to procure employment for its Scholars "without interruption": HSF is continuously seeking to place its Scholars in jobs with its corporate partners by sharing job listings on its Scholars-only portal. ¶98(c). HSF also "frequently" and "often" seeks to procure employment for its Scholars: The touted "benefits" of being an HSF Scholar include HSF's "career services" that provide "assistance" in securing "internships and full-time job opportunities." ¶98(a). Under the facts alleged in the complaint, HSF places Scholars with jobs regularly, and as part of its core mission, not episodically. *Contra* MTD 42-43.

The Act's definition is not limited to self-styled "staffing agencies." *Cf.* MTD 42. The text of the DCHRA is clear: An employment agency includes any entity that regularly seeks to procure staff for employers or work for employees, "with or without compensation." D.C. Code §2-1401.02(11). The statute thus contemplates that a nonprofit can be an employment agency. And the definition covers "any person" that attempts to procure employment, regardless of what other activities that entity engages in. *Id.* Not to mention that "[t]he Human Rights Act is a broad remedial statute, to be generously construed." *Blodgett*, 930 A.2d at 218.

Federal cases construing Title VII's definition of "employment agency" support covering HSF. *See* 42 U.S.C. §2000e(c). An entity "regularly undertakes" to procure employment under Title VII when it "actively assist[s] participants in the job search process," "help[s] participants [submit] job applications," "invite[s] recruiters from … companies to visit the program," and "facilitate[s] job in-terviews on-site." *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1291-92 (M.D. Ala. 2010). HSF does all that. *See* Am.-Compl. ¶98. And the "pursuit of employment … [is] a central and recurring component of [HSF's] program." *Wilborn*, 720 F. Supp. 2d at 1292. Like other entities that qualify as employment agencies, HSF "place[s] advertisements" on behalf of employers, "s[eeks] [prospective] employees … for placement," and "aid[s] employees" in completing the steps necessary to begin work

32

for the corporate partners. *Axness v. Aqreva LLC*, 118 F. Supp. 3d 1144, 1159 (D.S.D. 2015); *see* Am.-Compl. ¶98. HSF's decades-old district-court decisions do not persuade otherwise. *See* MTD 24.

Deeming HSF an employment agency would not lead to absurd results, like making every fraternity or sorority either stop discriminating based on sex or stop "assisting members with securing employment." MTD 43. Unlike HSF, student organizations do not host corporate recruiters for several job fairs each year, maintain a year-round listserv of job postings, or provide formal career services. And if one did, it should stop excluding students based on their ethnicity.

### 2. HSF is plausibly an educational institution.

Alternatively, HSF is an educational institution. An educational institution means "any public or private institution, including," an "academy," an "extension course," or "a business, nursing, professional, secretarial, technical, or vocational school." D.C. Code §2-1401.02(8). HSF is a private institution that functions as an academy, extension course, and professional training program. It "offers an extensive collection of educational courses and trainings for students yearround," both online and in person, "including many [courses and trainings] that are exclusively available to Scholars." Am.-Compl. ¶101. HSF's courses prepare students for college and give them training for how to interact in a professional setting. ¶101.

HSF does not lack "professors or teachers who follow a curriculum." *Cf.* MTD 43-44 (citing *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1383 (D.C. 1981)). Its programs, "using instructional material, follow a curriculum resulting in the increased skill or knowledge of [its] students." *Jaycees*, 434 A.2d at 1383. HSF's programs increase students' knowledge and skills by teaching them how to apply to college, find scholarships and grant money, thrive in college, and transition to a career. Am.-Compl. ¶101. And the teachers for these courses follow a set curriculum: HSF offers the same courses—including College 101 and Youth Leadership Institute—on a repeated basis multiple times per year. ¶101.

33

Nor is it "necessary that a degree or certificate be awarded," so long as there are "indicia of accomplishment." *Jaycees*, 434 A.2d at 1383; *cf.* MTD 44. HSF has those indicia. Participants in the Youth Leadership Institute, for instance, must successfully complete the first component of the program before they can attend the second part. *Youth Leadership Institute*, HSF (archived Jan. 28, 2026), perma.cc/BJN7-T5AD. And students who graduate from HSF's Scholars program are welcomed into the community of HSF alumni, where they have the opportunity to participate in alumni programs. Am.-Compl. ¶18. Joining an alumni community of former scholars—who all went through the same educational program—is more concrete evidence of accomplishment than simply receiving some "'credits.'" *Cf.* MTD 44. HSF would also be considered an educational institution under Title VI, *see supra* II.B.2, which is persuasive evidence that it is one under the DCHRA too, *see Newman*, 715 F. Supp. at 105.

