**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, |
| Plaintiff, |
| v. |
| HISPANIC SCHOLARSHIP FUND, |
| Defendant. |

Case No.: 1:25-cv-4207-LLA

ORAL ARGUMENT SET FOR
FEBRUARY 12, 2026

<u>**DEFENDANT HISPANIC SCHOLARSHIP FUND'S REPLY
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 1

    I.    The Alliance Lacks Standing. ................................................................. 1

        A.    Neither of the Alliance's student members have standing........................ 1

        B.    The Alliance lacks standing to challenge any parts of Phases II and III, and the HSF Fund A Scholar Program. ................................. 3

    II.    The Alliance's § 1981 Claim Must Be Dismissed, As There Is No Contract For The HSF Scholar Program. ............................................... 4

    III.    The Alliance's Title VI Claim Must Be Dismissed Because It Fails To Allege The HSF Scholar Program Is A Program Or Activity Receiving Federal Financial Assistance................................................. 15

    IV.    The Alliance's State Law Claims Must Be Dismissed. ........................... 20

        A.    The Court lacks, or in the alternative should not exercise, supplemental jurisdiction. ................................................... 20

        B.    AAER's position that HSF is an employment agency, educational institution, and public accommodation under the DCHRA must be rejected. .......................................................... 21

        C.    HSF is not a business establishment under CUCRA. ............................. 23

CONCLUSION..................................................................................................... 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. All. for Equal Rts. v. Am. Bar Ass'n*,
  No. 25-CV-3980, 2026 WL 161596 (N.D. Ill. Jan. 21, 2026)................2, 5, 6, 8, 9, 10, 11, 12

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  103 F.4th 765 (11th Cir. 2024) ..................................................................................5, 6

*Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*,
  No. 4:24-CV-00327, 2024 WL 3625684 (N.D. Tex. July 31, 2024).......................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................19

*Axness v. Aqreva LLC*,
  118 F. Supp. 3d 1144 (D.S.D. 2015) ...............................................................................22

*Branton v. F.C.C.*,
  993 F.2d 906 (D.C. Cir. 1993)........................................................................................4

*Brown v. FBI*,
  793 F. Supp. 2d 368 (D.D.C. 2011) ...............................................................................10

*Carney v. Adams*,
  592 U.S. 53 (2020)......................................................................................................3

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)....................................................................................................3

*Ctr. for Democracy & Tech. v. Trump*,
  507 F. Supp. 3d 213 (D.D.C. 2020) ................................................................................3

*Curran v. Mount Diablo Council of the Boy Scouts of Am.*,
  952 P.2d 218 (Cal. 1998).............................................................................................25

*D & N Bank v. United States*,
  331 F.3d 1374 (Fed. Cir. 2003)......................................................................................7

*U.S. ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC*,
  540 F. Supp. 2d 165 (D.D.C. 2008) ...............................................................................15

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008)....................................................................................................3

*Do No Harm v. AAUW,*
  No. 1:24-cv-1782-LLA (D.D.C. 2024) .................................................................14

*Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians,*
  No. 3:24-CV-11, 2025 WL 973614 (S.D. Miss. Mar. 31, 2025) .........................5, 13

*Ellison v. Am. Bd. of Orthopaedic Surgery,*
  11 F.4th 200 (3d Cir. 2021) .................................................................................2

*Estenos v. PAHO/WHO Fed. Credit Union,*
  952 A.2d 878 (D.C. 2008) ...................................................................................20

*\*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ..............................................................................................2

*Fischer v. United States,*
  603 U.S. 480 (2024) ............................................................................................17

*Forgeron Inc. v. Hansen,*
  149 Cal. App. 2d 352 (Cal. Ct. App. 1957) ........................................................7, 8

*Imaginarium, LLC v. United States,*
  166 Fed. Cl. 234 (2023) ....................................................................................7, 10

*Interdonato v. Interdonato,*
  521 A.2d 1124 (D.C. 1987) ...................................................................................8

*Isbister v. Boys' Club of Santa Cruz, Inc.,*
  707 P.2d 212 (Cal. 1985) .................................................................................24, 25

*Lewis v. Casey,*
  518 U.S. 343 (1996) ..............................................................................................4

*Lin v. D.C.,*
  47 F.4th 828 (D.C. Cir. 2022) ..............................................................................15

*Lloyd as Next Friend of M.L. v. Ingenuity Prep Pub. Charter Sch.,*
  No. 1:18-CV-00801, 2020 WL 6822681 (D.D.C. Nov. 20, 2020) ........................18

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ............................................................................................17

*Moore v. Chase, Inc.,*
  No. 1:14-cv-01178, 2016 WL 866121 (E.D. Cal. Mar. 7, 2016) ..........................20

*Newman v. Howard Univ. Sch. of Law,*
  715 F. Supp. 3d 86 (D.D.C. 2024) ......................................................................5, 7

*O'Connor v. Vill. Green Owners Ass'n,*
    662 P.2d 427 (Cal. 1983) .................................................................................23

*Passantino v. Weissmann,*
    752 F. Supp. 3d 168 (D.D.C. 2024) ..............................................................18

*Pines v. Tomson,*
    206 Cal. Rptr. 866 (Ct. App. 1984) ..............................................................24

*Robertson v. United States,*
    343 U.S. 711 (1952) ......................................................................................12

*Rotary Club of Duarte v. Bd. of Directors of Rotary Int'l,*
    224 Cal. Rptr. 213 (Ct. App. 1986) ..............................................................24

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,*
    786 F.3d 510 (7th Cir. 2015) ........................................................................20

*Samma v. U.S. Dep't of Def.,*
    No. 20-CV-1104, 2020 WL 4501000 (D.D.C. Aug. 4, 2020) .........................3

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................................2

*\*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.,*
    477 U.S. 597 (1986) ......................................................................................16

*U.S. Jaycees v. Bloomfield,*
    434 A.2d 1379 (D.C. 1981) .....................................................................22, 23

*United States v. Collins,*
    56 F.3d 1416 (D.C. Cir. 1995) (18 U.S.C. § 641) ........................................18

*United States v. McAusland,*
    979 F.2d 970 (4th Cir. 1992) ........................................................................18

*United States v. Schwartz,*
    785 F.2d 673 (9th Cir. 1986) ........................................................................18

*Ward v. D.C. Dep't of Youth Rehab. Servs.,*
    768 F. Supp. 2d 117 (D.D.C. 2011) ........................................................10, 13

*Warfield v. Peninsula Golf & Country Club,*
    896 P.2d 776 (Cal. 1995) ..............................................................................23

*Wilborn v. S. Union State Cmty. Coll.,*
    720 F. Supp. 2d 1274 (M.D. Ala. 2010) ..................................................21, 22

*Wisey's #1 LLC v. Nimellis Pizzeria LLC,*
   952 F. Supp. 2d 184 (D.D.C. 2013) ..................................................................20

**Constitutional Provisions**

U.S. Const. amend. I ...........................................................................................15

