**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS,<br>*Plaintiff*,<br>v.<br>HISPANIC SCHOLARSHIP FUND,<br>*Defendant*. | Civil Action No. 25 - 4207 (LLA) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff American Alliance for Equal Rights brings this action against the Hispanic Scholarship Fund ("HSF") alleging violations of 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*; and the California Unruh Civil Rights Act ("CUCRA,") Cal. Civ. Code § 51 *et seq*. ECF No. 15. HSF has filed a motion to dismiss the Alliance's amended complaint. ECF No. 19. For the reasons that follow, the court grants the motion in part and denies it in part.

## I. FACTUAL BACKGROUND

The court accepts the following factual allegations from the Alliance's amended complaint as true for purposes of deciding the motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court may also consider "any documents either attached or incorporated into the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977

F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).[1]

HSF is the "nation's largest nonprofit organization supporting Hispanic American higher education." ECF No. 15 ¶ 9. The organization aims to help Hispanic and Latino students attend college by providing scholarships and other support services. *Id.* Its "flagship" program is the HSF Scholar Program, which includes services like networking and mentorship, and for some participants with demonstrated financial need, monetary scholarships. *Id.* ¶ 13.

To be eligible for the HSF Scholar Program, an applicant must be a current high school senior, college student, or graduate student. *Id.* ¶ 28. The applicant must intend to be a full-time student at a qualifying institution during the fall semester after the application period and have a minimum cumulative GPA of 3.0 (if in high school) or 2.5 (if in college or graduate school). *Id.* ¶¶ 29-30. And the applicant must have U.S. citizenship, permanent legal residence, or status under the Deferred Action for Childhood Arrivals policy, although HSF indicates that there may be exceptions for students outside those categories. *Id.* ¶ 31. As relevant here, the HSF Scholar Program is open to "students of all races that identify as being of Hispanic Heritage." *Id.* ¶ 20. An applicant "must be at least one-quarter Hispanic/Latino," meaning that "students must be from a family whose ancestors came from at least one of these countries: Argentina, Belize, Bolivia,

[1] A plaintiff incorporates a document by reference into a complaint "where the document is not attached by the plaintiff but is 'referred to in the complaint and [] integral to [the plaintiff's] claim." *Banneker Ventures LLC, v. Graham*, 798 F. 3d 1119, 1133 (D.C. Cir. 2015) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)); *see* 5A Charles Alan Wright et al., *Federal Practice and Procedure* § 1327 (4th ed. 2026). "The prototypical incorporation by reference occurs" in a contract dispute where "either party attaches to its pleading an authentic copy of the contract itself." *Banneker Ventures LLC*, 798 F.3d at 1133. This case is not quite the prototypical case, but because the Alliance's claims hinge on whether certain sets of terms and conditions on HSF's website create contracts, those webpages are "integral" to the Alliance's claims and thus properly before the court.

Brazil, Chile, Colombia, Costa Rica, Cuba, Dominican Republic, Ecuador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Portugal, El Salvador, Spain, Uruguay, or Venezuela." *Id.* (quoting *Help Center (Eligibility)*, HSF[2]).

The application process for the HSF Scholar Program consists of two phases. Phase I requires the applicant to complete a brief online questionnaire about "their demographics, education, career interests, future plans, campus involvement, family, finances, and other personal details," but the applicant need not provide any supporting documents. *Id.* ¶ 15. As part of Phase I, the applicant must create an account on HSF's website. *Id.* ¶ 35. After creating an account and filling out the relevant information, the applicant must review a final page titled "Accept terms and conditions," and click "I agree" before submitting the application. *Id.* ¶ 36. In accepting these terms, the applicant must "acknowledge and agree that all applications and submitted materials shall become the property of HSF and will not be returned to you." *Id.* ¶ 37.

The applicant must also acknowledge having read the "Terms of Use" and "Privacy Policy" on HSF's website and agree to both. *Id.* ¶ 38. The Terms of Use state that "this is a contract between you and HSF," *id.* ¶ 38a (quoting *Terms of Use Agreement*, HSF[3]), and explain that "[y]ou must read and agree to these terms before using the HSF Service," *Terms of Use Agreement*, HSF, *supra* n.3. The "Service" is defined as HSF's "online and/or mobile services, web site, and software provided on, or in connection with, the service." *Id.* The Terms of Use include a warranty disclaimer, an arbitration clause, a "worldwide license" which allows HSF to use or reproduce any content that the user "submits, posts, displays, or otherwise makes available on the Service" such as "profile information, images, comments, [and] questions," including the user's "name, voice,

---

[2] *Available at* https://perma.cc/8PTM-PEFW.

[3] *Available at* https://perma.cc/YSJ2-T5U7.

and/or likeness" as contained in that content, and other provisions. *Id.* The Privacy Policy "explains how [HSF] collect[s], use[s], disclose[s], and protect[s] information that [it] collect[s] through the process of providing [the] Service." *Privacy Policy*, HSF.[4] Relevant here, applicants must agree to let HSF use their personal information for marketing or promotions and acknowledge that HSF may share such information with third-party business partners. ECF No. 15 ¶ 38b; *see Privacy Policy*, HSF, *supra* n.4.

After applicants complete Phase I, HSF narrows the pool to a group of "finalists" who move on to Phase II. ECF No. 15 ¶ 16. At this point, the finalists submit essays and HSF chooses preliminary winners, who must then submit documentation to verify their GPA, class level, educational institution, and major or field of study. *Id.* ¶ 17, 40. Winning students must accept their designations and sign a written pledge. *Help Center (HSF Scholar Program selection)*, HSF.[5] For the 2026 application cycle, Phase I opened on January 5 and closed on February 15. ECF No. 15 ¶ 15. HSF chose its 2026 finalists in March and selected preliminary winners in June. *Id.* ¶ 17. HSF will finalize its HSF Scholar designations in October. *Id.*

The HSF Scholar Program confers a variety of benefits and obligations on all Scholars. HSF Scholars obtain access to "the HSF Insider," a proprietary platform that shares information and career opportunities, including internship and job opportunities with corporate partners. *Id.* ¶ 46. HSF Scholars also have access to support services, including career coaching, mentorship, leadership development, and wellness resources. *Id.* ¶ 47. Scholars "must agree to fill out 'periodic surveys' for HSF." *Id.* ¶ 41 (quoting *Help Center (Eligibility)*, HSF, *supra* n.2). These

---

[4] *Available at* https://perma.cc/Z8Z8-G3D4.

[5] *Available at* https://perma.cc/U5TX-NQVT.

surveys "provide HSF with insight on the profile and needs of [its] Scholars to provide relevant and effective Scholar Support Services." *Id.* (quoting *Help Center (Eligibility)*, HSF, *supra* n.2).

The HSF Scholar Program also provides opportunities for Scholars to apply for additional benefits. Specifically, HSF puts on a variety of industry-specific conferences. *Id.* ¶ 48. These conferences are open only to HSF Scholars, and each requires a separate application with essays. *Id.* If a Scholar is selected to attend a conference, he must commit to attending the conference and completing "homework," and he must agree to repay costs of attendance if he fails to comply with those conditions. *Id.* ¶ 48. HSF also offers two avenues by which its Scholars may receive financial support for their education. ECF No. 15 ¶¶ 43-46. Each year, HSF awards more than $30 million in scholarships. *Id.* ¶ 44. HSF Scholars are "eligible" to apply for scholarships ranging from $500 to $5,000 each cycle, *id.*, with the award amount based on each student's "relative need," *2026 HSF Scholar Program Application*, HSF,[6] *see* ECF No. 33, at 30 (describing the Scholar Program as providing "philanthropic assistance to students with financial need"). To be considered for such a scholarship, the Scholar must submit a Free Application for Federal Student Aid ("FAFSA") form. *Id.* ¶ 33.[7] HSF Scholars may also participate in HSF's Fund a Scholar

---

[6] *Available at* https://perma.cc/KGQ2-8BYQ.

[7] The FAFSA is a form that current and prospective students fill out and submit so that colleges and graduate schools may determine how much financial aid the student is eligible to receive. *See FAFSA*, Federal Student Aid, U.S. Dep't of Educ., https://perma.cc/6LCH-5UCS. Students select the schools to which they wish to submit their FAFSA, and those schools "will have access to [the student's] FAFSA data electronically within a day after it is processed." *Learn About the FAFSA Submission Summary*, Federal Student Aid, U.S. Dep't of Educ., https://perma.cc/42UQ-TEKK. HSF is one of two non-school entities that may directly receive FAFSA data. *See* 20 U.S.C. § 1090(a)(2)(D) (permitting the Secretary to designate scholarship organizations as eligible to receive FAFSA data like other universities and educational institutions) ; *see also* Constitutionality of Race-Based Department of Education Programs, 49 Op. O.L.C. at 46 (Dec. 2, 2025) (noting that HSF is one of the "only two scholarship granting organizations" that the Department of Education has designated as eligible).

Program, which is a "public-facing platform that allows individuals to donate directly to HSF Scholars through HSF." ECF No. 15 ¶ 45; *see Fund a Scholar*, HSF.[8] Scholars may participate in the Fund a Scholar Program without submitting a FAFSA, ECF No. 15 ¶ 33; but the award amount for students who do not complete the FAFSA is capped at $500, *Help Center (Eligibility)*, HSF, *supra* n.2. To access the Fund a Scholar platform, HSF Scholars must agree to a separate Terms of Use Agreement. ECF No. 15 ¶ 45; *see Fund a Scholar Terms of Use Agreement*, HSF.[9] The Fund a Scholar Terms of Use Agreement contains one section governing the relationship between HSF Scholars who elect to use the Fund a Scholar platform and HSF, and another governing the relationship between Fund a Scholar donors and HSF. ECF No. 33, at 22-23; *Fund a Scholar Terms of Use Agreement*, HSF, *supra* n.9. HSF Scholars wishing to access the Fund a Scholar platform must "expressly grant" HSF a "royalty-free" and "perpetual . . . worldwide license to use, reproduce," "publicly display, and make derivative works of" all content that the Scholar posts on the Fund a Scholar platform, as well as a license for HSF to use "[the applicant's] name voice and likeness . . . for use in connection with the Platform and HSF's . . . business." *Fund a Scholar Terms of Use Agreement*, HSF, *supra* n.9; *see* ECF No. 15 ¶ 45. They also must agree to indemnify HSF. ECF No. 15 ¶ 45. Lastly, both HSF Scholars and Fund a Scholar donors must agree that that HSF will take 10% of the donated funds and provide 90% to the HSF Scholar, and that HSF "retains full discretion and authority to reallocate funds" for "any reason." *Fund a Scholar Terms of Use Agreement*, HSF, *supra* n.9; *see* ECF No. 15 ¶ 45.