### 3. HSF is plausibly a public accommodation.

D.C. "defines 'place of public accommodation' broadly." *Blodgett*, 930 A.2d at 218. The law was amended in 2021 to overrule prior decisions suggesting that the word "place" excluded websites and to clarify that the statute includes nonprofits that provide their services for free. *"Place of Public Accommodation" Under the D.C. Human Rights Act*, D.C. Office of Human Rights (Dec. 16, 2021), perma.cc/R2V2-A58S. A public accommodation is now an entity "that provides, to a person in the District, access to an accommodation, service, or good, whether or not that person or place maintains a physical location in the District or charges for those goods or services." D.C. Code §2-1401.02(24). Though the statute goes on to provide a nonexhaustive list of public accommodations, the main term "is defined 'broadly,'" and an entity need not be "one of the terms listed" to be covered. *Hunter ex rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 180 (D.D.C. 2014).

34

HSF meets this definition. Its website provides services to the public at large. Am.-Compl. ¶105. These services include HSF's "Scholarship Finder" and "College Prep" resources. *Id.* In its motion, HSF never denies that its website is open to the public, including in D.C.; denies that it provides services; or makes any other argument why it does not fall under the controlling definition of public accommodation.

HSF instead invokes the *expressio unius* canon, faulting the Alliance for not explaining why HSF is like one of the examples in the statute's long list of public accommodations. In one conclusory sentence with no analysis, HSF flatly asserts that it "is unlike any of the examples." MTD 44.

If this terse argument isn't forfeited, it fails. "[T]he *expressio unius* maxim does not apply to a statute in which mention is made by way of example." *In re M.M.D.*, 662 A.2d 837, 851 n.29 (D.C. 1995) (cleaned up). And here, the list in D.C.'s statute are examples, introduced by the word "such as." D.C. Code §2-1401.02(24); *see Conrad v. D.C. Alcoholic Beverage Control Bd.*, 287 A.3d 635, 647 (D.C. 2023) ("The use of the term … 'such as' indicates that the statutory list … is illustrative rather than exhaustive."). HSF also "ignores the fact that the D.C. Human Rights Act defines places of public accommodation to include 'establishments dealing with goods or services of any kind.'" *James v. Team Washington, Inc.*, 1997 WL 633323, at *2 (D.D.C. Oct. 7). HSF fits squarely within that example. It is an establishment because it is a "private institution." *Oxford English Dictionary*, *s.v. establishment.* And it provides many "services." *E.g.*, Am.-Compl. ¶18 ("a range of programs and support services"), ¶47 ("career coaching," "mentoring," "leadership development," and "wellness resources"); ¶105 ("Scholarship Finder" and "College Prep" resources offered to the public at large). As the statutory text makes clear, it makes no difference whether HSF "charges for those … services." D.C. Code §2-1401.02(24).

No statutory exception exempts HSF from the law. Though the DCHRA excludes institutions that are "distinctly private," *id.*, HSF does not invoke that exception. Nor could it. Instead of "distinctly private," HSF's website is open to all, and some of its resources are available to the public at

35

large. *E.g.*, Am.-Compl. ¶105 (Scholarship Finder and College Prep resources); ¶101 (College 101 course). Though the rest of its services are limited to Scholars, and thus Hispanics, that ethnicity-based exclusion is a violation of the DCHRA, not a defense to it.

### B.  California Unruh Civil Rights Act

California's Unruh Act covers "all business establishments of every kind whatsoever." Cal. Civ. Code §51(b); *see also* §51.5(a). Its use of those capacious terms was intentional: "[T]he inclusion of these words without any exception and without specification of particular kinds of enterprises, leaves no doubt that the term 'business establishments' was used in the broadest sense reasonably possible." *O'Connor v. Vill. Green Owners Assn.*, 662 P.2d 427, 430 (Cal. 1983).