**Statutes**

18 U.S.C. § 641 ...................................................................................................18

18 U.S.C. § 1954 .................................................................................................18

28 U.S.C. § 1367 .................................................................................................20

42 U.S.C. § 2000a(a) ..........................................................................................20

42 U.S.C. § 2000d .........................................................................................15, 17

42 U.S.C. § 2000d-4a(3)(A) ...............................................................................18

42 U.S.C. § 2000d-4a(3)(A)(i) ...........................................................................19

42 U.S.C. § 2000d-4a(3)(A)(ii) ..........................................................................19

Cal. Civ. Code § 51(b) ........................................................................................20

Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 ............................17

**Rules and Regulations**

Fed. R. Civ. P. 15(a)(1)(B) .................................................................................25

Fed. R. Civ. P. 15(a)(2) ......................................................................................25

28 C.F.R. § 42.102(c)(5) .....................................................................................16

**Other Authorities**

*FAFSA Fail: Examining the Impact on Students, Families, and Schools: Hearing
   Before the Subcomm. on Higher Educ. & Workforce Dev't*, 118th Cong. 2
   (2024) ................................................................................................................18

*Federal Financial Assistance*, Black's Law Dictionary (12th ed. 2024) .....................................16

Guidance on the Use of Federal Tax Information (FTI), Free Application for
   Federal Student Aid (FAFSA®) Data, and Non-FAFSA Data, U.S. Dep't of
   Educ., No. GEN-25-08 (Sep. 30, 2025) ("FAFSA Guidance"),
   https://perma.cc/CQ4Z-HNBY ......................................................................16

*Help Center—Student, General*, HSF, https://perma.cc/NV2M-QN9L (archived
    Feb. 9, 2026) ............................................................................................................13

Restatement (Second) of Contracts (1981) ..............................................................15

*Title VI Legal Manual* §V(e)(4), DOJ, https://perma.cc/NCE8-NFW5 (archived
    Feb. 9, 2026) ............................................................................................................19

**INTRODUCTION**

The Alliance's kitchen sink approach appears to muddy the waters as to whether the claims in its Amended Complaint should be dismissed. But when the dirt is allowed to settle, it is clear the Alliance's claims must be dismissed.

Has the Alliance alleged a contract *for* the HSF Scholar Program? No. It alleges a series of non-contracts, contracts in the orbit of the Scholar Program but not *for* it, and later-in-time allegedly contractual relationships that have nothing to do with Scholar selection. Therefore, the § 1981 claim must be dismissed. Has the Alliance alleged any "federal *financial* assistance?" No. It twists itself in knots to read "financial" out of Title VI and to expand the scope of that statute far beyond Congress's intent. Therefore, the Title VI claim must be dismissed.

Is HSF an employment agency, educational institution, or public accommodation under the DCHRA? No. Not only has no D.C. Court stretched the DCHRA to cover an HSF-like entity under those provisions, but if a court is going to do so, it should be a D.C. Court. Therefore, the DCHRA claim must be dismissed. Similarly, is HSF a business establishment under the CUCRA? No. HSF is not a non-profit engaged in for-profit lines of business, but if a court is going to so conclude, it should be a California Court. Therefore, the CUCRA claim must be dismissed.

The Alliance asks this Court to find contracts where there are none, re-interpret contracts where there is express contrary language, edit congressional enactments, and stretch state statutes. This Court should decline its invitation.

**ARGUMENT**

**I.    The Alliance Lacks Standing.**

**A.    Neither of the Alliance's student members have standing.**

The Alliance claims that "[t]o establish standing" it need only allege that one of its members "meet[s] the [Scholar P]rogram's nonethnic requirements" and merely *says* he intends

to apply this year—beyond that, according to the Alliance, "no more is needed." *See* Opp. to Mot. Dismiss Am. Compl. 4-5, Dkt. 33 ("Opp."). Not so. Here, that would mean millions of students from high school seniors to graduate students have standing. This low bar would open the floodgates to litigation for every scholarship-granting organization to any disgruntled student with passing awareness of the scholarship. Article III demands more. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (Article III "does not contemplate a system where 330 million citizens can come to federal court whenever they believe [an entity] … is acting contrary to … federal law"). "For a plaintiff to get in the federal courthouse door" he "must have a 'personal stake' in the dispute." *Id.* at 379 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

Students A and B are "not similarly situated." Opp. 9 n.1. Accordingly, this Court must determine on whose basis—one, neither, or both—the Alliance has standing. *Am. All. for Equal Rts. v. Am. Bar Ass'n*, No. 25-CV-3980 ("*ABA*"), 2026 WL 161596, at *4-5 (N.D. Ill. Jan. 21, 2026) (finding standing solely as to Member A, and that "[t]he amended complaint's allegations regarding Member B d[id] not confer representational standing"). Student A has not only not applied to the Scholar Program, he has failed to even create an HSF account that would enable him to apply or to access the many HSF programs "available to non-Hispanics." FAC ¶¶ 49, 54-55. All Student A has done is "reviewed the [Scholar P]rogram" and "determined how he would answer" the application's questions. Opp. 5 (quoting FAC ¶ 54). Merely reviewing the materials provided by counsel and thinking about becoming an HSF Scholar are insufficient to confer standing. They do not amount to taking "specific steps to apply for the 202[6 Scholar Program]." *See ABA*, 2026 WL 161596, at *5; *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021) ("[A] plaintiff … need[s] to plead that he or she took some actual steps that demonstrate a real interest in seeking the alleged benefit."). Instead, they amount only to steps taken in the prosecution

of this lawsuit, and a plaintiff cannot "manufacture" its way into Article III standing in the absence of an actual injury. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

As for Student B, he has never applied to the HSF Scholar Program previously, despite years of presumptive eligibility; does not claim to have applied for even one scholarship since he "applied for law school" years ago; and has not submitted the 2026 application. FAC ¶¶ 60-69. As of the filing of the Amended Complaint—the point from which standing must be assessed, *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)—Student B has only marginally differentiated himself from the millions of high school seniors to graduate students, and raises serious questions as to whether he is sincerely interested in the Scholar Program or merely this lawsuit, *see Carney v. Adams*, 592 U.S. 53, 63-64 (2020) (facts indicating plaintiff's mere "desire to vindicate his view of the law" offer "no support" for claim he was "able and ready" to apply).

**B.    The Alliance lacks standing to challenge any parts of Phases II and III, and the HSF Fund A Scholar Program.**

Any alleged injury derived from the HSF Fund A Scholar Program, the Scholar engagement surveys, or the essays in Phase II is too speculative to create standing. *Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 222-23 (D.D.C. 2020) ("[A] future injury cannot be 'speculative.' It must be 'certainly impending' or there must be a 'substantial risk' that it will occur."). Here, the Alliance does not even allege that those later parts of the process injure them at all. The Alliance's claim is that their student members are injured by the Hispanic heritage requirement at Phase I of the application. FAC ¶¶ 2-3; *see also* Mot. Dismiss Am. Compl. 13-16, Dkt. 19 ("MTD"). Nonetheless, the Alliance attempts to bootstrap-in these future events and contractual language which its members only have a vanishingly small, if any, likelihood of ever encountering as the Alliance grasps to find a contractual hook for its § 1981 claim. *See* MTD 13-16. But "standing is not dispensed in gross." *Samma v. U.S. Dep't of Def.*, No. 20-CV-1104, 2020

WL 4501000, at *5 (D.D.C. Aug. 4, 2020) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)). And the Alliance's attempt to drag in contractual language that it can only speculate its members will ever encounter must, as a result, fail.