---

[8] *Available at* https://perma.cc/P46F-AFZG.

[9] *Available at* https://perma.cc/D3BV-2D2Z.

### A. The Alliance and its Members

The Alliance is a membership organization "dedicated to ending racial and ethnic classifications across America." ECF No. 15 ¶ 2. In this case, the Alliance represents two members—identified as Students A and B—who wish to apply to the HSF Scholar Program but are ineligible because they are not Hispanic. *Id.* ¶ 50.

Student A was, as of early 2026, a high school senior with a 4.0 GPA. *Id.* ¶¶ 51-52. He is a U.S. citizen and intends to enroll as a full-time student in an accredited, public or not-for-profit, four-year university in the United States during the 2026-2027 academic year. *Id.* ¶ 52. He "sincerely wants to apply to the HSF Scholar[] Program, be selected, participate, and take advantage of the program's many benefits." *Id.* ¶ 57. But he does not identify as Hispanic, nor does he qualify under HSF's definition; rather, he is Asian American and none of his parents or grandparents is from one of the countries required for participation in the HSF Scholar Program. *Id.* ¶ 53. Student A has not created an account on HSF's website, *id.* ¶ 55, but if HSF no longer restricted the HSF Scholar Program to Hispanic students, he would create an account and "immediately apply for the program's next open cycle," *id.* ¶ 54.

Student B, as of early 2026, was a second-year law student. *Id.* ¶ 60. He has not previously applied to the HSF Scholar Program. *Id.* Student B identifies as white and non-Hispanic, and none of his parents or grandparents is from one of the countries required for participation in the HSF Scholar Program. *Id.* ¶ 62. Student B "sincerely wants to apply to the HSF Scholar[] Program, be selected," and take advantage the program's "scholar-support and career-services" tools. *Id.* ¶ 66. He also has "unmet financial need" and would "compete for HSF's lucrative scholarships and other funding" if allowed to participate. *Id*. ¶¶ 66-67. At the time the complaint

was filed, Student B had created an account on the HSF website, *id.* ¶¶ 64-65, and by February 2026, he had submitted his Phase I application, *see* Feb. 12, 2026 Minute Entry.

## II. PROCEDURAL HISTORY

In December 2025, the Alliance filed its original complaint, ECF No. 1, and a motion for a temporary restraining order and a preliminary injunction, ECF No. 4. The court thereafter entered a briefing schedule and set a hearing for January 15, 2026. Dec. 9, 2025 Minute Order. After HSF filed an opposition to the Alliance's motion for preliminary relief, ECF No. 11, and a motion to dismiss the complaint, ECF No. 12, the parties filed a joint motion requesting a new scheduling order, ECF No. 14. In that motion, the Alliance represented that it was withdrawing its motion for preliminary relief and that it intended to amend its complaint. ECF No. 14. The court vacated the briefing schedule and the January 15 hearing and set a new schedule for amended pleadings and dispositive motions. Dec. 31, 2025 Minute Order.

In January 2026, the Alliance filed an amended complaint, ECF No. 15. HSF filed a motion to dismiss, ECF No. 20, which is now ripe, ECF Nos. 33, 40. With leave of the court, *see* Feb. 2, 2026 Minute Orders, two amicus groups also filed briefs on behalf of HSF, ECF Nos. 34, 35. The court held argument on HSF's motion to dismiss in February 2026. *See* Feb. 12, 2026 Minute Entry.

## III. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction," and it is generally presumed that "a cause lies outside [of] this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Federal Rule of Civil Procedure 12(b)(1), the court must dismiss an action

unless the plaintiff can establish, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 177-78 (D.D.C. 2007). In reviewing a Rule 12(b)(1) motion, the court "is not limited to the allegations set forth in the complaint" and "may consider materials outside the pleadings." *Morrow v. United States*, 723 F. Supp. 2d 71, 76 (D.D.C. 2010) (quoting *Jerome Stevens Pharms. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Additionally, when reviewing a motion to dismiss pursuant to Rule 12(b)(1), the court is required to "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

### B. Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), the court will dismiss a complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion under Rule 12(b)(6), a court accepts all well-pleaded factual allegations in the complaint as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Although the plausibility standard does not require "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor will "'naked

assertion[s]' devoid of 'further factual enhancement'" suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

## IV. DISCUSSION

HSF first contends that the Alliance lacks standing to bring this action, or, at a minimum, that it lacks standing to challenge aspects of the HSF Scholar Program's selection process beyond Phase I. ECF No. 19, at 10-16. Next, on the merits, HSF argues that the Alliance's Section 1981 claim must be dismissed because the Alliance has failed to demonstrate that HSF discriminates in contracting, *id.* at 16-31; and that the Alliance's Title VI claim must be dismissed because HSF is not a recipient of federal funding and because the HSF Scholar Program is not a "program or activity" within the meaning of Title VI, *id.* at 31-37. Finally, HSF argues that the court lacks, or alternatively should not exercise, supplemental jurisdiction over the Alliance's state-law claims, *id.* at 37-42, and that these claims also fail on the merits, *id.* at 42-45. The court addresses each argument in turn.

### A. The Alliance's Standing

HSF disputes whether either Student A or Student B has standing sufficient to support the Alliance's standing to bring suit. ECF No. 19, at 10-13. As a fallback argument, HSF argues that the Alliance at least lacks standing to challenge aspects of the HSF Scholar Program beyond Phase I, because it is too speculative that Student A or Student B would advance to later stages of the selection process. *Id.* at 13-16. The court rejects both arguments and concludes that the Alliance has standing to challenge all aspects of the HSF Scholar Program.

An organizational plaintiff like the Alliance can satisfy Article III's standing requirements in two ways: "[e]ither the organization can claim that it suffered an injury in its own right, or

alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The Alliance seeks to establish standing based only on the latter approach, which requires an organization to demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). HSF argues only that the Alliance's standing "fails on the first prong because" neither Student A nor Student B has standing to sue in his own right. ECF No. 19, at 10; *see id.* at 10-13. The court disagrees and concludes that the Alliance has adequately pleaded facts to establish that both Student A and Student B have standing to sue.[10]

For a plaintiff to establish Article III standing in his own right: "(1) the [plaintiff] must have suffered an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'; (2) there must exist 'a causal connection between the injury and the conduct complained of'; and (3) it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Friends of Animals v. Jewell*, 828 F.3d 989, 991-92 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The asserted

---

[10] While HSF does not dispute the remaining prongs of the organizational-standing test, *see generally* ECF No. 19, the court easily concludes that the second requirement is met because the interests in this case are germane to the Alliance's "mission of ending ethnic preferences," ECF No. 15 ¶ 5; *see Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024) (declining to analyze the second prong where it was not disputed). The third requirement is prudential, not jurisdictional, *see Tanner-Brown*, 105 F.4th at 447, and HSF's failure to address it requires no further analysis from this court, *see Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 778 F. Supp. 3d 56, 74 (D.D.C. 2025) (taking a similar approach where the defendants did not challenge the second or third prongs).

injury of the Alliance's members—denial of the opportunity to compete for the HSF Scholar Program—is undoubtedly traceable to HSF, which establishes the Program's eligibility requirements. And the court can redress that asserted injury by enjoining HSF from using the contested ethnicity criterion. The standing inquiry thus turns on whether the Alliance has pleaded sufficient facts to establish that Student A or Student B has experienced a concrete, particularized injury.

A plaintiff experiences a concrete injury when a defendant's selection policy "denie[s] him the opportunity to compete for admission on an equal basis." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *see Am. All. for Equal Rts. v. Fearless Fund* ("*Fearless Fund*"), 103 F.4th 765, 772 (11th Cir. 2024) (concluding that a plaintiff association was injured by its members' exclusion from a private contest); *Am. All. for Equal Rts. v. Am. Bar Ass'n* ("*ABA*"), No. 25-CV-3980, 2026 WL 161596, at *4 (N.D. Ill. Jan. 21, 2026) (similar). Where a plaintiff seeks to challenge an eligibility requirement or selection process but has not yet submitted an application, he must demonstrate that he is "'able and ready' to apply . . . should the [defendant] cease to use race in" its selection process." *Gratz*, 539 U.S. at 263.

At the time the Alliance filed its amended complaint, both Student A and Student B were "able and ready" to apply to the HSF Scholar Program. Each satisfied the eligibility criteria other than the challenged ethnicity requirement. ECF No. 15 ¶¶ 51-53 (Student A); *id.* ¶¶ 60-62 (Student B). The Alliance alleges that, if the court required HSF to remove its ethnicity requirement, "Student A would immediately apply for the program's next open cycle." *Id.* ¶ 54. Student A "has reviewed the program's website, benefits, and eligibility requirements," has read the application, and has "determined how he would answer every question." *Id.* Although Student A "sincerely wants to apply," he has not created an HSF account because he knows that it

would be "futile" to apply due to the challenged ethnicity requirement. *Id.* ¶ 55; *see id.* ¶¶ 56-60 (alleging Student A's interest in participating in the HSF Scholar Program and his interest in applying in future application cycles). Student B had filled out Phase I of the application by the time the complaint was filed, *id.* ¶ 64, and the Alliance's counsel represented at the hearing that Student B had submitted his application by the deadline, *see* Feb. 12, 2026 Minute Entry. He, too, "sincerely wants to apply" and to participate in the Program. ECF No. 15 ¶ 66. These allegations suffice to establish that both students are "able and ready" to apply to the HSF Scholar Program if presented with the opportunity to submit a non-futile application.

HSF responds by pointing to additional steps that the students could have taken and by noting that Student B "never once applied" to the program in the past. ECF No. 19, at 12. These arguments fall short because the "able and ready" standard does not require a plaintiff "to engage in a futile act" and "go through the motions" when he knows that he is categorically ineligible for a program. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005). Even if the students' failure to complete every step short of a futile submission could "bolster[] the likelihood that [the students have] more interest in this lawsuit than actually being designated an HSF scholar," ECF No. 19, at 11, such weighing of evidence or assessing the truth of the allegations is inappropriate at the pleading stage. Rather, a plaintiff "need only make a plausible allegation of facts establishing each element of standing." *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

In inviting the court to second-guess the students' statements of general intent, HSF relies primarily on *Carney v. Adams*, 592 U.S. 53 (2020). *See* ECF No. 19, at 11-13. In *Carney*, the Supreme Court considered whether a lawyer had manufactured standing to challenge his state's party-membership requirement for judicial appointments. 592 U.S. at 55. The record reflected

that after the lawyer read about the requirement, he "changed his political affiliation from Democrat to unaffiliated independent," and then filed a lawsuit challenging the requirement. *Id.* at 62. During discovery, the lawyer stated his general intent to apply to any judgeship for which he was qualified, but he had no knowledge of any current openings and no explanation for why he had never applied in the past when he had been eligible to apply as a Democrat. *Id.* at 61. The Court concluded that, at summary judgment, the plaintiff had failed to demonstrate that he was "able and ready" to apply to a judgeship at the time the complaint was filed; instead, his application reflected a generalized interest in vindicating his preferred view of the law. *Id*. at 66. The Court explained that the case was "highly fact-specific," *id.* at 63, and it emphasized that the series of events leading up to the lawyer's commencement of the suit strongly implied that the lawyer had manufactured standing, *see id.* at 63-64.