"Nothing in the language or history of [Unruh] calls for excluding an organization from its scope simply because it is nonprofit." *O'Connor*, 662 P.2d at 430-31. Indeed, a nonprofit will qualify as a "business establishmen[t]" under Unruh even when it would not "ordinarily … be thought of as a 'traditional' business establishment." *Warfield v. Peninsula Golf & Country Club*, 896 P.2d 776, 789 (Cal. 1995). Nonprofits are often deemed business establishments. *See, e.g.*, *O'Connor*, 662 P.2d at 428 ("nonprofit organization whose membership consists of all owners of units at Village Green"); *Rotary Club of Duarte v. Bd. of Directors*, 224 Cal. Rptr. 213, 221 (Ct. App. 1986) ("nonprofit corporate association of local Rotary clubs"); *Warfield*, 896 P.2d at 778 ("nonprofit social and recreational club"); *Pines v. Tomson*, 206 Cal. Rptr. 866, 874 (Ct. App. 1984) ("nonprofit religious corporation"); *Isbister v. Boys' Club of Santa Cruz, Inc.*, 707 P.2d 212, 216 (Cal. 1985) ("nonprofit community service organizatio[n]").

HSF shares the hallmarks of what made these nonprofits "business establishments" under Unruh. With over 70 employees, it "employs a substantial paid staff." *Isbister*, 707 P.2d at 218; Am.-Compl. ¶112. HSF is also "classically 'public'" in its operation. *Warfield*, 896 P.2d at 790. It operates programs that are open to any and all comers. *See, e.g.*, Am.-Compl. ¶101 (College 101); ¶105 (Scholarship Finder and College Prep). Its programs—both those that are open and those that are selective—

are advertised on its website. ¶101. So HSF does not primarily facilitate "relationships which are truly private [*i.e.*], those which are continuous, personal, and social ... and take place more or less outside public view." *Isbister*, 707 P.2d at 220 n.14 (cleaned up). And HSF "publishes an official directory" of the other companies that it works with, *Rotary Club*, 224 Cal. Rptr. at 224, listing over 50 "corporate partners" on its website, Am.-Compl. ¶113. "The commercial benefits engendered by th[is] advertise-ment section of [the website] are obvious." *Rotary Club*, 224 Cal. Rptr. at 224.

HSF cannot distinguish itself from these nonprofit business establishments. It suggests that the business establishment in *O'Connor* was a landlord, MTD 45, but it was a "nonprofit homeowner's association." *Warfield*, 896 P.2d at 786; *see also id.* at 789 ("nonprofit condominium owners' association in *O'Connor*"). HSF points out that the nonprofit in *Isbister* had a clubhouse. MTD 45. But the *Isbister* nonprofit was a business establishment because it "employ[ed] a substantial paid staff," just like HSF. *Isbister*, 707 P.2d at 218. Plus, HSF has a physical headquarters from which it organizes in-person events across the country. Am.-Compl. ¶101, ¶109. HSF is also a close match for the Rotary Club, a nonprofit whose "primary purpose [wa]s to encourage a fellowship among business and professional men representing a diverse cross-section of the business and professional activities." *Rotary Club*, 224 Cal. Rptr. at 230. HSF, too, connects students with Fortune 500 companies—and with professional opportunities in a cross-section of different fields. Am.-Compl. ¶13, ¶46, ¶48.

HSF cites no case excluding a nonprofit like it from Unruh's capacious definition of business establishment. HSF is not a "charitable, expressive, and social organization, … whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members." *Curran v. Mt. Diablo Council of Boy Scouts*, 952 P.2d 218, 236 (Cal. 1998). HSF's purpose is advancing the careers of those who participate in its programs, especially its Scholars. Am.-Compl. ¶13, ¶18, ¶¶46-48. At a minimum, HSF cannot disprove that it's a "business establishment" at "the motion to dismiss stage," without a "factual record." *Stevens v. Optimum Health Inst.*, 2010 WL 1838252,

at *5 (S.D. Cal. May 5); *accord Randall v. UNOS*, 720 F. Supp. 3d 864, 882 & n.12 (C.D. Cal. 2024). This dispute must be resolved at summary judgment.

### C. Supplemental jurisdiction

Federal courts properly exercise jurisdiction over state claims that share a common nucleus of operative fact with a plaintiff's federal claims. *UMWA v. Gibbs*, 383 U.S. 715, 725 (1966). The Alliance's claims all share a common nucleus because they challenge the same conduct by HSF and allege the violation of parallel antidiscrimination laws. HSF's state claims are also neither "novel" nor "complex." 28 U.S.C. §1367(c)(1). They are often litigated in federal court and involve established bodies of state law.