The Alliance claims that "it doesn't matter how unlikely it is" "or how speculative it is" that any of its members will ever be bound by the allegedly contractual language upon which it bases its § 1981 claim. *See* Opp. 11. The Alliance is flatly wrong. There may be "some chance that … at some time," one of its members may encounter allegedly contractual components of the Fund A Scholar Program or later phases of the application but this mere "possibility [is] … far too remote and attenuated to establish a case or controversy under Article III." *See Branton v. F.C.C.*, 993 F.2d 906, 909 (D.C. Cir. 1993).

Even if this Court concludes that the Alliance is not jurisdictionally barred from relying on these speculative parts of the application or program, those latter aspects are nonetheless irrelevant to the question of whether there is a contract for the HSF Scholar Program. To illustrate the point, a student alleging claims against Harvard Law School's admission process would not be able to rely on the procedures for joining the Harvard Law Review as proof of anything about the law school admissions process. Whether that is because the student would not have standing to rely on the law review procedures or those procedures are simply irrelevant to the claim, the upshot is the same: those procedures could not serve as a basis for the admissions claim.

## II. The Alliance's § 1981 Claim Must Be Dismissed, As There Is No Contract For The HSF Scholar Program.

Everywhere the Alliance turns, it sees a contract. Opp. 16 (claiming "[t]he HSF program is crawling with contracts"). This scattershot approach is the result of a simple truth: there is no contract *for* the HSF Scholar Program, which is what is required for § 1981 liability to attach. That makes this case unlike *Fearless Fund*, *ABA*, and other cases relied on by the Alliance. Opp. 14-15.

Unlike its cited examples, the Alliance points to nothing of value that HSF bargains for. Fearless Fund not only explicitly referred to the terms of its grant as a "contract," but also, in exchange for funds, recipients "grant[ed] Fearless permission to use its idea, name, image, and likeness for promotional purposes and agree[ed] to indemnify Fearless to arbitrate any disputes that might arise." *See Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 775 (11th Cir. 2024). The contract in *ABA* rested on similar terms. 2026 WL 161596, at *7-8. Applicants were required to sign a release form stating that "[a]s consideration for [the scholarship] grant," the recipient allowed, *inter alia*, use of their name image and likeness, biography, and application components in ABA promotional materials. *Id.* Nor does the Alliance allege that HSF requires Scholars to forgo something of value. By contrast, in *Newman*, the plaintiff agreed to enroll at Howard, implicitly in lieu of enrolling elsewhere, on the condition of receiving the offered scholarship funds. *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 98, 104 (D.D.C. 2024) ("With this offer in hand, Newman enrolled at Howard."). No such terms are alleged here. The facts in *Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians* stand still further apart. No. 3:24-CV-11, 2025 WL 973614, at *1-2 (S.D. Miss. Mar. 31, 2025). There, the terms provided, *inter alia*, that "[i]f a recipient withdraws or discontinues their program for reasons within their control, they must return any scholarship funds received"—a clear enforceable term. *Id.* Once again, the Alliance points to no similarly clear term in the challenged HSF programs. As illustrated by the summary table below, every case on which the Alliance relies was determined to include a contract *for* the program at issue. The fact that the Alliance can point to no such contract here is dispositive.

| Case | Contract Language |
|---|---|
| *Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians*, No. 3:24-CV-11, 2025 WL | "Upon being awarded the scholarship, recipients must: |

| | |
|---|---|
| 973614, at *1-2 (S.D. Miss. Mar. 31, 2025) ("NAEMT") (emphasis added) | • Begin the educational program in the term for which the award is granted;<br>• Fully complete the EMS program for which the scholarship is awarded;<br>• Maintain passing grades and remain in good standing throughout the course of study;<br>• Seek certification by testing upon completion of their EMS educational program and;<br>• Provide follow up information and respond to NAEMT requests pertaining to their education and career….<br>**If a recipient withdraws or discontinues their program for reasons within their control, they must return any scholarship funds received."** |
| *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 775 (11th Cir. 2024) (emphasis added) | The original contest rules explicitly stated that they constituted "A CONTRACT."<br><br>And "[u]nder both the original and the amended (i.e., post-suit) rules, a winning entrant obtains $20,000 and valuable mentorship and, **in return, grants Fearless permission to use its idea, name, image, and likeness for promotional purposes** and agrees to indemnify Fearless to arbitrate any disputes that might arise." |
| *Am. All. for Equal Rts. v. Am. Bar Ass'n*, No. 25-CV-3980, 2026 WL 161596, at *7-8 (N.D. Ill. Jan. 21, 2026) (emphasis added) | "**The release form is a contract** between the applicant and the ABA. It states, '**As consideration** for such grant and for the opportunity to participate in the American Bar Association Legal Opportunity Scholarship Program,' the applicant must '**grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application'** in its own materials. Legal Opportunity Scholarship 2025, Kaleidoscope (2025 Application). Applicants must sign and date the release form, endorsing the statement: 'I hereby consent to the use of information about myself and my application, as stated and described herein, and agree with the provisions of this release form.' 2025 Application.<br>… |

| | Although the written release form is not in the record, the amended complaint plausibly describes the essential ingredients of a non-exclusive license granted to the ABA to use copyrighted materials, that is, the applicant's essay and other written submissions." |
|---|---|
| *Newman v. Howard Univ. Sch. of Law*, 715 F. Supp. 3d 86, 98 (D.D.C. 2024) (emphasis added) | In exchange for the scholarship, the plaintiff "had to rank in the top half of his law school class…. Failure to do so would result in his scholarship being suspended…. Or, if Newman's performance dropped low enough, the scholarship agreement could be terminated altogether…. **With this offer in hand, Newman enrolled at Howard**." |

The Court can, and should, end its analysis there.

Lacking these essential elements, the Alliance asks this Court to hold that so long as some language that could be in a contract can be found in the orbit of the program that the Alliance alleges injures its members, § 1981 liability can attach. *See* Opp. 16. But "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." *Imaginarium, LLC v. United States*, 166 Fed. Cl. 234, 242 (2023) (quoting *D & N Bank v. United States*, 331 F.3d 1374, 1377 (Fed. Cir. 2003)). No court has previously found a contract for § 1981 purposes under these circumstances, and this Court should not be the first.