The Alliance's case is distinguishable from *Carney* in several respects. First, the *Carney* Court considered a plaintiff's burden at summary judgment, and HSF provides no basis for this court to extend *Carney* to the pleading stage. Indeed, if the court were to scrutinize the veracity of Student A and Student B's intentions, that would contravene the court's obligation to take the allegations in the Alliance's complaint as true for purposes of deciding the motion to dismiss. *See Lujan*, 504 U.S. at 561 (explaining that "each element [of standing] must be supported . . . with the manner and degree of evidence required at the successive stages of litigation").

Second, HSF lacks any evidence akin to the substantial record evidence in *Carney* that contradicted the plaintiff's statement of intent and supported the Court's conclusion that the plaintiff simply had a generalized interest in vindicating his preferred view of the law. *See Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians*, No. 3:24-CV-11, 2025 WL 973614, at *4 (S.D. Miss. Mar. 31, 2025) (concluding that a plaintiff association had standing to challenge the

eligibility criteria for a scholarship where, "[u]nlike the plaintiff in *Carney* who could not point to a specific judgeship he sought to fill, [the organization's member] ha[d] named the specific scholarship for which she intends to apply").

Third, and most important, the *Carney* Court reaffirmed that "a plaintiff need not 'translat[e]' his or her 'desire for a job . . . into a formal application' where that application would be merely a 'futile gesture.'" 592 U.S. at 60 (alterations in original) (quoting *Teamsters v. United States*, 431 U.S. 324, 365 (1977)). Student A and Student B, unlike the plaintiff in *Carney*, have never before been eligible to apply to the HSF Scholar Program. *See* ECF No. 15 ¶¶ 51-53 (explaining that Student A fails to meet the Program's ethnicity requirement and is thus ineligible); *id.* ¶¶ 60-63 (same for Student B). Because both students were "able and ready" to apply to the HSF Scholar Program at the time the complaint was filed, they each had standing to sue sufficient to confer associational standing on the Alliance.

HSF also raises a related, but more limited, standing challenge. It argues that "the Alliance's standing does not extend beyond Phase I of the HSF Scholar Program application" because "it is highly speculative that either Student A or Student B will advance to latter phases out of the pool of nearly 70,000 applicants if they did apply." ECF No. 19, at 13. But this argument misunderstands the nature of the Alliance's claimed injury—that the threshold ethnicity requirement bars Student A and Student B from competing on an equal basis for the HSF Scholar Program and all subsequent opportunities for HSF Scholars. "Because the injury lies in the denial of an equal *opportunity* to complete" for the HSF Scholar Program and its benefits, standing does not depend on the actual likelihood that either student would be selected for the HSF Scholar Program or for subsequent application-based programs open only to HSF Scholars, including industry-specific conferences or the Fund a Scholar Program. *Shea v. Kerry*, 796 F.3d 42, 50

(D.C. Cir. 2015) (noting that courts cannot "inquire into the plaintiff's qualifications (or lack thereof) when assessing standing"); *see Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Florida*, 508 U.S. 656, 666 (1993) (explaining that, because the injury is "the denial of equal treatment . . . , not the ultimate inability to obtain the benefit," a plaintiff seeking to challenge a race-conscious selection process "need not allege that he would have obtained the benefit but for the barrier in order to establish standing"). To the extent that HSF is arguing that the Alliance fails to allege that Student A and Student B are denied equal treatment with respect to future opportunities available to HSF Scholars, *see* ECF No. 19, at 15-16, that argument "conflates standing with the merits," *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). "At the standing stage[, the court] must take as correct" the Alliance's theory of the merits. *Campbell*, 203 F.3d at 23-24. The Alliance's claim that HSF denies Alliance members like Student A and Student B the opportunity to compete on an equal footing establishes that the Alliance has a "personal stake" in this case. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). The court declines to graft on any additional constraint as to what arguments the Alliance may make once it has established standing.

### B. Section 1981 (Count I)

Section 1981 of the Civil Rights Act of 1866 protects "the equal right . . . to make and enforce contracts without respect to race." *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 529 (D.C. Cir. 2025) (alteration in original) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006)). In enacting that statute, "Congress established a rule of equal treatment for newly freed slaves by giving them the 'same right' to make and enforce contracts . . . 'as is enjoyed by white citizens.'" *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019) (quoting 42 U.S.C. § 1981(a)). Section 1981 protects "the making, performance, modification, and termination of

contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

HSF's motion to dismiss centers on whether the Alliance tethered its claim of racial discrimination to a protectable contractual right. The Alliance argues that the HSF Scholar Program is "crawling with contracts," each of which suffices to state a Section 1981 claim. ECF No. 33, at 16. HSF responds that the Scholar Program is a gift in nature and that none of the adjacent contracts deny contractual rights on the basis of race. *See* ECF No. 19, at 16-31. Before addressing the parties' arguments, the court provides an overview of the two cases in which the Supreme Court has addressed the scope of Section 1981's protections and which shape the court's analysis of the Alliance's Section 1981 claim.

First, *Runyon v. McCrary*, 427 U.S. 160 (1976), illustrates a "classic violation of [Section] 1981." *Id.* at 172. In *Runyon*, the defendants were "private, commercially operated, nonsectarian schools" that denied admission to prospective students because they were Black. *Id.* at 168. As the Court explained, "[u]nder [the prospective] contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments." *Id.* at 172. But because "neither school offered services on an equal basis to white and nonwhite students," the Court concluded that the plaintiffs had successfully established a Section 1981 claim. *Id.* at 172-73. In so holding, the Court declined to opine on issues not presented in the case, including whether Section 1981 affected "the right of a private social organization to limit its membership on racial or any other grounds." *Id.* at 167.

Second, in *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006), the plaintiff was the sole shareholder of a company that had entered into several contracts with defendant Domino's Pizza. *Id.* at 472-73. When Domino's Pizza broke these contracts because of allegedly racial

animus toward the shareholder, the shareholder filed suit under Section 1981. *Id.* at 473-74. In denying the shareholder's claim, the Supreme Court explained that "Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." *Id.* at 480. Because the shareholder was predicating his Section 1981 claim on contractual rights that belonged to his company rather than to himself, the Court concluded that he had failed to state a claim. *See id.* at 475-76.

*Runyon* and *Domino's Pizza* provide important grounding principles for this case. Specifically, to state a claim under Section 1981, a plaintiff must "initially identify an impaired 'contractual relationship' under which the plaintiff has rights." *Domino's Pizza*, 546 U.S. at 476. "Such a contractual relationship need not already exist, because [Section] 1981 protects the would-be contractor along with those who already have made contracts." *Id.*; *see Runyon*, 427 U.S. at 172 (holding that plaintiffs who "sought to enter into contractual relationships" but were prevented from doing so on a racially motivated basis had established a violation of Section 1981). But the text of Section 1981 requires the plaintiff to show that "he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza*, 546 U.S. at 479-80. That is, "nothing in the text of [Section] 1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice." *Id.* at 479. Rather, the statute protects only the right "to give and receive *contractual rights* on one's own behalf"—"the right . . . denied in some States to [B]lack[]" people. *Id.* at 475.

There is one additional threshold issue: what jurisdiction's law governs questions of contract formation and scope for the purpose of analyzing the Alliance's Section 1981 claim. The Alliance suggests in a footnote that because Section 1981 is a federal law, the meaning of a "contract[]" should "turn[] on traditional principles of contract law, not the law of any particular

State." ECF No. 33, at 20 n.3. HSF also references "traditional contract principles," ECF No. 19, at 16-17, but proceeds to define a contract by reference to federal common law, District of Columbia law, and California law, *see id.* at 24 (first citing *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 181-82 (D.D.C. 2012) (federal common law); then citing *Mero v. City Segway Tours of Wash. DC, LLC*, 826 F. Supp. 2d 100, 105 (D.D.C. 2011) (District of Columbia law); and then citing *Sully-Miller Contracting Co. v. Gledson/Cashman Constr., Inc.*, 103 Cal. App. 4th 30, 36 (Cal. Ct. App. 2002) (California law)). Although neither party clarifies the precise origin of "traditional contract principles," the court concludes that application of District of Columbia law is appropriate.

Appellate courts frequently "require[] a district court to apply the forum state's contract law to determine if a [Section] 1981 contractual relationship existed." *Mutua v. Tex. Roadhouse Mgmt. Corp.*, 753 F. Supp. 2d 954, 959 (D.S.D. 2010) (explaining that Eighth Circuit precedent required the court to apply South Dakota law to determine whether an at-will employee had contractual rights under Section 1981); *see Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir. 1999) (applying New Mexico law to determine whether an at-will employee had contractual rights under Section 1981); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998) (explaining that "Texas law firmly supports the contractual nature" of a relationship for Section 1981 purposes); *see also Kargbo v. Nat'l R.R. Passenger Corp.*, 243 F. Supp. 3d 6, 10 (D.D.C. 2017) (explaining that federal courts apply "the most appropriate or analogous state statute of limitations" for Section 1981 claims (quoting *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004))). This comports with Section 1988, which provides that if federal law is "deficient in the provisions necessary to furnish suitable remedies" in cases under Section 1981, courts may look to "the common law" of the forum state so long as it is "not inconsistent with the

Constitution and laws of the United States." 42 U.S.C. § 1988(a). And applying the forum state's law makes good sense: because Section 1981 guarantees equal rights in contracting, the scope of the rights protected will turn on the contractual rights of similarly situated comparators, which will typically be a question of state law. The court accordingly looks to District of Columbia law in deciding questions of contract formation and scope. That said, because the District has substantially adopted the Restatement (Second) of Contracts, the court's answer would not change if it were to apply federal common law contract principles.