### 1. The state and federal claims share a common nucleus of fact.

Supplemental jurisdiction exists when a state claim is "so related" to a federal claim that "they form part of the same case or controversy." 28 U.S.C. §1367(a). This phrase has been interpreted to mean the state and federal claims share "'a common nucleus of operative fact.'" *Lindsay v. GEICO*, 448 F.3d 416, 424 (D.C. Cir. 2006). "This standard is broad," requiring "only" that the claims "have some loose factual connection." 13D Fed. Prac. & Proc. Juris. §3567.1 (Wright & Miller, 3d ed.). Per HSF's quoted source, the test is failed only when "'there is almost no factual or legal overlap between the state and federal claims.'" MTD 38.

This case is a poster child for supplemental jurisdiction. All the Alliance's claims challenge exactly the same conduct: HSF's intentional discrimination against non-Hispanics by barring them from the HSF Scholars Program. And the Alliance's claims all invoke antidiscrimination statutes that turn on proof of intentional ethnic discrimination, an "'overlap that will aid in the resolution of the federal claims.'" MTD 39 (cleaned up). A complaint claiming that the "same or similar facts" violate "parallel federal and state laws" against "discrimination" is "[t]he clearest case for supplemental jurisdiction." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 536 (D.C. Cir. 2025). Cases exercising supplemental jurisdiction over state and federal antidiscrimination claims challenging the same conduct

are legion. *E.g.*, *Ortega v. Champion Room BK*, 2023 WL 5279368, at *7 (E.D.N.Y. May 1); *Bradley v. Meijer Stores L.P.*, 2023 WL 3042984, at *1 (N.D. Ill. Apr. 21). Notably, HSF could not find a single example of a court denying supplemental jurisdiction in this context.

HSF's only response is that the triggers for these antidiscrimination laws—a contract for §1981; federal funding for Title VI; a business establishment for Unruh; and an employment agency, educational institution, or public accommodation for D.C.—are not the same and ask different questions. *See* MTD 39. But even those questions are not totally distinct: Both §1981 and Unruh ask about contracts. *See* Cal. Civ. Code §51.5(a). Federal funding is relevant to both Title VI and whether HSF is a business establishment. *See Randall*, 720 F. Supp. at 881. And whether HSF is an educational institution is relevant to both Title VI and the DCHRA. *Compare* 42 U.S.C. §2000d-4a*, with* D.C. Code Ann. §2-1402.41.

More fundamentally, claims do not lack a common nucleus of fact because they have nonoverlapping elements. *See Rodemaker v. Valdosta Bd. of Educ.*, 110 F.4th 1318, 1330 (11th Cir. 2024). Supplemental jurisdiction remains appropriate when claims with different elements "stem from the same events." *Peart v. Latham & Watkins*, 985 F. Supp. 2d 72, 80-81 (D.D.C. 2013). When the claims challenge the same conduct, plaintiffs can package federal antidiscrimination claims even with state common-law claims that require no proof of discrimination. *E.g.*, *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 3 n.2 (D.D.C. 2011) (Title VII, DCHRA, and breach of contract); *Shah v. Spirit Airlines*, 2024 WL 4527353, at *3 (S.D. Fla. Oct. 18) (state-law negligence, intentional infliction of emotional distress, and §1981). Far easier than those cases, the Alliance's parallel state and federal antidiscrimination claims here are an "'obvious'" case for supplemental jurisdiction. *Lindsay*, 448 F.3d at 424.

### 2. The state claims are not novel or complex.

Once a court has supplemental jurisdiction, it "may decline to exercise" it for a "claim" that "raises a novel or complex issue of State law." 28 U.S.C. §1367(c)(1). As reflected in the word "may,"

declining supplemental jurisdiction under §1367(c) is discretionary. *See GTE New Media Servs. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 46 (D.D.C. 1998).