Without more, the Alliance simply reiterates the details of the Terms of Use, Privacy Policy, and Terms and Conditions. Opp. 15-18. But as already explained, none of those items are contracts for the Scholar Program, if they are contracts at all. MTD 16-31. None of the cases or arguments in the Alliance's opposition changes that reality. As both California and D.C. contract law provide, to create a contract, it "must be supported by good and valuable consideration, and the consideration must be such as was bargained by the parties." *Forgeron Inc. v. Hansen*, 149 Cal. App. 2d 352, 360-61 (Cal. Ct. App. 1957) ("[T]he consideration for a promise must be an act

or a return promise, bargained for and given in exchange for the promise. … The existence or non-existence of a bargain where something has been parted with by the promisee or received by the promisor depends upon the manifested intention of the parties." (citations and internal quotation marks omitted)). That "the promisor gains some advantage therefrom[] does not establish consideration without the element of bargain or agreed exchange." *Id.* at 361. A contract "must be supported by sufficient consideration, and the consideration is not sufficient unless the releasor receives something of value to which he or she had no previous right." *Interdonato v. Interdonato*, 521 A.2d 1124, 1134 (D.C. 1987). Here, the Alliance fails to allege any such valuable consideration. The Scholars are not giving anything to the Program that constitutes valuable consideration. Without that, there is no contract, and without a contract, there is no § 1981 claim.

The Alliance waves around its recent partial victory in another jurisdiction—*ABA*, 2026 WL 161596 (N.D. Ill. Jan. 21, 2026)—as support for its claim that there is a sufficient contract here. Opp. 14. But that case demonstrates why there is no contract for the Scholar Program. In *ABA*, as part of the application for the scholarship being challenged, the scholarship applicants were required to sign a release granting the ABA "the right to use a winner's application materials for promotional purposes." 2026 WL 161596, at *1. A complete application package to the ABA included the applicant's transcript, letters of recommendation, a release form, and the applicant's personal statement. *Id.* at *2. And the release form noted that it needed consideration in exchange for the scholarship. It states, "'As consideration for such grant and for the opportunity to participate in the [ABA] Legal Opportunity Scholarship Program,' the applicant must 'grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application' in its own materials." *Id.* (citation omitted). The ABA's Privacy Policy also allowed the ABA to "sell members' data to third parties." *Id.* at *7.

The court held that "[s]ince that is effectively a license to use copyrighted application materials, and a license constitutes valuable consideration sufficient to form a contract," the Alliance sufficiently pled a § 1981 claim. *Id.* at *1. It held that the "'consideration' is valuable to the ABA," as "[t]he ABA uses members' information … to generate advertising revenue for itself and to sell them its products and services—like premium memberships, practice groups, CLEs, and other materials, events, and more. Growing the size of the ABA's membership also increases its audience and its effectiveness when lobbying and litigating." *Id.* at *7. But HSF does not require any consideration for an applicant to submit his or her application. Indeed, the Alliance does not point to any subsequent products HSF might seek to sell Scholars, or any other item of value that HSF would receive.

**Terms and Conditions are not a contract for the HSF Scholar Program.** The Alliance claims that the provision in the Terms and Conditions that requires applicants to "acknowledge and agree that all applications and submitted materials shall become the property of HSF and will not be returned to you" is consideration and creates a contract for the Scholar Program. Opp. 16-17. But there are at least two issues with that claim. *First*, that statement does no more than inform applicants their application materials cannot be returned to them once they submit. MTD 26-27. In the same way that in the pre-internet days if a student submitted a paper application it would not be returned, HSF has no process to return an applicant's completed form. Furthermore, that provision is a far cry from the release form and privacy policy in *ABA*. The Terms and Conditions here do not state that HSF will use "your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application in its own materials" and will "sell" your data to third parties. *ABA*, 2026 WL 161596, at *2 (internal quotation marks omitted). HSF applicants do not give up any rights to use their application materials in any way for any purpose

in exchange for submitting their application to the HSF Scholar Program. *Contra* Opp. 17. There is nothing more to it. That the Terms and Conditions do not explicitly say that applicants are allowed to use their materials without HSF's permission, or do not explicitly say what HSF does with the materials, does not provide any basis for the Alliance's mere speculations that HSF will use the materials as the ABA does. *See id.* The Court should reject such speculations. *Brown v. FBI*, 793 F. Supp. 2d 368, 379 (D.D.C. 2011); *Imaginarium, LLC*, 166 Fed. Cl. at 242.

*Second*, even if the Court were to imbue the phrase "become[s] the property of HSF" with more meaning, at most that phrase relates to the completed application form for Phase I, which does not include any essays or other applicant-produced copyrightable material. *See* FAC ¶¶ 36-37, 40 (referencing the materials submitted during Phase I, which do not include essays)[1]; Ex. 1 to Reply (Terms and Conditions); MTD 29-31; *cf. ABA*, 2026 WL 161596, at *2 (application includes essays in the first instance). Obviously, things like an applicant's name, address, phone number, high school or college, and GPA do not, and cannot, become HSF's property. Accordingly, *ABA* is inapposite and cannot support the Alliance's claim. *ABA*, 2026 WL 161596, at *6-8.

**The Terms of Use and Privacy Policy are not contracts for the HSF Scholar Program.** As for the Terms of Use and Privacy Policy, the Alliance raised this same argument in *ABA* and the district court found that it failed to state a claim. 2026 WL 161596, at *6 (noting that because "Member A created an account on the Kaleidoscope platform" and "[n]o barriers to Member A's

---

[1] The Terms and Conditions only applies to Phase I. It informs applicants that their "applications and submitted materials become the property of HSF." FAC ¶ 37. When explaining the "application" and submission process, it asks applicants to "acknowledge that when you click 'I AGREE' below, you will not be able to edit or change your application." Ex. 1 to Reply. It also asks applicants to "acknowledge that you must click 'I AGREE' below to officially submit your application." *Id.* The Terms and Conditions do not refer to the next steps or essays. *See id.*; *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 120 n.2 (D.D.C. 2011) (considering document attached by defendant in considering its motion to dismiss where document was "referred to in the complaint" and the "complaint necessarily relie[d]" upon it).

formation of a contract with Kaleidoscope have been alleged," "no claim has been stated against Kaleidoscope"). The district court reached that conclusion not because the terms of use and privacy policy were with a third party but because there were no barriers to the Alliance's student members' ability to form that contract. The same is true here. Both Student A and B are free to create a contract with HSF through the Terms of Use and Privacy Policy to receive the limited revocable license to use the HSF website—indeed, Student B has done so. *See* FAC ¶ 64.

Furthermore, those agreements are limited in their scope to the use of the HSF website, which is evident from their written terms. *See Terms of Use Agreement*, HSF, perma.cc/UE33-KQ2T (incorporated by reference at FAC ¶ 38.a); *Privacy Policy*, HSF, perma.cc/Z8Z8-G3D4 (incorporated by reference at FAC ¶ 38.b). The express terms of those contracts state that in exchange for the rights HSF asks of its website users, the website users get a license to use the website consistent with the terms. And the website has numerous uses, including access to a "Scholarship Finder" and "College Prep" resources. FAC ¶ 105. There is nothing more to those contracts. They are not contracts for the HSF Scholar Program unlike the release form in the *ABA* case, which directly and explicitly concerns the ABA's Legal Opportunity Scholarship Program.[2]

---

[2] The Scholarship in *ABA* differs from the HSF Scholar Program in at least one other material respect. HSF does not promise any funds. *Cf. ABA*, 2026 WL 161596, at *1 (noting that the ABA commits to awarding $15,000 to incoming law students). Instead, HSF clearly states that it will provide Scholars with "[the opportunity to] be eligible to receive a scholarship, *depending on available funds*." MTD 20. For HSF, providing a gift under the HSF Scholar Program is conditional whereas the ABA promises to award $15,000 each year. With such a key distinction, it is misleading for the Alliance to compare these programs. The Alliance loops in the "implied duty of good faith and fair dealing" to argue that HSF is required to "seek funding and award scholarships when funds are available." Opp. 20-21. However, that implied duty only applies to contracts, and the HSF Scholar Program, by communicating that it does not guarantee funds, along with the lack of contractual elements, MTD 16-29; *infra* § II, establish that it does not create a contract.