With these background principles in mind, the court proceeds to the Alliance's claim that the HSF Scholar Program violates Section 1981. The Alliance alleges that applicants or HSF Scholars may contract with HSF in at least eight different ways. ECF No. 33, at 16-23. When students apply to the HSF Scholar Program, they must agree to the terms and conditions at Phase I, which (1) incorporate the website's terms of use and privacy policies, and (2) require applicants to agree that their information "shall become" HSF's property, and they must (3) submit essays and thus enter a "contest" for the HSF Scholar Program at Phase II. ECF No. 15 ¶¶ 35-40; *see* ECF No. 33, at 16-19. Upon selection into the HSF Scholar Program, there are benefits available to all Scholars, such as (4) access to the HSF Insider and other career resources, and obligations on all Scholars, including (5) the obligation to complete surveys for HSF's benefit. ECF No. 15 ¶¶ 41, 46; *see* ECF No. 33, at 20, 22. There are also several additional contracting opportunities for HSF Scholars, including (6) the opportunity to apply to attend HSF Scholar conferences, which, upon acceptance, obligates the Scholar to certain terms; (7) the opportunity to apply for scholarship funding through HSF, the receipt of which is conditioned on the Scholar using the funds for educational purposes; and (8) the opportunity to participate in the Fund a Scholar Program, which is exclusive to HSF Scholars. ECF No. 15 ¶¶ 41-48; *see* ECF No. 33, at 21-23.

HSF disputes that any aspect of the HSF Scholar Program can give rise to Section 1981 liability because, in its view, the entire program is a gift to students rather than a contract or series of contracts under which the Scholars have legal rights or obligations. ECF No. 19, at 24-31. The court addresses each alleged contract in turn, beginning with the purported contracts a student may encounter when applying to the HSF Scholar Program and then turning to the benefits, obligations, and opportunities conferred on HSF Scholars.

**1. Applying to the HSF Scholar Program**

The Alliance first argues that an applicant to the HSF Scholar Program enters into a contract when he submits Phase I of the application because he must click a checkbox that says "I agree" on a page titled "Accept terms and conditions." ECF No. 33, at 16 (quoting ECF No. 15 ¶ 27); *see* ECF No. 15 ¶¶ 34-40; ECF No. 40-1 at 4.[11] The Alliance focuses on two sets of terms and conditions: one requiring the applicant to acknowledge the website's "Terms of Use" and "Privacy Policy" pages, ECF No. 15 ¶ 38, and another requiring that the applicant "acknowledge and agree that all applications and submitted materials shall become the property of HSF and will not be returned to you," *id.* ¶ 37.

*a. Terms of Use and Privacy Policy*

HSF does not dispute that the Terms of Use and Privacy Policy are contracts. It instead argues that it "does not rely on race or ethnicity to interfere with any person's right to 'make' or 'enforce' the Terms of Use and Privacy Policy Agreements" because both contracts are "contracts

[11] The citations to ECF No. 40-1 refer to the CM/ECF-generated page numbers at the top of each page rather than any internal pagination.

to use HSF's website, . . . not contracts for access to the benefits of the HSF Scholar Program." ECF No. 19, at 39 & n.6 (quoting 42 U.S.C. § 1981). The court agrees.

The Terms of Use Agreement "explains the terms by which you may use" the "Service." *Terms of Use Agreement*, HSF, *supra* n.3. The "Service" is defined as HSF's "online and/or mobile services, web site, and software provided on, or in connection with, [HSF's website and online] service." *Id.* The Terms of Use Agreement is undoubtedly contractual in nature—it provides that, "[b]y accessing or using the Service, you signify that you have read, understood, and agree to be bound by this Terms of Use Agreement . . . and to the collection and use of your information, as set forth in the HSF Privacy Policy, whether or not you are a registered user" with an account. *Id.* The Privacy Policy, in turn, "explains how [HSF] collect[s], use[s], disclose[s], and protect[s] information that [it] collect[s] through the process of providing [the] Service." *Privacy Policy*, HSF, *supra* n.4. Neither relies on, or even references, the user's race or ethnicity. *See ABA*, 2026 WL 161596, at *6 (concluding that the plaintiff organization failed to state a Section 1981 claim based on its member's creation of an account on a platform with terms of service and a privacy policy because "[n]o barriers to [the member's] formation of a contract with [the platform provider] ha[d] been alleged").

The Alliance responds that the Terms of Use and Privacy Policy are unenforceable "browsewrap" contracts until the moment a website user affirmatively clicks "I accept" when submitting Phase I of his application. ECF No. 33, at 18. But that argument goes to the enforceability of the contract, not to its scope. *See Bradley v. Nat'l Collegiate Athletic Ass'n*, 464 F. Supp. 3d 273, 293-94 (D.D.C. 2020) (recognizing that, under District of Columbia law, "[e]ven if a contract is one of adhesion, it is enforceable unless it is deemed unconscionable upon judicial scrutiny" (alteration in original) (quoting *Am. Med. Colls. v. Princeton Rev., Inc.*, 332 F. Supp. 2d

11, 16 (D.D.C. 2004)). Even assuming that the Terms of Use and Privacy Policy become enforceable only at the moment the applicant submits his Phase I application, the Terms of Use and Privacy Policy remain nothing more than contracts to use the "Service"—that is, HSF's platforms. And any student, regardless of race, can use the Service on equal terms, including by accessing the website's public resources about navigating the college application process and finding scholarships. Because use of the Service is racially neutral—that is, because Student A and Student B may use the HSF website just as any other student can—these standard contracts cannot form the basis of a Section 1981 claim. *See Austin-Spearman v. AARP & AARP Servs. Inc.*, 119 F. Supp. 3d 1, 3 n.1 (D.D.C. 2015) (explaining that a "website's Terms of Service 'describe the terms and conditions that govern the relationship between the user of a Web site and its operator'" (quoting Jonathan D. Frieden, *Essential Elements of Effective Terms of Use*, 18 J. Internet L. 3 (2014)).

The Alliance also suggests that the Terms of Use and Privacy Policy make all students give up the same rights, but that HSF "give[s] only Hispanics all the benefits of the bargain, including the right to submit a non-futile application to the Scholars Program and the ability to access the parts of the website available only to Scholars." ECF No. 33, at 18. But each contract clarifies what benefits it confers upon users: use of the Service. Neither the Terms of Use nor the Privacy Policy say anything about the right to submit a non-futile application to the Scholar Program. A few examples demonstrate why this is so. On one hand, if an applicant fell below the relevant GPA requirement, was only a junior in high school, or attended a non-qualifying educational institution, he would have no contractual right to submit a non-futile application. On the other hand, an applicant who was facially eligible for the Scholar Program and had submitted a timely application but later learned that HSF had arbitrarily discarded her application could not bring a

breach of contract claim under the Terms of Use or the Privacy Policy because neither confers nor even implies a right to a certain level of review of an applicant's materials. Because the court cannot rewrite the plain text of the Terms of Use or the Privacy Policy contracts, it concludes that neither can form the basis for a Section 1981 claim. *See ABA*, 2026 WL 161596, at *6.

*b. Submission acknowledgment*

Next, the Alliance alleges that an applicant enters into a contract with HSF when he submits Phase I of the application, because he must "acknowledge and agree that all applications and submitted materials shall become the property of HSF and will not be returned to you." ECF No. 33, at 16 (quoting ECF No. 15 ¶ 37). According to the Alliance, this language requires students "to give HSF their intellectual-property, privacy, and other rights to the information in their applications and other materials in exchange for a chance to apply, be considered, and win." ECF No. 15 ¶ 37. HSF responds that this provision is not an offer to contract, but instead "simply inform[s] applicants that their applications 'will not be returned' and thus practically become HSF's property." ECF No. 19, at 27. HSF has the better argument.

In the other cases on which the Alliance relies involving Section 1981 challenges to diversity scholarships, the text of the contract makes clear that the parties exchanged consideration. The Alliance principally relies on *Fearless Fund*, which concerned a Section 1981 challenge to "an entrepreneurship funding competition open only to businesses owned by black women." 103 F.4th at 769. That case was made easy by express language in the original contract, explaining to applicants that "BY ENTERING THIS CONTEST, YOU AGREE TO THESE OFFICIAL RULES, WHICH ARE A CONTRACT." *Id.* (internal quotation marks omitted). The court concluded that, even after the defendant had altered that language, the contest still constituted a bargained-for exchange supported by sufficient consideration because, in exchange for the

opportunity to compete for $20,000, each applicant gave the defendant the right to use the ideas from her application without additional compensation, the right to use the applicant's "name, image, and likeness for public relations, advertising, promotional purposes," and a promise to indemnify the defendant for various liabilities and to arbitrate any disputes. *Id.* at 770, 775 (internal quotation marks omitted). Those terms clearly created adequate consideration because the defendant obtained the right to use the applicant's information for commercial and promotional purposes. *See id.* at 775. Similarly, in *ABA*, the plaintiff alleged that the scholarship application required that an applicant "grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application . . . [a]s consideration for such grant and for the opportunity to participate in the [program]." 2026 WL 161596, at *7 (internal quotation marks omitted). The court noted that, "[a]lthough the written release is not in the record, the amended complaint plausibly describe[d] the elements of a non-exclusive license granted to use copyrighted materials, that is, the applicant's essay and other written submissions." *Id.* at *8. Because that license constituted "sufficient consideration," the court concluded that the plaintiff had adequately pleaded an impaired contractual relationship under Section 1981. *Id.*

In contrast to *Fearless Fund* and *ABA*, the requirement that applicants to the HSF Scholar Program "agree that all applications and submitted materials shall become the property of [the] HSF and will not be returned to you," ECF No. 15 ¶ 37; *see Terms of Use Agreement*, HSF, *supra* n.3, does not *expressly* grant HSF any sort of license or right to use an applicant's materials for HSF's own purposes. Nor do the other "terms" on the list of terms and conditions help the Alliance's argument. In addition to agreeing to the Terms of Use and Privacy Policy, an applicant must also "certify that neither you nor any of your immediate family members . . . is an employee

of [the] HSF" and "that all information submitted is your own work and honestly presented," "acknowledge and agree that you are only eligible to receive one scholarship administered by [the] HSF per year," and after the disputed "property clause," acknowledge that once an applicant clicks "I agree" he will "officially submit [the] application" and he will "not be able to edit or change [the] application." ECF No. 40-1 at 4. None of these other provisions—save the above-described Terms of Use and Privacy Policy—confer any rights on HSF, and the clauses after the contested "property clause" cut against the Alliance's speculation that the terms and conditions confer on HSF a license to use the application materials in any way. *Cf. ABA*, 2026 WL 161596, at *8. Nor does the Alliance allege any other facts to show that the submission acknowledgment confers a license upon HSF. *Compare* ECF No. 15 ¶ 37, *with id.* ¶ 45 (alleging that the Fund a Scholar program requires a student to agree to grant HSF a license to use the student's name, voice, and likeness). Because the plaintiff bears the burden of "initially identify[ing] an impaired 'contractual relationship' under which the plaintiff has rights," *Domino's Pizza*, 546 U.S. at 476 (quoting 42 U.S.C. § 1981(b)), and the Alliance has not alleged facts sufficient to plead that any language at the submission stage of Phase I establishes a contractual relationship, the court concludes that this argument fails.