Aside from calling the Alliance's state-law claims "'novel or complex,'" HSF makes no argument why, if this Court maintains a federal claim, it should exercise its discretion to deny supplemental jurisdiction over any state claim. MTD 40-41. Courts are supposed to consider several factors, none of which HSF briefs: "judicial economy, convenience of and fairness to litigants, and comity between the state and federal courts." *Williams v. 5300 Columbia Pike Corp.*, 891 F. Supp. 1169, 1181 (E.D. Va. 1995) (citing *Gibbs*, 383 U.S. at 726-27). And here, those factors favor supplemental jurisdiction. For the D.C. claim, supplemental jurisdiction is bolstered by the fact that "federal courts in this district routinely hear cases applying [DCHRA]." *Omnicare, Inc. v. UnitedHealth Grp.*, 594 F. Supp. 2d 945, 975 (N.D. Ill. 2009).[4] And for the California claim, a dismissal would accomplish nothing because the D.C. courts are no better than this Court at applying California law, *Williams*, 891 F. Supp. 1169, or would require the Alliance to turn this one lawsuit into three lawsuits spanning two coasts, *see Itar-Tass Russian News Agency v. Russian Kurier*, 140 F.3d 442, 448 & n.2 (2d Cir. 1998). All of the Alliance's claims, moreover, turn on the same facts about the HSF Scholars Program. Because this Court will find those facts for the federal claims, it "is in a superior position to apply" those facts for the state claims too. *Omnicare*, 594 F. Supp. 2d at 975.

The Alliance's state-law claims are "not novel or complex" to begin with. *Lindsay*, 448 F.3d at 424. "The very existence of established [state] law" on these issues "defeats [HSF's] argument." *Gard v. Teletronics Pacing Sys.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994). As does the existence of federal cases interpreting analogous federal statutes. *Bagley v. Yale Univ.*, 42 F. Supp. 3d 332, 355 (D. Conn. 2014).

---

[4] *E.g.*, *Viardo v. Fams. USA Found.*, 2025 WL 2336223, at *4 (D.D.C. Aug. 13); *Richardson v. Nat'l R.R. Passenger Corp.*, 2025 WL 1568198, at *5 (D.D.C. June 3); *Pietrangelo v. Refresh Club*, 2024 WL 3400258, at *9 (D.D.C. July 12), *aff'd*, 2025 WL 1953500 (D.C. Cir. July 16).

For the D.C. claim, the only disputed question is whether HSF is an "employment agency," "educational institution," or "public accommodation." *See* MTD 40-41, 42-44. Since HSF is liable if it satisfies any *one* of those terms, this Court likely won't need to consider them all. *See* Am.-Compl. ¶¶96-97, ¶100, ¶104. Even if it does, the definitions are not hard. D.C.'s highest court already has a key precedent on the meaning of "educational institution." *Jaycees*, 434 A.2d at 1383. D.C. courts have also fleshed out what it means to be a "public accommodation." *E.g.*, *Blodgett*, 930 A.2d at 218 & n.5. And D.C.'s definition of "employment agency," as HSF notes, "mirrors the definition … in Title VII." MTD 42. *Compare* 42 U.S.C. §2000e(c), *with* D.C. Code §2-1401.02(11). Title VII's definition has been interpreted extensively,[5] and that "familiarity and experience" makes D.C. law not overly "'novel or complex'" for a federal court, *Bagley*, 42 F. Supp. 3d at 355; *accord Whitbeck v. Vital Signs*, 116 F.3d 588, 591 (D.C. Cir. 1997) ("District of Columbia courts interpreting the DCHRA have generally looked for guidance to cases from the federal courts arising under federal civil rights statutes" (cleaned up)).

For the Alliance's California claim, the only disputed issue is whether HSF is a "business establishment." *See* MTD 41, 44-45. "The determination of what constitutes a 'business establishment' under the Unruh Civil Rights Act is an oft-litigated issue." *Harrison v. Rancho Mirage*, 243 Cal. App. 4th 162, 173 (2015). By quoting multiple cases in this deep well of precedent, HSF effectively concedes as much. *See* MTD 41.

HSF's only counterpoint fails. It says—quite tersely for the D.C. claim—that "no District Columbia court" or "California Court has held" that a "nonprofit" like HSF comes under these statutory definitions. MTD 40-41. That argument would be a reason why HSF *wins* on these claims, not

---

[5] *E.g.*, *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 808-09 (N.D. Cal. 2024); *Girard v. Int'l Ass'n of Approved Basketball Offs.*, 2020 WL 13664730, at *4 (D. Conn. Feb. 27), *aff'd*, 840 F. App'x 635 (2d Cir. 2021); *Cooper v. Abdul–Aziz*, 2015 WL 12552064, at *2 (D. Minn. Nov. 4); *Covington v. Hamilton Twp. Bd. of Educ.*, 2015 WL 3746338, at *16-17 (D.N.J. June 15); *Scaglione v. Chappaqua Cent. Sch. Dist.*, 209 F. Supp. 2d 311, 315-16 (S.D.N.Y. 2002).