**No "performance" creates a contract for the HSF Scholar Program.** As already explained, to the extent the Alliance seeks to rely on the post-Phase I application or later stages of the program to demonstrate that there is a contract for the Scholar Program, it is either jurisdictionally barred or those items are irrelevant. *See supra* § I.B. However, for the sake of completeness, HSF addresses the Alliance's arguments here.

*First*, the Alliance fails to identify a case where an essay requirement for a scholarship converted the scholarship into a contract. Opp. 19; MTD 30. The Alliance made this same argument in *ABA* and it did not garner any consideration in the district court's opinion. *Compare* Opp'n to Mot. to Dismiss Am. Compl., *ABA*, 2025 WL 3454941, § II.4 (Aug. 25, 2025), *with ABA*, 2026 WL 161596 (not addressing this argument). If the district court there thought that the essay component alone converted the scholarship into a contract, it could have said so.

*Second*, the Alliance claims that *Robertson v. United States* stands for the proposition that "[c]ontests are contracts because they elicit performance" and "'it is irrelevant that the donor derives no economic benefit from' the performance." Opp. 19 (quoting 343 U.S. 711, 714 (1952)). But that misreads *Robertson*. In fact, *Robertson* states clearly that the contest at issue there "would be different if an award were made in recognition of past achievements or present abilities, or if payment was given not for services … but out of affection, respect, admiration, *charity* or like impulses." 343 U.S. at 713-14 (emphasis added). Charity, recognition of past achievements, and present abilities are precisely why HSF designates Scholars and awards scholarships.

*Third*, the Alliance's reliance on *Founders First* and *NAEMT* is misplaced because there were allegations of a contract for the scholarship itself in those cases and the rights and responsibilities of the recipients were dramatically different than at issue here. *See supra* (table of cases). In *NAEMT*, the program at issue provided that if an applicant is awarded a scholarship, the

recipient must "[b]egin the educational program in the term for which the award is granted; Fully complete the EMS program for which the scholarship is awarded; Maintain passing grades and remain in good standing throughout the course of study; Seek certification by testing upon completion of their EMS educational program and; Provide follow up information and respond to NAEMT requests pertaining to their education and career." *NAEMT*, 2025 WL 973614, at *1-2. And, "[i]f a recipient withdr[ew] or discontinue[d] their program for reasons within their control, they [were required to] return any scholarship funds received." *Id.* at *2.

The HSF Scholar Program imposes no conditions, let alone anything similar to those required by the NAEMT program. In fact, completely opposite to the NAEMT program, the HSF Scholar Program does not even dictate how a recipient uses the possible funds the recipient is awarded. Scholarship recipients receive these funds directly and may use the money as they see fit. MTD 5-6. *Contra* Opp. 20. The Alliance contends that the HSF Scholar Program requires students to spend the funds "only on 'expenses related to school.'" Opp. 20 (quoting Compl. ¶ 44). That is incorrect. A quick look at the HSF Scholar Program's FAQ page, incorporated in the Amended Complaint ¶ 44, shows that the Program does not dictate how the funds can be used. *Help Center—Student, General*, HSF, https://perma.cc/NV2M-QN9L (archived Feb. 9, 2026); *see Ward*, 768 F. Supp. 2d at 120 n.2. At most, in response to the question "What may the scholarship funds (monetary award) be used for?" the HSF Scholar Program notes that funds "may be used for tuition, fees, books, and other academic related supplies, as well as for room/board and transportation expenses related to school." *Id.* But there is no obligation or consequence if a recipient uses the funds for another purpose. And again, the NAEMT scholarship promises to award scholarships of $1,250, *NAEMT*, 2025 WL 973614, at *1, whereas here, the HSF Scholar Program makes no such guarantee. Accordingly, *NAEMT* does not support the Alliance's claim.

*Founders First* is of no greater assistance to the Alliance. There, "[t]he program offer[ed] contestants a grant in exchange for their time, intellectual property, and a promise to use the funds in a manner acceptable to Founders." *Am. All. for Equal Rts. v. Founders First Cmty. Dev. Corp.*, No. 4:24-CV-00327, 2024 WL 3625684, at \*3 n.7 (N.D. Tex. July 31, 2024). Not so here. And, in *Founders First*, the defendant did not dispute that the grant was a contract. *Id.* at \*3. Accordingly, *Founders First* does not help the Alliance.

The same is true of *Do No Harm v. AAUW*, No. 1:24-cv-1782-LLA (D.D.C. 2024), where fellowship recipients "had to agree to be a full-time student and spend the money only on approved expenses." Opp. 15. The HSF Scholar Program imposes no such obligation, and as the Alliance acknowledged, the defendant in that case "did not deny that its scholarship was a contract under § 1981." *Id.*

**No Scholar "contracting opportunities" create a contract for the HSF Scholar Program.** The Alliance's reliance on Scholar programming—job fairs, conferences, job banks, etc.—is misplaced as that programming cannot be the basis for concluding that there is a contract for the Scholar Program. *Supra* § I.B. But in any event, the arguments are meritless. The Alliance fails to identify any consideration that HSF receives for hosting job fairs, conferences, and a job bank for Scholars. There is none. The Scholar programming is charitable in nature and is a gift just like the rest of the Scholar Program.

The Alliance's attempt to build its case on the HSF Fund A Scholar Program fails because it is a separate and distinct program as evidenced by the fact that the Fund A Scholar Program has its own separate terms of use agreement. MTD 28-29. The Alliance cannot rely on the Fund A Scholar Program as a contract for the HSF Scholar Program when the Fund A Scholar Program terms of use say otherwise.

*Finally*, with respect to the First Amendment, HSF merely asserts the unremarkable claim that the Scholar Program is First Amendment-protected expressive conduct. MTD 23 (citing FAC ¶ 9, which identifies both the message HSF intended to convey and that the Alliance understood it: HSF "support[s] Hispanic American higher education" and "strives to help" Latino students attain it); *see also* FAC ¶ 49 (describing HSF's "mission" as "helping 'students and parents'" and providing scholarships); *id.* ¶ 90 (similar). That reality clarifies that an expression of mutual assent to be bound by a contract does not exist, though one would be needed for the Scholar Program to be "contractual." *See* FAC ¶ 34; *U.S. ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC*, 540 F. Supp. 2d 165, 170 (D.D.C. 2008) ("It is axiomatic that 'formation of a contract requires … a manifestation of mutual assent to [an] exchange.'" (quoting Restatement (Second) of Contracts §§ 17, 22 (1981))). Instead of expressing mutual assent to be bound by a contract, the Scholar Program expresses only "a general expression of support for the recipient [of its charitable spending] and its views," consistent with the First Amendment, *see* MTD 22-23, and is therefore outside the scope of § 1981.