*c. Phase II essay submissions and whether a "contest" is a contract*

The Alliance next suggests generally that "[c]ontests are contracts" and that the application to the HSF Scholar Program is a contest. ECF No. 33, at 18-19. A contest certainly may be an offer for a unilateral contract, which the applicant accepts by entering, but only where the core elements of a contract are met. *See Newman v. Howard Univ. Sch. of L.*, 715 F. Supp. 3d 86, 103 (D.D.C. 2024) (noting that District of Columbia law requires "a meeting of the minds between the parties on all material terms, along with an intent by the parties to be bound," that is, "'an offer,

acceptance, and consideration'" (quoting *Bullard v. Curry-Cloonan*, 367 A.3d 127, 131 (D.C. 1976))). The court concludes that the application for the HSF Scholar Program is not a contract, because applicants must write essays just to compete for admission offers and thus cannot accept any potential contract by performance. In this way, the application is not a unilateral offer by HSF, but instead, at most, constitutes an invitation for students to make offers to contract.

To understand why, compare the situation here with a classic contracts case in which a store publishes an advertisement in a newspaper, stating: "Saturday 9 A.M. Sharp 3 Brand New Fur Coats Worth to $100.00 . . . First Come First Served $1 Each." *Lefkowitz v. Great Minneapolis Surplus Store, Inc.*, 86 N.W.2d 689, 690 (Minn. 1957). In *Lefkowitz*, the plaintiff was the first to show up to the store to participate in the deal, but the defendant refused to sell him a coat because he was a man and, "by a 'house rule[,]' the offer was intended for women only." *Id.* The court concluded that the advertisement was a unilateral offer that the plaintiff had accepted by showing up first because the advertisement "was clear, definite, and explicit, and left nothing open for negotiation." *Id.* at 691. Here, by contrast, HSF makes no commitments to any Scholar Program applicants until (1) it selects the preliminary winners and verifies their information and (2) the winning students accept their designations and sign a written pledge. *See* ECF No. 15 ¶¶ 16-17; 33; *see also Help Center (HSF Scholar Program selection)*, HSF, *supra* n.5. Thus, the question whether admission to the HSF Scholar Program is ultimately a contract or a gift remains unanswered at this stage of the process, meaning that this stage does not involve a contract at all.

But even at the point when HSF ultimately offers admission into the Scholar Program for a given year, that offer of admission is not compensation for services rendered, such that admission into the program could reasonably be construed as a contract. In *Robertson v. United States*, 343 U.S. 711 (1952), the Supreme Court considered whether the payment of a prize to the winner of a

music contest was a gift or a contract for income taxation purposes. There were several conditions to enter: each applicant was required to submit three symphonic works; none of the pieces could be published or performed until after the contest ended; and each applicant had to grant the Detroit Orchestra certain rights in the music. *Id.* at 712. Based on these criteria, the Court determined that "payment of a prize to a winner of a contest is the discharge of a contractual obligation" and "in no sense a gift." *Id.* at 713. The Court differentiated the case from a situation where "an award w[as] made in recognition of past achievements or present abilities, or if payment was given not for services . . . but out of affection, resect, admiration, charity, or like impulses." *Id.* at 713-14. Here, the HSF Scholar Program falls squarely into one of the hypothetical situations the *Robinson* Court distinguished: HSF awards "not for services . . . but out of . . . charity, or like impulses." *Id.*

Along similar lines, the application-stage essays do not convert ultimate admission into the HSF Scholar Program into a contract as payment for prior services rendered. That is because the application essays may help HSF select its scholars, but the essays do not afford any independent benefit to HSF. Rather, like any personal statement, the application essays reflect each applicant's past achievements and present abilities, for which HSF rewards some applicants. HSF is thus correct when it argues that the application essays alone do not transform ultimate admission to the scholarship program into a contract.

The cases on which the Alliance relies are consistent with the court's conclusion. *See* ECF No. 33, at 19. For example, the contest in *American Alliance for Equal Rights v. Founders First Community Development Corporation*, No. 4:24-CV-327, 2024 WL 3625684 (N.D. Tex. July 31, 2024), was a contract not simply because it involved a competition, but rather because, as the parties conceded, "the program offer[ed] contestants a grant in exchange for their time, intellectual property, and a promise to use the funds in a manner acceptable to [the defendant]." *Id.* at *3 n.7.

And in *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, No. 23-CV-3424, 2023 WL 6295121 (N.D. Ga. Sep. 27, 2023), *aff'd in part, rev'd in part and remanded*, 103 F.4th 765 (11th Cir. 2024), although the district court did conclude that the contest "operate[d] as a unilateral offer to contestants that they may accept by completing their entry," *id.* at *5, the Eleventh Circuit clarified that the contest was a "bargained-for exchange" and thus a contract because "a winning entrant obtains $20,000 and valuable mentorship and, in return, grants [the defendant] permission to use its name, image, and likeness for promotional purposes and agrees to indemnify [the defendant] [and] to arbitrate any disputes that might arise," *Fearless Fund*, 103 F.4th at 775. Accordingly, while many contests may constitute unilateral offers to contract that can be accepted by performance, *see* ECF No. 33, at 19, the court concludes that the essay-competition portion of the HSF Scholar Program is not independently sufficient to render the application process contractual.

### 2. Benefits to and obligations on HSF Scholars and subsequent opportunities to contract

The Alliance also argues that the HSF Scholar Program is contractual, and not a gift, because it confers benefits to and imposes obligations on Scholars upon admission and offers additional opportunities for Scholars to contract. The Alliance admits that while "a scholarship *can* be a noncontractual gift," it contends that "[i]n our modern world, most scholarships are contracts because they demand performance from students, and because sophisticated nonprofits require students to make various promises via rules, terms conditions, and other binding agreements." ECF No. 33, at 13. Specifically, the Alliance contends that HSF confers benefits on Scholars in the form of access to the HSF Insider and other career resources; imposes the obligation on Scholars to complete surveys; and provides additional contracting opportunities related to

conferences, HSF scholarships, and the Fund a Scholar Program. *See id.* at 20-24. The Alliance argues that each involves racially exclusionary contracts between HSF and the Scholars. The court addresses each argument in turn.

*a. The HSF Insider and other career resources*

HSF Scholars obtain "[e]xclusive access" to the "HSF Insider," a "proprietary platform" that "offers students exclusive internship and job opportunities with HSF corporate partners," ECF No. 15 ¶¶ 13, 46, as well as other career services, *id.* ¶ 47. The Alliance contends that HSF violates Section 1981 by providing these benefits only to HSF Scholars (and thus not to anyone who is non-Hispanic). *Id.* ¶¶ 76-77. HSF does not address the HSF Insider and other career resources in its motion to dismiss. *See generally* ECF No. 19, at 16-31. In its reply brief, HSF contends that this "programming is charitable in nature" and it receives no consideration for offering it. ECF No. 40, at 14. Raising the argument only in a reply is sufficient to forfeit the issue. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("We need not consider this argument because plaintiffs have forfeited it on appeal, having raised it for the first time in their reply brief."); *see also Lee v. Blinken*, No. 23-CV-1783, 2024 WL 639635, at *3 (D.D.C. Feb. 15, 2024) (explaining that "it is a 'basic precept that arguments generally are forfeited if raised for the first time in reply'" (quoting *Twin Rivers Paper Co. v. Sec. & Exch. Comm'n*, 934 F.3d 607, 615 (D.C. Cir. 2019))).

But even HSF's argument in its reply brief fails to fully respond to the Alliance's argument. The Alliance contends that HSF facilitates exclusive contracting opportunities with third-party corporate partners like banks or law firms. *See* ECF No. 15 ¶ 76; *see also* ECF No. 33, at 21-22. HSF's argument that it "receives no consideration," ECF No. 19, at 29, for hosting the HSF Insider or offering other career resources is non-responsive because the Alliance does not stake its claim

on the contention that access to the job bank creates a contract with HSF, but rather argues that HSF is liable for creating opportunities for HSF Scholars to contract with corporate partners on a racially exclusive basis. There may well be arguments that the mere facilitation of contracts between HSF and third parties is insufficient to bring HSF within Section 1981's ambit, but HSF makes none. "Because courts are 'essentially passive instruments of government,' [the parties must] 'frame the issues for decision.'" *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339, 342 (2026) (per curiam) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020)). Because HSF does not respond to this argument, the court deems it forfeited at this juncture.

*b. Surveys*

The Alliance also argues that the HSF Scholar Program is contractual because each Scholar "must agree to fill out 'periodic surveys' for HSF." ECF No. 15 ¶ 41. The Alliance appears to base this allegation on the Help Center page, which states that students selected as HSF Scholars are "required to sign" a pledge and "[a]dditionally . . . asked to complete periodic surveys." *See Help Center (HSF Scholar Program selection)*, HSF, *supra* n.5; see ECF No. 15 ¶ 41 (quoting the same language). Curiously, HSF does not argue that the non-mandatory phrase "asked to complete periodic surveys" is insufficient to establish that students make any sort of return promise in exchange for participation in the Scholar Program.

HSF instead argues only that the surveys are not contractual because the "benefit of filling out the surveys is to the Scholars, not to HSF." ECF No. 19, at 29. HSF also makes a general assertion that "filling out some surveys periodically is not the type of consideration required to form a contract," and that "a mere promise to fill out surveys is far from meeting any element of a contract." *Id.* at 30. Both arguments contravene core principles of contract law. First, the fact that HSF believes that the obligation it imposes on Scholars is in the students' best interest is

irrelevant: consideration requires only a return promise, *see* Restatement (Second) of Contracts § 71 (Am. L. Inst. 1981), and HSF does not dispute that the Scholars "promise" to fill out surveys in exchange for participation in the program, ECF No. 19, at 30; *see* ECF No. 33, at 21 ("Under fundamental principles of contract law, courts do not even permit inquiry into the adequacy of the consideration for a promise or a transfer." (internal quotation marks omitted) (quoting *ABA*, 2026 WL 161596, at *6)).

Taking as true the Alliance's allegation that HSF Scholars "must agree" to fill out these surveys, the students are promising to perform a task—completing surveys "which will provide HSF with insight on the profile and needs of [their] Scholars"—"in exchange for continued participation in the Scholar Program." *Help Center (HSF Scholar Program selection)*, HSF, *supra* n.5; *see* ECF No. 15 ¶ 41. As the Alliance notes, courts have long recognized that a party's performance or forbearance constitutes consideration even if the other party believes that the performance or forbearance is in the best interest of the performing party. ECF No. 33, at 21 (citing *Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1891)). Under District of Columbia law, "'[a]n exchange of promises' or a 'detriment to the promisee' constitutes legally sufficient consideration, 'so long as it is bargained-for.'" *Wash. Inv. Partners of Del., LLC v. Sec. House, K.S.C.C.*, 28 A.3d 566, 574 (D.C. 2011) (quoting *Pearsall v. Alexander*, 572 A.2d 113, 118 (D.C. 1990)); *see* Restatement (Second) of Contracts § 75.