a reason why these claims are overly novel or complex. "[T]he fact that there are no reported [state] cases involving" a certain fact pattern "does not mean" the case presents "a novel or complex issue of State law." *Smith v. K-Mart Corp.*, 899 F. Supp. 503, 507 (E.D. Wash. 1995). That the Court must apply established law to novel facts is not a reason to deny supplemental jurisdiction. *Phillips v. Del Toro*, 2022 WL 1597583, at *4 (D.D.C. May 19); *Omnicare*, 594 F. Supp. 2d at 975. This Court will have the benefit of the existing caselaw. *Compare, e.g.*, *Pines*, 206 Cal. Rptr. at 873-76 (nonprofit was a business establishment), *with Hart v. Cult Awareness Network*, 16 Cal. Rptr. 2d 705, 713 (1993) (nonprofit was not a business establishment). And from there, it can reason by analogy, "the most familiar form of legal reasoning." Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 741 (1993).

## IV.    This Court should not preemptively deny the Alliance leave to amend.

Even if this Court dismisses all or part of the complaint, it should not entertain HSF's request to preemptively deny leave to amend as "futile." MTD 24, 31. When a court dismisses a complaint, it "'normally will give plaintiff leave to file an amended complaint.'" *O'Donnell v. Barry*, 148 F.3d 1126, 1137 n.3 (D.C. Cir. 1998) (quoting Wright & Miller); *accord Ghawanmeh v. Islamic Saudi Acad.*, 268 F.R.D. 108, 110 (D.D.C. 2010) (calling amendment after dismissal the "normal and anticipated practice"). "[I]t is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as … futility." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (cleaned up). Plaintiffs must be given "every opportunity to cure a formal defect in the pleading" because the Federal Rules adopt a "policy of deciding cases on the basis of the substantive rights involved rather than on technicalities." 5B Fed. Prac. & Proc. Civ. §1357 (Wright & Miller, 4th ed.). Rule 15 thus tells courts to "freely give leave" to amend when "justice so requires." Fed. R. Civ. P. 15(a)(2).

Depending on how this Court rules, the Alliance will seek leave to amend. In many places, HSF argues that the complaint should say "more in the way of specificity," a classic example of what could be addressed in an amended pleading. *Pappas v. D.C.*, 513 F. Supp. 3d 64, 100 (D.D.C. 2021).

42

HSF would suffer no prejudice from an amendment given the infancy of this case. *Id.* And though the Alliance amended once already as of right, a second amended complaint is justified because HSF's current motion to dismiss is the first time it has addressed the Alliance's three new claims (Title VI, DCHRA, and Unruh).

This Court should not determine that any amendment would be futile prematurely, before the Alliance files a motion for leave to amend and attaches a proposed pleading. Courts are not well positioned to "opine in the abstract" about a future motion to amend. *Ali v. Al-Nahyan*, 2025 WL 3250945, at \*31 (D.D.C. Oct. 31). They especially "cannot assess whether an amendment would be futile without reviewing the proposed amendment." *Id.*; *accord Williams v. Brennan*, 285 F. Supp. 3d 1, 6 (D.D.C. 2017) (refusing to "preemptively deny" leave because ruling without seeing "a proposed second amended complaint" would be "premature"). HSF's perfunctory assertions of futility do not "carr[y] its burden" of defeating "leave to amend" before the Alliance even files a motion seeking that relief. *Mead v. City First Bank of D.C.*, 256 F.R.D. 6, 8 (D.D.C. 2009).

## CONCLUSION

This Court should deny the motion to dismiss the amended complaint. If the Court grants any part of the motion, it should not deny the Alliance leave to amend.

Dated: February 2, 2026

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy
  (D.D.C. No. 489651)
Cameron T. Norris
  (D.D.C. No. VA083)
  *Lead Counsel*
R. Gabriel Anderson
  (Texas Bar #24129302)*
Tyler A. Dobbs
  (Texas Bar #24134044)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
gabe@consovoymccarthy.com
tdobbs@consovoymccarthy.com

*D.D.C. bar application forthcoming

*Attorneys for American Alliance for Equal Rights*

44

## CERTIFICATE OF SERVICE

On February 2, 2026, I e-filed this opposition with the Court, which emailed everyone requiring service.

/s/ *Cameron T. Norris*

45