## III. The Alliance's Title VI Claim Must Be Dismissed Because It Fails To Allege The HSF Scholar Program Is A Program Or Activity Receiving Federal Financial Assistance.

"Title VI provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Lin v. D.C.*, 47 F.4th 828, 847 (D.C. Cir. 2022) (quoting 42 U.S.C. § 2000d). But because the Alliance failed to plead facts plausibly alleging that HSF receives "Federal financial assistance" or that the Scholar Program is a "program or activity," this claim must fail. *See* MTD 31-37 (quoting 42 U.S.C. § 2000d).

Assuming *arguendo* that non-money assistance qualifies as "financial assistance," even the Alliance acknowledges that to be "Federal financial assistance" the assistance provided by the federal government must be of "value," in particular, of "economic benefit," to the recipient. *See* Opp. 26 (quoting *Federal Financial Assistance*, Black's Law Dictionary (12th ed. 2024)); *id.* at 27 (quoting *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986)). HSF receives no such benefit. The sole form of "assistance" the Alliance alleges that HSF "receives" is "access to FAFSA data" under the Higher Education Act, which authorizes "the Department of Education [to] disclose[] FAFSA data to," *inter alia*, HSF. FAC ¶¶ 85-86. This is of no economic value to HSF. *See* MTD 32-37. At most, the Alliance alleges that HSF receives information that helps HSF to *give* gifts of money *to students*. That is the opposite of receiving something of financial value *to HSF*. MTD 31.

As explained in HSF's motion, HSF is "not permitted to further disclose FAFSA data or FTI for any other purpose beyond the application, award, and administration of [its] specific aid programs," *see* Guidance on the Use of Federal Tax Information (FTI), Free Application for Federal Student Aid (FAFSA®) Data, and Non-FAFSA Data, U.S. Dep't of Educ., No. GEN-25-08 (Sep. 30, 2025) ("FAFSA Guidance"), https://perma.cc/CQ4Z-HNBY.[3]

Furthermore, the regulatory language from which the Alliance selectively quotes, Opp. 27, comes at the end of a list of types of assistance each of which would have tangible, economic value to the recipient. *See* 28 C.F.R. § 42.102(c)(5). Accordingly, the provision on which the Alliance

---

[3] The Alliance claims this portion of the FAFSA Guidance says HSF "uses the FAFSA data for 'the application, award, and administration of their specific aid programs." Opp. 26; *id.* at 29 (claiming the FAFSA Guidance says "HSF uses the data" in a particular way). This is incorrect. The Guidance says nothing about how HSF uses FAFSA data, or even *that* HSF uses FAFSA data or receives it from the federal government. What it says is that HSF "may" receive this data and that if it does, it can only use it for the enumerated purposes. *See* FAFSA Guidance.

16

relies must be read in that context. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) (discussing *noscitur a sociis* and *ejusdem generis* canons of statutory interpretation as "common sense"). In any event, it is this Court not the Department of Education that must ultimately interpret the statute, and the statute requires "financial" assistance. 42 U.S.C. § 2000d; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 406-07, 412-13 (2024).

The Alliance also baldly claims that "FAFSA data are at the core of HSF's business model" and thus "economically beneficial to HSF." Opp. 26. But that makes no sense. The Alliance acknowledges HSF has been awarding scholarships since 1975, FAC ¶ 24; but the FAFSA was not created until nearly 20 years later, *see* Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (authorizing the promulgation of the standardized federal form now called FAFSA). Regardless, the Alliance did not plead any facts about HSF's "business model" apart from the conclusory assertion that the Scholar Program is a "flagship program," which, at the most is an assumption that the Program has a high public profile. *See* FAC ¶¶ 13, 91, 102. And in any event, the Alliance does not contest, nor could it, that HSF is expressly forbidden from using the FAFSA data for any purpose other than to administer the scholarship.

The Alliance's claim that HSF is "wrong to suggest that students … provide the FAFSA data to HSF," Opp. 28; *see also id.* at 27 (claiming "only the federal government … has" FAFSA data), is contradicted by the Alliance's own Amended Complaint where it twice alleges that students submit FAFSA data "*to HSF*." *See* FAC ¶ 52.d (alleging that Student A "would submit a FAFSA *to HSF*" (emphasis added)); *id.* ¶ 61.c (same for Student B).

Equally ineffective is the Alliance's attempt to point the Court towards a series of inapposite cases that hold "information *can* be a thing of value." Opp. 27 (emphasis added) (citation omitted). To start, none of these cases interpret "Federal financial assistance" under Title

VI, instead they concern the use of the phrase "thing of value" in criminal statutes relating to theft or misuse of information or other things. *See United States v. McAusland*, 979 F.2d 970, 974 (4th Cir. 1992) (18 U.S.C. § 641 (criminal statute about conversion of government property)); *United States v. Schwartz*, 785 F.2d 673, 679 (9th Cir. 1986) (18 U.S.C. § 1954 (criminal anti-kickback statute)); *United States v. Collins*, 56 F.3d 1416, 1419 (D.C. Cir. 1995) (18 U.S.C. § 641). Moreover, FAFSA data cannot be traded "for political advantage" like "state secrets," *Schwartz*, 785 F.2d at 679 (citation omitted), nor does it have financial value like Department of Defense procurement information that could be sold to another competitor, *McAusland*, 979 F.2d at 972.[4]

Finally, the Alliance argues it has sufficiently alleged the Scholar Program is a "program or activity" within the meaning of the statute.[5] Not so. The Alliance failed to allege that either the "assistance" at issue was extended to HSF "as a whole" or that HSF "is principally engaged in the business of providing education." *See* MTD 31-37 & n.7, 42-43; 42 U.S.C. § 2000d-4a(3)(A).

---

[4] It is unclear how the conviction of a Defense Intelligence Agency technical analyst who "convert[ed] government computer time and storage, as well as the use of photocopiers and office supplies … to support his ballroom dance activities," *Collins*, 56 F.3d at 1417 (cited at Opp. 27), offers insight on the meaning of "Federal financial assistance." Regardless, any inference that § 1090(a)(2)(D)'s FAFSA data disclosure allowance is economically valuable to HSF like state secrets or procurement information is particularly unreasonable considering the Department of Education's botched implementation of FAFSA updates, which was the subject of Congressional hearings for being rife with access, delay, and accuracy problems. *FAFSA Fail: Examining the Impact on Students, Families, and Schools: Hearing Before the Subcomm. on Higher Educ. & Workforce Dev't*, 118th Cong. 2, 18 (2024); *Passantino v. Weissmann*, 752 F. Supp. 3d 168, 174 (D.D.C. 2024) (court may take judicial notice of congressional hearings on a motion to dismiss).