Second, and relatedly, "the adequacy of consideration is not a matter for the court to determine." *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1198 (D.C. Cir. 2018); *see CD Int'l Enters., Inc. v. Rockwell Cap. Partners, Inc.*, 251 F. Supp. 3d 39, 43 (D.D.C. 2017) ("In determining whether a valid contract exists, [courts] will not inquire into the adequacy of consideration, even where it is arguably slight, as long as it is legally sufficient." (alteration in

original) (quoting *Wash. Inv. Partners of Del. LLC*, 28 A.3d at 574)). Thus, to the extent that HSF wishes to argue that "filling out some surveys periodically is not the type of consideration required to form a contract" because it is insufficiently burdensome, that type of argument fails as a matter of law. *See ABA*, 2026 WL 161596, at *6 ("Applied here, this principle means that this court cannot accept the [defendant's] invitation to compare the amount of money the [defendant] awards [scholarship] winners to the value of the consideration the [defendant] received in return.").

*c. Conferences*

HSF Scholars are eligible to "attend exclusive Scholar Conferences, including the National Leadership Conference, STEM Summit, Finance Conference, Media and Entertainment Summit, Entrepreneurship Summit, and Healthcare Summit." ECF No. 15 ¶ 48. The Alliance argues that students enter into contractual relationships with HSF when they attend these conferences because students must "confirm" that they will "attend" the conference "in its entirety" and "complete the required homework assignment prior to the conference." *Id.* Scholars who renege on this agreement are "responsible for covering 100% of the costs incurred by HSF," including travel, lodging, and three meals per day. *Id.* As with the HSF Insider and other career resources, HSF does not address these conferences in its motion to dismiss the Alliance's Section 1981 claim, *see generally* ECF No. 19, at 16-31, and generally alleges in its reply brief that the conferences are "programming [that] is charitable in nature and is a gift just like the rest of the Scholar Program." ECF No. 40, at 14. The argument is thus forfeited. *See Am. Wildlands*, 530 F.3d at 1001; *see also Lee*, 2024 WL 639635, at *3. But the argument is also nonresponsive to the Alliance's specific factual allegation that HSF Scholars must promise certain performance in exchange for their funded attendance at these conferences, satisfying the basic requirements for a contract. Nor does HSF dispute that this opportunity to contract is gated by an ethnicity requirement, since only HSF

Scholars are eligible to attend these conferences. *See infra* pp. 35-36. The Alliance thus may proceed on this theory.

d. *HSF Scholarship Funds*

As part of the HSF Scholar program, HSF selects a subset of Scholars to receive a scholarship between $500 and $5,000. The Alliance alleges that HSF requires these Scholars to "'us[e]' the monetary award 'for tuition, fees, books, and other academic related supplies, as well as for room/board and transportation expenses related to school.'" ECF No. 15 ¶ 44 (alteration in original) (quoting *Help Center (General)*, HSF[12]). Thus, according to the Alliance, HSF restricts opportunities to contract for these monetary scholarships on the basis of race because the opportunities are limited to HSF Scholars, and non-Hispanic students are precluded from becoming HSF Scholars. *See* ECF No. 15 ¶ 76. HSF argues both that "there are no requirements as to when the funds are used, or limited items upon which the funds are used," ECF No. 19, at 19-20, and in the alternative, that a condition setting permissible uses of the funds would not convert the gift into a contract, *id.* at 20-21. While the Alliance offers extremely thin factual allegations, the court must construe those allegations in the light most favorable to the Alliance, and thus concludes that the Alliance's theory may give rise to Section 1981 liability.

In response to the question "What may the scholarship funds . . . be used for?", the Help Center page explains that "[s]cholarship funds may be used for" those previously listed school-related expenses. *Help Center (General)*, HSF, *supra* n.12. The Alliance alleges that students "must" use the funds on these expenses, but it does not make clear when or whether students in fact make this promise. *See* ECF No. 15 ¶ 44; *see also* Restatement (Second) of Contracts § 1

[12] *Available at* https://perma.cc/9VFT-HQK5.

(defining a contract as "a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes as a duty"). Taking as true the Alliance's factual allegation that Scholars "must" use the funds under the conditions laid out on the HSF's Help Center Page, the students' promise would constitute consideration and would thus confer contractual rights on students. "Courts have found that a promise 'to use the gift for an express purpose and not for any other purpose' 'tend[s] to demonstrate that consideration was given for the gift.'" *PeaceTech Lab, Inc. v. C5 Accelerate LLC*, No. 20-CV-922, 2021 WL 106718, at *5 (D.D.C. Jan. 12, 2021) (alteration in original) (quoting *Mass. Eye & Ear Infirmary v. Eugene B. Casey Found.*, 417 F. Supp. 2d 192, 197 (D. Mass. 2006)). To the extent that there is a factual dispute whether HSF indeed requires students to promise to use their funds on certain conditions, that dispute is better reserved for after discovery.

*e. Fund a Scholar*

The Alliance alleges that HSF Scholars gain "[e]ligibility to participate in HSF's Fund A Scholar Program, a public-facing platform that allows individuals to donate directly to HSF Scholars through HSF." ECF No. 15 ¶ 45. The Alliance points to two contracts implicated by the Fund a Scholar program: (1) HSF Scholars must agree to a separate Terms of Use Agreement to access the Fund a Scholar platform, *id.*; *see Fund a Scholar Terms of Use Agreement*, HSF *supra* n.9, and (2) Scholars that receive funding through the program are third-party beneficiaries to the contract between HSF and the Fund a Scholar program's donors, *id.*; and it argues that both opportunities to contract are impaired by racial discrimination because they are limited to HSF Scholars, and thereby necessarily limited to Hispanic students. ECF No. 33, at 22-23. HSF responds that the Terms of Use for the Fund a Scholar Program is no different than the Terms of

Use to access the HSF's website, and that the Fund a Scholar program is "a gift or donation," not a contract. ECF No. 19, at 29. The court agrees with the Alliance.

First, unlike the Terms of Use and Privacy Policy to access HSF's website, *see supra* pp. 21-24, the court has little trouble concluding that the Terms of Use to access the Fund a Scholar platform forms the basis for a Section 1981 claim because HSF Scholars must make several promises in exchange for the ability to use the platform, and the platform is available only to Scholars and thus unavailable to all non-Hispanic students. To access the Fund a Scholar platform, a Scholar must "expressly grant" HSF a "royalty-free" and "perpetual . . . worldwide license to use, reproduce," "publicly display, and make derivative works of" all content that the scholar posts on the Fund a Scholar platform, as well as a license for HSF to use "[the applicant's] name voice and likeness . . . for use in connection with the Platform and HSF's . . .business." *Fund a Scholar Terms of Use Agreement*, *supra* n.9. Additionally, HSF Scholars seeking to use the platform must agree to standard contractual provisions including a promise to "indemnify or hold harmless HSF from liability." *Id.* And HSF Scholars and Fund a Scholar donors must agree that that "[a]ll donations are charitable gifts to HSF and become the exclusive property of the organization," that HSF will take 10% of the donated funds and provide 90% to the HSF Scholar, and that HSF "retains full discretion and authority to reallocate funds" for "any reason." *Id.* These promises constitute sufficient consideration, and HSF offers no real argument to the contrary. Indeed, HSF concedes that similar license grants constituted sufficient consideration in other cases. ECF

No. 40, at 5; *see ABA*, 2026 WL 161596, at *7-8; *Fearless Fund*, 103 F.4th at 775. The Fund a Scholar Terms of Use Agreement is thus a contract.[13]

HSF also suggests that it does not contract with the HSF Scholars who participate in the Fund a Scholar program because it does not guarantee that they will receive any money. ECF No. 19, at 29. That argument makes little sense because, in HSF's own words, HSF Scholars bargain for "access to the platform" through which they may receive donations, not for funds that HSF provides. *Id.* at 27-28. If a seller of goods contracted with another entity to display the goods for sale, the existence of the contract would not depend on whether any third parties chose to buy the goods—the promise to grant use of the platform would constitute sufficient consideration. *See supra* p. 32 (explaining that courts do not probe into the adequacy of consideration so long as it is legally sufficient).

Perhaps realizing the weakness of its position concerning the contractual nature of the Fund a Scholar Program, HSF quickly pivots to the argument that the Fund a Scholar Program does not violate Section 1981 because "is based on a person's status as an HSF Scholar and unmet financial need as determined by HSF." ECF No. 19, at 28. But HSF does not dispute that all non-Hispanic people are categorically barred from this contracting opportunity because only Hispanic people are eligible to become HSF Scholars, and only HSF Scholars are eligible for the Fund a Scholar Program. *See generally* ECF Nos. 19, 40. The ethnicity requirement is thus apparent from a quick two-step—hardly the significant attenuation HSF attempts to conjure.

---

[13] Because the court concludes that the Fund a Scholar program creates a contract between students and HSF, it need not reach the Alliance's argument that students can assert contractual rights as third-party beneficiaries of the HSF-donor relationship. *See* ECF No. 33, at 23.

The Alliance illustrates the problem by reference to *Watson v. Fraternal Order of Eagles*, 915 F.2d 235 (6th Cir. 1990). In *Watson*, a Black mother and son were invited to a party at a social club owned by an all-male social group with 700 members, none of whom were Black. *Id.* at 237. Other non-members were able to purchase drinks at the bar without needing to prove their membership, but when the Watsons attempted to purchase soft drinks at the bar, the defendant asked them to leave "to avoid having to contract with [them]" by selling them the drinks. *Id.* at 243. The court held that the defendant's refusal to serve the plaintiffs violated Section 1981 because "no white guests were removed from the club in order to prevent them from purchasing soft drinks." *Id.*

*Watson* is not on all fours with this case, because the relevant comparators there were the other non-member guests, not members in an organization from which the Watsons were excluded. *See id.* Nonetheless, the Alliance's reliance on the case is well-taken. HSF cannot end-run Section 1981 by stating that the Fund a Scholar program provides an equal opportunity for HSF Scholars to contract when it limits who can become an HSF Scholar in the first instance on the basis of race. Recall *Runyon*, where the Court concluded that private schools who refused to admit Black students engaged in "classic" violations of Section 1981. 427 U.S. at 172. On HSF's theory, the defendants could have escaped liability simply by creating an organization available only to white people and then administering a private school open only to members of that organization. Section 1981 is not so feeble.