[5] Highlighting the deficiency of its position on the merits, the Alliance appears primarily concerned that this argument was, in its view, not in the "body text." Opp. 28-29. But because two thirds of the points made were directing the Court to arguments made in the body of the brief, MTD n.7 (citing *supra* §§ III and IV.B.1 of the Motion to Dismiss), it is flatly incorrect to say the footnote's contents were "distinct from" or not "include[d] in the main text," *contra* Opp. 29 (citation omitted). *See Lloyd as Next Friend of M.L. v. Ingenuity Prep Pub. Charter Sch.*, No. 1:18-CV-00801, 2020 WL 6822681, at *4 n.6 (D.D.C. Nov. 20, 2020) ("[D]eclin[ing party's] invitation to discount the argument just because it appeared in a footnote.").

Statutory permission for FAFSA data access is not "assistance" received by HSF or the Scholar Program, MTD 31-37 & n.7; *see also supra* § III, let alone "funds" received by either, *see Title VI Legal Manual* §V(e)(4), DOJ, https://perma.cc/NCE8-NFW5 (archived Feb. 9, 2026) (Title VI applies to operations that "receive[] funds" from the federal government) (cited at Opp. 29). Moreover, the statute plainly includes the "as a whole" language in defining "program or activity," 42 U.S.C. § 2000d-4a(3)(A)(i), and the Alliance's pivot to relying (at Opp. 29-30) on the conclusory allegation that the Scholar Program is HSF's "flagship scholarship program" and thus the assistance does go to HSF "as a whole" does not save its Title VI claim. This mere conclusion is "not entitled to the assumption of truth," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), and the Alliance cannot leverage this baseless conclusion as support for an equally unsupported conclusion that any FAFSA data HSF receives from the federal government furthers HSF's purported "central" or "primary" purpose. *Contra* Opp. 29-30. As explained in HSF's Motion, the Alliance simply did not allege facts that would support an inference that the access is extended to HSF "as a whole"; e.g., for "general assistance" rather than for a particular purpose. MTD 31 n.7.

HSF is also not "principally engaged in the business of providing education," 42 U.S.C. § 2000d-4a(3)(A)(ii). *Contra* Opp. 30-31. It provides funds and other support services to students and families who are looking to others—e.g., colleges and universities—to "provid[e] education" to them in the form of programs at the end of which they will receive a degree or certificate, or some other accomplishment indicator. MTD 43-44; *see also id.* 31 n.7. HSF's offerings include none of these things. Moreover, the Alliance confuses "support services," which it alleges HSF provides to Scholars, FAC ¶ 90, with "social services," which is the term in the statute, *id.* (quoting 42 U.S.C. § 2000d-4a(3)(A)(ii)). By claiming HSF provides "social services" and going on to acknowledge that a social service is assistance "of the sick, destitute, or unfortunate," or the like,

19

Opp. 30 (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 527 (7th Cir. 2015)), the Alliance demonstrates that it misunderstands HSF's mission, the Scholar Program, and what its pleadings represent the Program as entailing—the Scholar Program is not a social service for the "unfortunate," it is an expression of support for the empowerment of excellent, high-achieving students and their families, *see, e.g.*, FAC ¶ 40 (only the "best" students are Scholars), only a fraction of whom receive any financial support from the Scholar Program, *see, e.g.*, *id.* ¶ 44 (observing that not all Scholars receive a scholarship).

## IV.    The Alliance's State Law Claims Must Be Dismissed.

### A.    The Court lacks, or in the alternative should not exercise, supplemental jurisdiction.

The Alliance believes that § 1981 and Title VI (the federal claims) are "parallel antidiscrimination laws" with the DCHRA and the CUCRA (the state law claims) thus, in its view, this Court has supplemental jurisdiction under 28 U.S.C. § 1367. Opp. 38-39. That is wrong. The federal analogue for the DCHRA is Title VII. *See Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 886-87 (D.C. 2008) ("We follow cases construing Title VII in interpreting and applying the provisions of the DCHRA"). And the federal analogues for the CUCRA are Title II of the Civil Rights Act and the Americans with Disabilities Act. *Compare* 42 U.S.C. § 2000a(a) *with* Cal. Civ. Code § 51(b); *see also Moore v. Chase, Inc.*, No. 1:14-cv-01178, 2016 WL 866121, at *3 (E.D. Cal. Mar. 7, 2016) ("In the disability context, the California 'Unruh Act' incorporates ADA standards."). With this correction, and in light of many different questions that must be resolved between the claims, MTD 38-40, it is clear that the mere "background factual overlap" between the federal and state claims that the Alliance proffers is insufficient to confer supplemental jurisdiction on this Court, *Wisey's #1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 189 (D.D.C. 2013). The Alliance does not contest that there would be no reason for this Court to

maintain the state claims if none of the federal law claims survive HSF's motion to dismiss. *Compare* MTD 40 *with* Opp. 39-42.

Finally, the Alliance claims that the DCHRA and CUCRA claims do not raise novel or complex issues of state law, despite admitting that the threshold questions of whether those statutes apply to HSF at all are disputed, and failing to muster any on-point precedent applying those statutes to facts alleged here. *See* Opp. 41 ("For the D.C. claim, the only disputed question is whether HSF is an 'employment agency,' educational institution,' or 'public accommodation.'"); *id.* ("For the Alliance's California claim, the only disputed issue is whether HSF is a 'business establishment.'"); *infra* at § VI.A-B (detailing the Alliance's unprecedented attempted application of the DCHRA and CUCRA to HSF). If the DCHRA or the CUCRA is ever applied to an HSF-like entity, the first application should come from D.C. or California courts. Accordingly, this Court should decline to exercise its discretion to maintain supplemental jurisdiction over the state law claims because they present novel and complex issues of state law.

### B. AAER's position that HSF is an employment agency, educational institution, and public accommodation under the DCHRA must be rejected.

The Alliance's boundless reading of the DCHRA, under which HSF is allegedly an employment agency, educational institution, *and* a public accommodation, Opp. 31-36, must be rejected. *First,* the Alliance points to no caselaw in this Circuit supporting its argument that HSF is an employment agency. It instead relies on *Wilborn*, a 2010 decision from the Middle District of Alabama, which held that there was a material issue of fact regarding whether the defendants' truck driver vocational program was an employment agency under Title VII. *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1291-92 (M.D. Ala. 2010). However, *Wilborn*'s holding turned on the key fact that defendants were "required to place 70 percent of … students into a job" and thus "required … program participant[s] to file applications with five different companies." *Id.* at

1291. HSF has no similar requirements. Unlike the program in *Wilborn*, it does not have "the pursuit of employment" as "a central and recurring component of [its] program." *Id.* at 1292. The other case the Alliance relies on, *Axness*, similarly involved defendants that "assisted [employers] in staying staffed" through temporary employment placements. *Axness v. Aqreva LLC*, 118 F. Supp. 3d 1144, 1159 (D.S.D. 2015) (internal quotation marks omitted). Such actions closely resemble employment agency functions, and do not at all resemble the job fairs or job listings that HSF provides. *See* MTD 42-43. The Alliance's arguments to the contrary must be rejected.