### 3. Section 1981 and the First Amendment

Finally, HSF argues that if the court has any "doubt that the HSF Scholar Program should be understood as charitable gift-giving, the First Amendment places a heavy thumb on the scale." ECF No. 19, at 22. The court is not entirely certain what HSF means by this. HSF seems to assert

that because its primary intent is expressive or charitable, then its conduct necessarily falls outside of Section 1981's ambit. *See id.* at 22-23 (arguing that awarding scholarships is "expressive conduct" and the alleged "indicia of contract . . . cannot transform HSF's expressive intent in granting recognition through the Scholar Program into a contract"). The court does not doubt HSF's sincere charitable intent. But "[e]ven where both parties know that the transaction is in part a bargain and in part a gift, the element of bargain may nevertheless furnish consideration for the entire transaction" and courts "ordinarily" refrain from "inquir[ing] into the adequacy of consideration, particularly where one or both of the values exchanged are difficult to measure." Restatement (Second) Contracts § 71 cmt. Despite HSF's charitable intent, the court may not compare the value of students' consideration to the value of HSF's consideration, so long as it is legally sufficient. *See supra*, p. 32. And while the First Amendment protects expressive conduct, the Supreme Court has already rejected the notion that it conflicts with Section 1981. In *Runyon*, the Court "assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions." 427 U.S. at 176. But the Court clarified that "it does not follow that the [p]ractice of excluding racial minorities from such institutions is also protected by the same principle." *Id.*; *see Norwood v. Harrison*, 413 U.S. 455, 470 (1973) (noting that, although "private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, . . . it has never been accorded affirmative constitutional protections").

### C. Title VI (Count II)

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. HSF argues that it is not subject to Title VI because it receives no "Federal financial assistance" and because it is not a "program or activity." ECF No. 19, at 31 & n.7. The Alliance does not argue that federal funds are disbursed to HSF. Instead, it argues that HSF receives "exclusive access to FAFSA data" and, because that data is of value, HSF qualifies as a "program . . . receiving Federal financial assistance." ECF No. 15 ¶¶ 84, 88; *see* ECF No. 33, at 26-28. Having weighed the parties' arguments, the court concludes that the federal government's disclosure of FAFSA data to HSF is insufficient to bring HSF within Title VI's ambit.

As the parties agree, federal financial assistance must involve an "*economic* benefit provided by the federal government." ECF No. 19, at 32; *see* ECF No. 33, at 26; *see also Federal Financial Assistance*, Black's Law Dictionary (12th ed. 2024). The Alliance contends that the "FAFSA data have economic benefit to HSF because it uses them to run its flagship scholarship program." ECF No. 33, at 26. This both eschews common sense and seeks an unreasonably large expansion of the phrase "federal financial assistance." First, what "assistance" does the FAFSA data provide to HSF? Taking the Alliance's factual allegations as true, HSF uses the data to decide how to administer its scholarships, which are awarded based on each student's financial need. ECF No. 15 ¶ 91. But the court sees no well-pleaded allegation that the data is of "economic benefit" to HSF. The Alliance never alleges that, in the absence of the disclosure of FAFSA information, HSF would incur specific costs to ascertain the financial need of each student. Indeed, it appears that HSF's access to FAFSA data primarily benefits students with financial need, who can more easily demonstrate their status.

The Alliance points to cases construing criminal statutes in which courts have noted that information can be a "thing of value." ECF No. 33, at 27. True, but the words "thing of value" are "found in so many criminal statutes throughout the United States that they have in a sense become words of art." *United States v. Girard*, 601 F.2d 69, 71 (2d Cir. 1979) (noting that a "thing of value" under criminal extortion and bribery laws may include "the promise of sexual intercourse," "an agreement not to run in a primary election," or "the testimony of a witness"). Congress chose not to use that term of art in Title VI; it instead used the much narrower phrase "federal financial assistance." And the dicta the Alliance cites in *U.S. Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597 (1986), is not to the contrary. In *Paralyzed Veterans*, the Court held that the third-party beneficiaries of federal financial assistance—commercial airlines that benefited from airports' receipt of federal grant money—were not subject to the Rehabilitation Act because they were not the intended recipients of the federal financial assistance. *Id.* at 607-10.[14] The Court explained, in the footnote on which the Alliance relies, that courts should not understand its holding "to say that Congress could not give federal financial assistance in the form of property improvements, such as a runway." *Id.* at 607 n.11. Rather, courts deciding whether an entity receives "federal financial assistance" should "start[]" with "the grant statute" and identify the recipient of the "money" or "whatever thing of value is extended by the grant statute." *Id.* The court declines to conclude that the Supreme Court's offhand, footnoted use of the phrase "thing of value" implicitly imported the criminal-law definition of "thing of value" into Title VI's definition of "federal financial assistance." *See Royal*

---

[14] Like Title VI, the Rehabilitation Act applies to entities that receive "[f]ederal financial assistance." 29 U.S.C. § 794.

*Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 42 (2025) (declining to follow dictum in a "barely reasoned" footnote that was "outside of the issue being decided" in the case).

The Alliance's reliance on *Kamen v. AT&T Co.*, 791 F.2d 1006 (2d Cir. 1986), is similarly misplaced. The Second Circuit did not hold in *Kamen* that "arrangements providing service [and] research" qualify as "federal financial assistance," as the Alliance suggests, *see* ECF No. 15 ¶ 88 (alterations in original) (quoting *Kamen*, 791 F.2d at 1013); rather, the court held that the plaintiff's argument was not so groundless as to be *sanctionable*, *see Kamen*, 791 F.2d at 1013 (expressly noting that its holding was "not to say" that the defendants were "necessarily subject to suit," but merely that the plaintiff's argument was not "unreasonable").

The plain text of Title VI—and the parties' own dictionary definitions—make clear that Title VI applies only to entities that receive monetary assistance or a close substitute from the federal government. Because the Alliance fails to allege facts showing that HSF receives federal funds or other "financial assistance," the court dismisses Count II.[15]

### D. State-law claims (Counts III and IV)

The Alliance also alleges discrimination in violation of the DCHRA (Count III) and the California Unruh Civil Rights Act (Count IV). As to those claims, the Alliance seeks to invoke the court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, which permits the court to hear state-law claims that form part of the "same case or controversy" as the federal claims. ECF No. 1 ¶ 127. Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine*

[15] Because the court dismisses Count II based on the Alliance's failure to allege that HSF receives "federal financial assistance," the court need not reach the HSF's alternative argument that the HSF Scholar Program is not a "program or activity" within the meaning of Title VI. *See* ECF No. 19, at 31 n.7.

*Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Thus, even where a plaintiff's claims arise out of a common nucleus of operative facts, a court "may decline to exercise supplemental jurisdiction" over a claim if it "raises a novel or complex issue of State law." 28 U.S.C. § 1367(c); *see Edmonson & Gallagher v. Alban Tower Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C. Cir. 1995) (noting that each of the listed bases under Section 1367(c) is "independently sufficient" for the court to decline supplemental jurisdiction). "The Supreme Court has counseled that 'the proper function of [a] federal court is to ascertain what the state law is, not what it ought to be; and [the D.C. Circuit] ha[s] observed that 'a federal court should be reluctant to retain pendent jurisdiction over a question for which state jurisprudence gives inadequate guidance.'" *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 932 (D.C. Cir. 1996) (first alteration in original) (first quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498 (1941); then quoting *Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C. Cir. 1982)). When deciding whether to decline supplemental jurisdiction, courts consider factors including judicial economy, convenience, fairness, and comity. *Edmondson & Gallagher*, 48 F.3d at 1266.

First, the court disposes of HSF's argument that the court lacks supplemental jurisdiction. *See* ECF No. 19, at 38-40. The court concludes that the Alliance's state-law claims are "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). The Alliance's federal- and state-law claims arise out of a common nucleus of operative facts: that students who are not Hispanic seek to apply to the HSF Scholar Program but are barred by an ethnicity requirement that the Alliance contends is unlawful. A case in which the plaintiff alleges that the "same or similar facts" violate "'parallel federal and state laws,'" such as "laws prohibiting discrimination," provides "[t]he clearest case for supplemental jurisdiction." *Joyner*, 140 F.4th at 536 (quoting *Lindsay v. Gov.*

*Emps. Ins. Co*, 448 F.3d 416, 424 (D.C. Cir. 2006)). HSF argues that the closest analogue to the DCHRA is Title VII, not Title VI, so they are not "parallel" statutes. ECF No. 40, at 20. But both the DCHRA and Title VI are "laws prohibiting discrimination," *id.*, and, more importantly, the Alliance's claims under both laws arise from the same set of factual allegations. HSF also argues that the state-law claims turn on different issues than the federal-law claims. ECF No. 19, at 39-40. That argument may factor in the court's discretionary decision whether to exercise supplemental jurisdiction, but it does not deprive the court of supplemental jurisdiction. The court thus proceeds to evaluate whether the Alliance's DCHRA and CUCRA claims present novel or complex issues of state law and then assesses whether the court should decline to exercise supplemental jurisdiction on that basis.

**1. District of Columbia Human Rights Act (DCHRA)**

The DCHRA prohibits entities including "employment agenc[ies]," D.C. Code § 2-1402.11(a)(2); "educational institution[s]," *id.* § 2-1402.41(1); and "place[s] of public accommodations," *id.* § 2-1402.31(a), from engaging in racial discrimination. The Alliance argues that HSF is liable under the DCHRA because it qualifies as at least one of those three types of entities. ECF No. 15 ¶¶ 94-107. HSF argues first that the court should decline to exercise supplemental jurisdiction because the Alliance's claims present novel issues, ECF No. 19, at 40-41, and, in the alternative, that the Alliance fails to state a claim under the DCHRA, *id.* at 42-44. HSF contends that the Alliance's claim is novel because "[n]o District of Columbia Court has held that a nonprofit that offers scholarships and other benefits to students is an employment agency, educational institution, or public accommodation under the DCHRA." *Id.* at 40-41. As the Alliance points out, not every novel application of a law will require resolution of a novel legal issue—some claims may simply be wrong, while others may clearly be permissible

despite involving unusual facts. *See* ECF No. 33, at 40. Here, because the Alliance's claim is neither expressly foreclosed nor expressly covered by existing caselaw, the court concludes that comity and fairness strongly militate towards declining to exercise supplemental jurisdiction.