*Second,* the Alliance's argument that HSF is an educational institution strains credulity. As noted by the D.C. Circuit in *Jaycees*, even an organization that describes itself "as a supplementary *education institution* to provide … opportunity for personal development and achievement" is not an educational institution under the DCHRA, as such services are "merely … an obvious goal of [an] organization [that] serve[s] the community by developing generally … the abilities of its members." *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1383 n.8 (D.C. 1981) (emphasis added). HSF's various professional development programs simply do not make it an educational institution under the DCHRA or Title VI. MTD 43-44.

*Third,* the Alliance does not point to a single case that has found that a nonprofit like HSF that merely operates a website accessible from D.C. is a public accommodation under the DCHRA. There is scant caselaw interpreting the DCHRA's public accommodation provision, but considerations in the lead case, *Jaycees*, 434 A.2d at 1381, point strongly against application of the DCHRA to HSF here. In *Jaycees*, the court held that "a voluntary membership organization whose primary function is to render community service and instill a sense of service to the community in the members and associate members" is not a public accommodation. *Id*. The court so held notwithstanding the "vast network of services" the organization provided, because "to read

the Act [otherwise] is to ignore the plain meaning of the statutory language." *Id.* "The obligation of the judiciary is to give that meaning to words accorded by common experience and understanding. To go beyond this is to intrude upon the policy-making function of the legislature." *Id.* at 1383 n.7 (internal quotation marks omitted). A determination that HSF's website and public resources make it a public accommodation under the DCHRA would likely bring *every* website under the DCHRA's purview. The DCHRA is not so broad.

### C.    HSF is not a business establishment under CUCRA.

The Alliance tries to position HSF as a "business establishment" to keep its CUCRA claim alive, arguing that "HSF cannot distinguish itself from [other] nonprofit business establishments." Opp. 36-37. But HSF is distinct from each of the business establishments the Alliance identifies.

The condo association at issue in *O'Connor*, which consisted of all owners of condo units within a particular development, employed a professional property management firm, obtained insurance for all owners, and assessed fees, among other "customary business functions" that the court describes as "traditional landlord[]" functions aimed at "enhanc[ing] the project's economic value." *O'Connor v. Vill. Green Owners Ass'n*, 662 P.2d 427, 431 (Cal. 1983). The association thus mimicked a profit-seeking commercial business, unlike HSF's free charitable services.

The private country club in *Warfield* was held to be a business establishment under CUCRA because it derived a "significant amount of revenue" from the purchase of goods and services on its premises by nonmembers. *Warfield v. Peninsula Golf & Country Club*, 896 P.2d 776, 778 (Cal. 1995). It was those "business transactions" that occurred "on a regular and repeated basis and constitute[d] an integral part of the club's operations" that led the court to conclude the club was a business establishment. The Alliance has alleged no similar transactions for HSF.

The Alliance also misconstrues *Rotary Club*. Opp. 36-37. HSF's listing of corporate partners is distinct in kind from the Rotary Club's "directory" which lists hotels owned and

operated by members for the purpose of directing business to those hotels. *Rotary Club of Duarte v. Bd. of Directors of Rotary Int'l*, 224 Cal. Rptr. 213, 224 (Ct. App. 1986), *aff'd*, 481 U.S. 537 (1987). The Rotary directory produced direct "commercial benefits" *for its members*, unlike HSF's directory which merely recognizes and thanks *sponsors*. Further, the Rotary Club's "primary purpose" of "encourag[ing] a fellowship among business and professional men," *id.* at 224, 230, is commercial in nature. In holding that the Rotary Club was a business establishment, the court emphasized that "substantial business benefits" flow to members and that many members have their dues paid by their employer or written off in their taxes as business expenses in recognition of those benefits. *Id.* at 224-26. HSF, by contrast, does not have a membership structure, much less a paid one, and is not at all restricted to "business and professional" persons, but rather serves students, who are not yet professionals. Merely being connected with companies and professional opportunities does not rise to the level of the direct "business benefits" that Rotarians enjoy.

The Christian Yellow Pages at issue in *Pines* were held to be a business establishment based on a long list of "businesslike attributes" including, most saliently, the fact that the nonprofit sells commercial advertisements for its "Yellow Pages"-like directory, and the owners' admission that the company had a commercial and economic purpose. *Pines v. Tomson*, 206 Cal. Rptr. 866, 875-76 & n.10 (Ct. App. 1984). Here, again, the nonprofit is mimicking a commercial business, unlike HSF's operations which are purely charitable in nature.

The Boys' Club at issue in *Isbister* operates physical community recreational facilities that members pay to access. *Isbister v. Boys' Club of Santa Cruz, Inc.*, 707 P.2d 212, 214 (Cal. 1985), *as modified on denial of reh'g* (Dec. 19, 1985). Here again the Alliance has misrepresented the court's holding. The court held that the nonprofit was a business establishment specifically because these recreational facilities were a public "place of amusement" that would have been subject to

24

California's prior public accommodations law that CUCRA supplemented. *Id.* at 215-17, 220 ("[W]e have emphasized that the Club's status as a 'business establishment' covered by the act arises from its 'public' nature; it offers basic recreational facilities to a *broad segment* of the population."); *see also Curran v. Mount Diablo Council of the Boy Scouts of Am.*, 952 P.2d 218, 236-37 (Cal. 1998) (confirming *Isbister*'s narrow holding). Neither the staff that HSF employs nor the programs it advertises via its public website, *see* Opp. 36-37, are implicated by this holding.

HSF is in fact analogous to the Boy Scouts, which the Supreme Court of California held was not a business establishment because it was a "charitable, expressive, and social organization … whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members." *Curran*, 952 P.2d at 236. The court described the Boy Scouts as "an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structure and activities are not comparable to those of a traditional place of public accommodation or amusement." *Id.* at 238. Similarly, HSF's alleged function is to provide "the knowledge and resources to successfully complete a higher education … and support services and scholarships to students." FAC ¶ 90. And its activities and resources are not comparable to a place of public accommodation. *Supra* § IV.B. This court should hew closely to *Curran*'s careful approach and decline to sweep into CUCRA's coverage thousands of noncommercial nonprofits that do not resemble public accommodations.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice. *See* Fed. R. Civ. P. 15(a)(1)(B), (2) (only allowing amendment once as a matter of course).

Respectfully submitted,

*/s/ Edward H. Williams II*

Edward H. Williams II (D.C. Bar No. 1046312)
**ORRICK, HERRINGTON &**
  **SUTCLIFFE LLP**
2100 Pennsylvania Ave, NW
Washington, DC  20037
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
edward.williams@orrick.com

Jill L. Rosenberg (*pro hac vice*)
**ORRICK, HERRINGTON &**
  **SUTCLIFFE LLP**
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenberg@orrick.com

ReNika Moore (*pro hac vice*)
Sarah Hinger (*pro hac vice*)
Alexis Alvarez (*pro hac vice*)
**AMERICAN CIVIL LIBERTIES UNION**
  **FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(917) 565-6837
rmoore@aclu.org
shinger@aclu.org
aalvarez@aclu.org

*Counsel for Hispanic Scholarship Fund*

February 9, 2026

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2026, a copy of the foregoing Defendant's Reply
Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Amended
Complaint was served on all parties of record.

*/s/ Edward H. Williams II*
Edward H. Williams II (D.C. Bar No. 1046312)