The Alliance first argues that HSF is an "employment agency" because it helps Scholars obtain internships and jobs, holds job fairs, and maintains an internal portal of job listings with corporate partners. ECF No. 15 ¶¶ 96-98; ECF No. 33, at 31-33. HSF does not fall within a common-sense definition of an employment agency, yet the Alliance argues that HSF's job-related resources and functions, taken together, establish that it "regularly undertak[es] or attempt[s] . . . to procure employees for an employer or to procure for employees, opportunities to work for an employer." D.C. Code § 2-1401.02(11). To be sure, HSF touts benefits including access to an exclusive platform "which shares invaluable information and career opportunities" and "[c]areer services" that include assisting Scholars with "getting internships and full-time job opportunities." ECF No. 15 ¶ 13; *see 2026 HSF Scholar Program Application*, HSF, *supra* n.5. But the Alliance cannot point to any courts that have interpreted the phrase "employment agency" either under District of Columbia law or under the analogous Title VI to include a nonprofit that offers basic career resources. At best, the Alliance cites an out-of-circuit case in which a district court deemed a vocational training program to be an "employment agency" because the agency "billed itself as a highly intensive occupational training program with the end result being employment in the field" and "actively assist[ed] participants in the job search process" which it "required" participants to "actively pursue." *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1292 (M.D. Ala. 2010) (internal quotation marks omitted); *see* ECF No. 33, at 32. The lack of precedent may not doom the Alliance's argument on the merits, but it surely renders the claim novel.

The Alliance next argues that HSF is an "educational institution." ECF No. 15 ¶ 101; ECF No. 33, at 33-34. An "educational institution" under the DCHRA includes "any public or private institution including an academy, college, elementary or secondary school, extension course, kindergarten, nursery, school system or university; and a business, nursing, professional, secretarial, technical, or vocational school; and includes an agent of an educational institution." D.C. Code § 2-1401.02(8). The Alliance contends that HSF is an "academy," "extension course," and "professional training program." ECF No. 33, at 33; *see* ECF No. 15 ¶ 101. It points to its allegations that HSF offers "educational courses and trainings," such as a "College 101 course" that teaches students "how to apply to college, find scholarships and grant money, thrive in college, and transition to a career." ECF No. 15 ¶ 101; *see* ECF No. 33, at 33. It asserts that HSF has a "curriculum" because it offers the same courses on a repeated basis, and that students receive an "'indicia of accomplishment'" when they "graduate from HSF's scholars program" because they are "welcomed into the community of HSF alumni, where they have the opportunity to participate in alumni programs." ECF No. 33, at 34 (quoting *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1383 (D.C. 1981)). The court again concludes that accepting the Alliance's arguments would require an expansion beyond the plain text of the DCHRA and existing cases interpreting it. Indeed, the only case that the Alliance cites—*U.S. Jaycees*, 434 A.2d 1379; *see* ECF No. 33, at 33-34—is over forty years old and stands for the proposition that a voluntary membership organization touting itself "as a supplementary education institution to provide (young men) with opportunity for personal development and achievement" is *not* an educational institution, *U.S. Jaycees*, 434 A.2d at 1383 n.8. The Alliance's argument that HSF presents a closer case than the closest analogue is precisely the type of novel argument ill-suited for resolution by this court.

Finally, the Alliance argues that HSF is a "place of public accommodation." ECF No. 15 ¶ 105; ECF No. 33, at 34-35. The DCHRA defines a place of public accommodation as "any person or place that provides, to a person in the District, access to an accommodation, service, or good, whether or not that person or place maintains a physical location in the District or charges for those goods or services." D.C. Code § 2-1401.02(24). The definition then includes a long list of examples. The parties dispute whether the list is exhaustive or illustrative and whether nonprofits are similar to any of the listed examples. HSF argues that "a nonprofit . . . that merely operates a website accessible from [the District]" is not a public accommodation, ECF No. 40, at 22-23, and also relies on *U.S. Jaycees* as the sole case to support its argument. But *U.S. Jaycees* predates relevant statutory amendments expanding the definition of public accommodations under the DCHRA by clarifying both that a "physical location in D.C. is not required" and that "[a]n entity need not necessarily charge for goods or services to constitute a place of public accommodation." *"Place of Public Accommodation" Under the D.C. Human Rights Act*, D.C. Office of Human Rights.[16] For its part, the Alliance argues that the DCHRA must be "generously construed," ECF No. 33, at 31, and it relies on federal caselaw to suggest that the statute's list of examples is non-exhaustive, *id.* at 34-35 (first citing *Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 180 (D.D.C. 2014); then citing *James v. Team Wash., Inc.*, No. 97-CV-00378, 1997 WL 633323, at *2 (D.D.C. Oct. 7, 1997)). As the parties' arguments suggest, the Alliance's contention that HSF is a "place of public accommodation" raises novel arguments that are better resolved in the District's local courts.

---

[16] *Available at* https://perma.cc/R2V2-A58S.

Despite the novelty of its DCHRA claims, the Alliance contends that considerations of judicial economy, fairness, and comity favor the court's exercise of supplemental jurisdiction. ECF No. 33, at 40-41. The court recognizes that declining to exercise supplemental jurisdiction over the Alliance's DCHRA claims may result in the Alliance filing suit in the Superior Court of the District of Columbia. But judicial economy nevertheless presents "no serious counterweight" where, as here, the court "has invested virtually no time" on the state law issues and there has been "no trial of the [state] law claims, and little analysis." *Edmonson & Gallagher*, 48 F.3d at 415. And the D.C. Circuit has emphasized that "a federal court should be reluctant to retain pendent jurisdiction over a question for which state jurisprudence gives inadequate guidance." *Women Prisoners of D.C. Dep't of Corr.*, 93 F.3d at 922. "Given that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law,' and out of an abundance of deference to the District of Columbia courts, this [c]ourt should decline to address" the Alliance's DCHRA claims. *Wisey's #£1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 192 (D.D.C. 2013) (first alteration in original) (quoting *Gibbs*, 383 U.S. at 726).

What is more, the Alliance will suffer no prejudice from a dismissal because the supplemental jurisdiction statute "not only provides for a thirty-day grace period for refiling in state court," but also "stops the clock on any otherwise-applicable limitations period during the pendency of the federal-court suit." *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 191 (D.D.C. 2018); *see* 28 U.S.C. § 1367(d); *Artis v. District of Columbia*, 583 U.S. 71, 74-77 (2018). The court accordingly declines to exercise supplemental jurisdiction over Count III and dismisses the claim without prejudice.

**2. California Unruh Civil Rights Act (CUCRA)**

The CUCRA provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter their . . . race, . . [or] ancestry, . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The Alliance argues that HSF is a "business establishment" under the CUCRA and is thus subject to its antidiscrimination provision. ECF No. 15 ¶¶ 110-113; ECF No. 33, at 36-38. HSF argues that the court should decline to exercise supplemental jurisdiction over this novel claim, ECF No. 19, at 41, or in the alternative, that HSF is not a "business establishment" and is thus not subject to the CUCRA, *id.* at 44. The Alliance argues that this issue is neither novel nor complex because "[t]he determination of what constitutes a 'business establishment' under the Unruh Civil Rights Act is an oft-litigated issue." ECF No. 33, at 41 (quoting *Harrison v. City of Rancho Mirage*, 243 Cal. App. 4th 162, 173 (Cal. Ct. App. 2015)). The court again concludes that prudential factors counsel in favor of declining supplemental jurisdiction.

"While the phrase 'all business establishments of every kind whatsoever' must be interpreted as broadly as reasonably possible, its scope remains limited to entities acting as private business establishments." *Brennon B. v. Superior Ct.*, 513 P.3d 971, 980 (Cal. 2022). That is, "in order to be a 'business establishment' under the Act—an entity must operate as a business or commercial enterprise when it discriminates." *Id.* at 981. The Alliance correctly notes that a nonprofit may qualify as a business establishment and argues that HSF is a business establishment because it employs paid staff and publishes an official directory of its corporate partners. *See* ECF No. 15 ¶¶ 111-113; ECF No. 33, at 37. But the California Supreme Court has since narrowed several of the cases on which the Alliance relies. *Compare* ECF No. 33, at 36-38, *with Brennon*

*B.*, 513 P.3d at 980-82. In *Brennon B.*, the California Supreme Court analyzed the CUCRA's applicability to a public school district. 513 P.3d at 974. In so doing, the Court emphasized the limitations on its prior holdings (including the ones on which the parties rely) that nonprofits may constitute business establishments. *See id.* at 679-82. Although the Alliance argues that this court could easily decide how the CUCRA applies in a new context simply by "reason[ing] by analogy" to other cases, ECF No. 33, at 42, that is not how California courts approach such questions. Instead, those courts look to "the statute's purpose, legislative history, and public policy" to determine its scope. *Brennon B.*, 513 P.3d at 977. Those modes of analysis rely on California state law and history and are better addressed by a California court. In the wake of *Brennon B.*, the scope of CUCRA's application to nonprofits remains unsettled. The Alliance may well have persuasive arguments in favor of construing the CUCRA to cover HSF and similar nonprofits. But this court is ill-suited to pick and choose among those arguments in the absence of controlling precedent. "[T]he degree of uncertainty in state law . . . should be given considerable weight" as a factor to "guide the District Court's discretion" in whether to exercise supplemental jurisdiction. *Fin. Gen. Bankshares, Inc. v. Metzger*, 680 F.2d 768, 776 (D.C. Cir. 1982) (holding that the district court abused its discretion in exercising supplemental jurisdiction despite the "novel and unsettled nature of" local law). Here, as evinced by the parties' dueling case citations, the state of the CUCRA—one of California's landmark statutes—remains in substantial flux. "[A]n authoritative state court ruling on the [novel state-law] claim should be permitted, instead of a guess or uncertain prediction by a federal court." *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1085-86 (10th Cir. 2011) (quoting *Roe v. Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d 1221, 1237 (10th Cir. 1997)); *see S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 542 (4th Cir. 2002) (Traxler, J., concurring) ("The federal courts should be wary about extending state

statutes into territories of state law previously untouched by those statutes, especially when a federal court is asked to extend a particular state statute to cover a particular set of circumstances and the state courts themselves have questioned the propriety of doing so."); *see also Schlagel v. Disc. Tire Co. of Colo., Inc.*, No. 23-CV-2909, 2025 WL 316549, at *13 (D. Colo. Jan. 28, 2025) (declining to exercise supplemental jurisdiction over an issue of Colorado state law where the Colorado Supreme Court had "not yet issued any controlling authority on the issue," nor had the lower courts provided "persuasive guidance"). The court declines to exercise supplemental jurisdiction over Count IV and dismisses it without prejudice.

## V. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss, ECF No. 19, is **GRANTED** to the extent that Count II is **DISMISSED** with prejudice and Counts III and IV are **DISMISSED** without prejudice, but the motion is otherwise **DENIED**. It is further **ORDERED** that Defendant shall file an answer to Count I on or before October 14, 2026.

LOREN L. ALIKHAN
United States District Judge

Date: September 30, 2026